Exhibit F

Page 1

Gagosian

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------x

PATRICK CARIOU,

         Plaintiff,    Index No.:

  vs.                08 CIV 11327 (DAB)

RICHARD PRINCE, GAGOSIAN

GALLERY, INC., LAWRENCE

GAGOSIAN, and RIZZOLI

INTERNATIONAL PUBLICATIONS,

INC.,

         Defendants.

---------------------------------x


VIDEOTAPED DEPOSITION OF LAWRENCE GAGOSIAN

New York, New York

Thursday, October 8, 2009


Reported by:
Bryan Nilsen, RPR
JOB NO. 304041

124f62dc-aafd-4b4d-8d4d-6238fe654739

Page 14

1           Gagosian
2      Q.   It comes back to your recollection?
3      A.   No, I remember the matter, I just
4  didn't remember whether it was a lawsuit. It
5  was a complicated thing. I really don't
6  remember exactly.
7           I was deposed. I remember that.
8  That's what I told you.
9      Q.   So this is a case in which you were
10 deposed?
11     A.   I was deposed, yes.
12     Q.   And when I say this I'm referring to
13 Plaintiff's Exhibit 47.
14     A.   That's correct.
15     Q.   Okay, thank you.
16          What is your occupation?
17     A.   I'm an art dealer.
18     Q.   Now, in this case, the one that
19 you're here for today, you're a defendant, you
20 already said that, correct?
21     A.   Yes.
22     Q.   And Gagosian Gallery Inc. is a
23 defendant, is that your understanding?
24     A.   Yes.
25     Q.   Is Gagosian Gallery Inc. a

Page 15

1           Gagosian
2  corporation?
3      A.   Yes.
4      Q.   Do you know in what state it's
5  incorporated?
6      A.   I think New York.
7      Q.   And where is its principal place of
8  business, if you know?
9      A.   980 Madison avenue.
10     Q.   Now, at the beginning of this
11 deposition you were asked for your residence
12 address.
13     A.   I was asked for my address.
14     Q.   Okay.
15     A.   I don't think he said residence.
16     Q.   I'm asking you, what's your
17 residence address?
18     A.   147 East 69th Street.
19     Q.   In Manhattan?
20     A.   Manhattan.
21     Q.   Is 980 Madison Avenue the principal
22 place of business of Gagosian Gallery?
23     A.   Yes, it is.
24     Q.   Is it a gallery or offices or both?
25     A.   Galleries have offices.

Page 16

1           Gagosian
2      Q.   But there is a gallery at that --
3      A.   Yeah.
4      Q.   -- location? Okay.
5           I know you're trying to answer my
6  question, but try to wait until I'm finished.
7  Your lawyer may want to object, and also the
8  court reporter, if we're talking over each
9  other, he won't be able to get my question or
10 your answer.
11     A.   Thank you.
12     Q.   Are you an officer of Gagosian
13 Gallery Inc.?
14     A.   I believe I am.
15     Q.   What is the title that you hold?
16     A.   President.
17     Q.   Are you the CEO?
18     A.   I don't think we have a CEO.
19 I don't know.
20     Q.   Are there any other officers?
21     A.   I have a secretary.
22     Q.   And who is the secretary?
23     A.   Melissa Lazarov.
24     Q.   Can you spell that, please?
25     A.   L-A-Z-A-R-O-V.

Page 17

1           Gagosian
2      Q.   She's the secretary with a capital S
3  of the corporation?
4      A.   I believe so.
5      Q.   She keeps the books?
6      A.   She's not the bookkeeper. She's the
7  secretary.
8      Q.   She keeps the minute books?
9      A.   Not necessarily.
10     Q.   Are you a director of that
11 corporation?
12     A.   I don't know.
13     Q.   Is there a board of directors?
14     A.   I don't think so.
15     Q.   Are you a shareholder of Gagosian
16 Gallery Inc.?
17     A.   I believe I'm the sole owner.
18     Q.   So you believe you're a hundred
19 percent shareholder?
20     A.   That's my understanding. Actually,
21 I think my sister may have -- we may have given
22 my sister a small piece of it so I can provide
23 her with some money.
24     Q.   What is her name?
25     A.   Judy Womble.

Page 34

1           Gagosian
2    have to see when we get to it.
3         THE WITNESS: I mean --
4         MS. BART: There's no question.
5    BY MR. BROOKS:
6      Q.  Mr. Gagosian, let me know when
7    you're ready for me to ask you questions about
8    this exhibit.
9         (Witness looks at exhibit.)
10     A.  Okay.
11     Q.  Okay?
12     A.  Yeah.
13     Q.  Now, I'm going to ask you some
14   questions about the first page.
15     A.  Which? I'm sorry?
16     Q.  The first page.
17     A.  Okay.
18     Q.  We're just going to go through page
19   after page. So the first one is stamped
20   GP001991 at the bottom.
21        Melissa Lazarov, is that -- the
22   recipient of this e-mail, is that the person you
23   identified before as being the secretary of --
24     A.  That's correct.
25     Q.  And Nicole Hecht works at

Page 35

1           Gagosian
2    980 Madison?
3      A.  Yes.
4      Q.  Do you know her?
5      A.  I do.
6      Q.  And the subject of this e-mail is
7    announcement card and adverts. What is an
8    announcement card, if you know, with respect to
9    the show?
10     A.  An announcement card is something we
11   put in the mail to our clients and museums. It
12   goes out to our mailing list.
13     Q.  Announcing the show?
14     A.  Announcing the show.
15     Q.  And does that announcement card have
16   any depiction of any of the images from the show
17   or does it just announce there will be a show?
18     A.  It varies.
19     Q.  In this case do you remember?
20     A.  I think it did, yes.
21     Q.  Do you know what it depicted?
22     A.  An image from the show. I don't
23   recall exactly.
24     Q.  Do you know if it was the same image
25   as the invitation?

Page 36

1           Gagosian
2      A.  The invitation?
3      Q.  Yes.
4      A.  Well, that is the announcement card.
5      Q.  That's the same thing?
6      A.  Yes.
7      Q.  Okay. So Nicole Hecht is writing
8    that Larry reviewed the options and wants to run
9    the attached ad in ArtForum. And then it says
10   will also run in Art in America and Art and
11   Auction. Do you recall reviewing ads for the
12   show including ads placed in ArtForum magazine?
13     A.  I always review --
14        MS. BART: Objection to form.
15     A.  I always review the ads. I always
16   review the ads. So, you know, I don't recall
17   the specific --
18     Q.  That's a normal function that you
19   perform?
20     A.  Right. They show me options and --
21     Q.  Right. And on the third line there
22   there's a reference to JPEGs. Do you see that?
23        It reads, They are JPEGs so do not
24   appear very sharp, and then it goes on. Do you
25   know what a JPEG is?

Page 37

1           Gagosian
2      A.  It's an electronic image.
3      Q.  The next page in this exhibit, do
4    you know who Rysia Murphy is?
5      A.  I do.
6      Q.  R-Y-S-I-A.
7      A.  Mm-hmm.
8      Q.  Who is she? Who is she?
9      A.  She's an assistant.
10     Q.  That works for your company?
11     A.  Yes.
12     Q.  And she says, LG -- is that a
13   reference to you?
14     A.  Yes.
15     Q.  Wants to make sure the ad is large
16   and very clear, and he also wants to see the
17   ads to approve. This refers to an ad in the
18   New York Times?
19     A.  I guess so. Does it say so?
20   I don't know.
21     Q.  It says run the attached again in
22   NYT.
23     A.  Yeah, New York Times, right.
24     Q.  And this was an ad for two different
25   shows, the Prince show and a show by an artist

Page 46

1          Gagosian
2    Q.  At that time?
3    A.  At that time.
4    Q.  It could become available later?
5    A.  Exactly.
6    Q.  Do the salespeople who work for you
7  receive commissions when they sell a painting?
8    A.  Yes, they do.
9    Q.  All right. I see two others that
10 say hold LG. But there's also another two at
11 the bottom of the first page that say hold CC.
12 Do you know what that means?
13   A.  It could mean Candy Coleman. I'd
14 have to --
15       MS. BART: Don't guess.
16       THE WITNESS: Huh?
17       MS. BART: Don't guess.
18   A.  I don't know for sure.
19   Q.  Did she work for you in 2008?
20   A.  Yes.
21   Q.  Where?
22   A.  Los Angeles. San Diego.
23   Q.  Do you have a gallery in San Diego?
24   A.  No, but she works out of her home in
25 San Diego and she goes up to LA about once a

Page 47

1          Gagosian
2  week.
3    Q.  In the show, when a painting was
4  sold, can you tell us how the payment stream
5  worked, who was the payment made to and how did
6  Mr. Prince get paid?
7    A.  Mr. Prince gets a percentage of the
8  proceeds. The salesperson gets a commission.
9  The gallery retains the balance.
10   Q.  Well, let's just take a hypothetical
11 and make it clear. Let's take the very first
12 one, Especially Around Midnight, which the
13 indication is that was sold?
14   A.  Right.
15   Q.  So let's say Mr. X bought it, and
16 let's just say he bought it for 2-million
17 dollars?
18   A.  Right.
19   Q.  Who would he pay the 2-million
20 dollars to?
21   A.  To the gallery.
22   Q.  By check, by wire transfer --
23   A.  Either.
24   Q.  -- or does it not matter?
25   A.  One of the two.

Page 48

1          Gagosian
2    Q.  Then what does the gallery do with
3  the -- we're taking 2-million dollars as an
4  example, what does the gallery do with that
5  2-million dollars?
6    A.  We pay -- we pay the artist. And
7  if it was -- if I sold it, then there's no
8  commission. But if somebody else sold it, you
9  know, in the organization, then they would get
10 a commission.
11   Q.  And then the gallery would keep the
12 balance?
13   A.  Correct.
14   Q.  In the case of this show do you know
15 what the breakdown was, what percent Mr. Prince
16 received?
17       MS. BART: Objection, form.
18   A.  I believe he received 40 -- no,
19 60 percent. The gallery received 40 percent.
20   Q.  So, again, hypothetically, if the
21 painting sold for 2 million he should receive
22 1.2 million, is that right?
23   A.  Correct.
24   Q.  He being Mr. Prince?
25   A.  That's right.

Page 49

1          Gagosian
2    Q.  Does the Gagosian Gallery have a
3  website?
4    A.  Yes, we do.
5    Q.  Did you -- withdrawn.
6        Did your website publicize the fact
7  that the Canal Zone show was about to open?
8    A.  I would imagine so.
9    Q.  Did Gagosian Gallery issue a press
10 release stating that the show was going to open,
11 the Prince show was going to open?
12   A.  We always do.
13   Q.  Are you aware that Mr. Prince was
14 interviewed by Interview Magazine shortly before
15 the Canal Zone show opened?
16   A.  I don't recall.
17   Q.  Do you know if Gagosian Gallery
18 arranged such an interview for Mr. Prince?
19   A.  It wouldn't -- that wouldn't be the
20 case usually.
21   Q.  Do you know Glenn O'Brien?
22   A.  I do.
23   Q.  Do you recall, now that I've
24 mentioned his name, that he interviewed
25 Mr. Prince in Interview Magazine?

Page 50

1        Gagosian
2    A.  It's possible, I just don't --
3  I don't have a specific recollection.
4    Q.  Do you know whether Gagosian Gallery
5  sent JPEGs of images from the Canal Zone show to
6  Interview Magazine to be used in connection with
7  the publication of the Prince interview?
8    A.  I don't have a specific
9  recollection.
10   Q.  Do you know if Interview Magazine
11 had a slide show in connection with the Canal
12 Zone exhibition on its website?
13   A.  I didn't know that.
14   Q.  Was Peter Brant the owner of
15 Interview Magazine in 2008, if you know?
16   A.  I know he bought it recently. I
17 don't know the date that he bought it, so I
18 don't know who was the owner at that point.
19   Q.  Was there a -- withdrawn.
20       The show opened on November 8th,
21 2008. Was there a dinner in connection with
22 the opening of the show?
23   A.  I'm sure there was.
24   Q.  Do you recall?
25   A.  I don't recall exactly.

Page 51

1        Gagosian
2    Q.  Do you recall going to it?
3    A.  I'm sure I did.
4    Q.  Was it -- let me see if I can help
5  you. Was it in the Gramercy Park Hotel?
6        MS. BART: Well, objection. The
7    witness has testified that he doesn't
8    recall.
9        MR. BROOKS: Right. And I can --
10   I'm entitled to help his recollection.
11 BY MR. BROOKS:
12   Q.  Do you recall a dinner in the
13 Gramercy Park Hotel, which is right near
14 Gramercy Park?
15   A.  I honestly don't, but --
16   Q.  Do you recall having any
17 involvement, you personally, in preparing the
18 invitation list for the dinner in connection
19 with the opening of the Canal Zone show?
20   A.  What I almost always do is review a
21 list. I'm given a list and I'll sometimes take
22 somebody's name off or add somebody's name, but
23 it's usually pre-prepared.
24   Q.  And did you do that in connection
25 with the dinner for the opening of this show?

Page 52

1        Gagosian
2    A.  I almost always do.
3    Q.  But you don't remember?
4    A.  I don't have specific recollection.
5    Q.  Okay.
6        (Discussion off the record.)
7        MR. BROOKS: This is 48.
8        (Plaintiff's Exhibit 48, series of
9    e-mails, was marked for identification, as
10   of this date.)
11       MR. BROOKS: Plaintiff's Exhibit 48
12 is a series of -- again, a series of
13 e-mails.
14       MS. BART: It's just a compilation,
15   not that they're one sequence, correct?
16       MR. HAYES: They don't appear to be
17   a chain.
18       MR. BROOKS: I'm not sure.
19       MS. BART: They're not.
20       MR. HAYES: No, they're not a chain.
21 BY MR. BROOKS:
22   Q.  Again, take your time, look them
23 over, tell me when you're ready and I'll ask you
24 some questions.
25   A.  Okay.

Page 53

1        Gagosian
2    Q.  On the first page of Exhibit 48,
3  stamp 3313 at the bottom, who is Victoria
4  Gelfand, is she in your London --
5    A.  Yes.
6    Q.  -- gallery?
7    A.  Yes.
8        MS. BART: Let him finish his
9    question.
10   Q.  And then Karen Ho, H-O, does she
11 also work for Gagosian Galleries?
12   A.  I think so.
13   Q.  She has a Gagosian.com e-mail
14 address apparently?
15   A.  Yeah. Yeah, then she must.
16   Q.  She says to Victoria Gelfand, as per
17 LG, he needs to approve everyone we are inviting
18 to the Prince dinner, is that correct?
19   A.  That's what it says.
20   Q.  Was that -- good point. That was a
21 bad question. I didn't mean is that what it
22 says. What I mean is is that an accurate
23 statement by her that you had to approve
24 everyone who was invited?
25   A.  Yes, I think so.

## Page 54

1   Gagosian
2   Q.  Next page, again, that's another
3   e-mail from Karen Ho, it's similar to the one we
4   just looked at, so I'll pass to the third one.
5       Now, here's an e-mail from Rysia
6   Murphy saying that you took some names off the
7   list, is that your recollection that you did
8   that?
9   A.  I don't have a specific
10  recollection.
11  Q.  It's something you would do?
12  A.  Yes.
13  Q.  The next page has -- it says,
14  Subject, For LG to check for Prince opening and
15  dinner.  And it says at the top, Please ask LG
16  if he would like any of these people to be
17  invited.  I assume you don't know which people
18  that refers to, correct?
19  A.  No.
20  Q.  How about further down it says
21  something spelled wrong, but it says something
22  about Guggenheim's original list.  Do you have
23  any idea what that refers to?
24  A.  Not -- not really.
25  Q.  Do you normally or typically invite

## Page 55

1   Gagosian
2   people from the Guggenheim museum to these types
3   of openings?
4       MS. BART:  Objection, form.
5   Q.  You can answer.
6   A.  Not typical or normal.  It just
7   depends.
8   Q.  Sometimes you do?
9       MS. BART:  Objection, form.
10  Q.  You can answer.
11  A.  Yeah, sometimes we do.
12  Q.  The next page, which is 3375 at the
13  bottom, Rysia Murphy, who I think you've
14  identified, says, Please just make sure it is
15  not sent to anyone that has not been approved by
16  LG as he is being very strict about this dinner.
17      Is she correct in saying that you
18  were being very strict about that dinner?
19      MS. BART:  Objection, form.
20  A.  I don't remember what that meant,
21  but it's -- I just take it at face value.  I
22  really don't remember why I was being strict.
23  Maybe I'm always strict.
24      MS. BART:  Or if you were.
25  Q.  And the last page attaches the most

## Page 56

1   Gagosian
2   up-to-date dinner list and states, As you know,
3   LG has been super-intense about who is invited,
4   et cetera, do you see that, from Rysia Murphy?
5   A.  Yeah.
6   Q.  Do you have a recollection of
7   being --
8   A.  Super-intense?
9   Q.  -- super-intense about this
10  particular dinner?
11  A.  No.
12      (Discussion off the record.)
13  BY MR. BROOKS:
14  Q.  Ready?
15  A.  Yeah.
16      MR. BROOKS:  I'd like to mark as
17  Plaintiff's Exhibit 49 an e-mail.
18      (Plaintiff's Exhibit 49, e-mail
19      dated October 23, 2008, was marked for
20      identification, as of this date.)
21  Q.  Just for the record, the e-mail is
22  dated October 23, 2008.  And it's from Meredith
23  Dunn, D-U-N-N, to a number of addressees.
24      Mr. Gagosian, I believe earlier
25  today you said that curating a show like this

## Page 57

1   Gagosian
2   was a collaborative effort.  Do you remember
3   saying that?
4   A.  Yeah, usually, right.
5   Q.  And in this case it was?
6   A.  Yes.
7   Q.  And I think you mentioned somebody
8   named Sam in that answer, do you recall?
9   A.  Yes, I do.
10  Q.  And is this Sam Orlofsky --
11  A.  Yes.
12  Q.  Is he one of the people who was
13  involved?  Yes?
14  A.  Yeah.
15      MS. BART:  You have to answer yes or
16  no.
17      MR. BROOKS:  What's the problem?
18      MS. BART:  I was just saying he has
19  to answer yes or no.
20      THE WITNESS:  She's telling me how
21  to answer.
22      MS. BART:  Well, no, I'm not.  I'm
23  just saying --
24      MR. BROOKS:  I know what you mean.
25      THE WITNESS:  The form of answer.

Page 58

1       Gagosian
2       MR. BROOKS: Right. She's saying
3   you shouldn't nod your head.
4       THE WITNESS: Right.
5   BY MR. BROOKS:
6       Q.  Sam Orlofsky works for you?
7       A.  Yes, he does.
8       Q.  These other people -- and I'm not
9   going to read all the names, but the other
10  people listed on this Exhibit 49 -- A, were they
11  all Gagosian employees, and, B, were any of them
12  involved in curating the show?
13      A.  I don't recall which of them were
14  involved specifically, no.
15      Q.  Are they all Gagosian employees, to
16  your knowledge?
17      A.  I would assume so.
18      Q.  You mentioned a Candy Coleman
19  before, do you recall that?
20      A.  Yes.
21      Q.  And she's -- her name seems to be in
22  the middle of this list of addressees, do you
23  see that?
24      A.  I do.
25      Q.  If I asked you this before, I

Page 59

1       Gagosian
2   apologize, but where does she work?
3       A.  Los Angeles.
4       Q.  I think you said that, right.
5       Were celebrities invited to this
6   dinner?
7       A.  I don't recall.
8       Q.  Were people from MOMA invited?
9       A.  Most likely.
10      Q.  And that would be an acronym for the
11  Museum of Modern Art?
12      A.  Correct.
13      Q.  Were people from the Guggenheim and
14  Whitney museums invited?
15      A.  I would assume so.
16      Q.  And then it says and other clients
17  who will, capital letters, buy his work. Did
18  you play a role in making sure that the clients
19  who were invited would be likely to buy
20  Mr. Prince's work?
21      MS. BART: Objection, form.
22      A.  Well, you want to invite a range of
23  people, some of them because they're friends of
24  the artist, some of them because they're known
25  to collect the work, others because they have a

Page 60

1       Gagosian
2   museum status. So it's a mix of people, but you
3   always want to include customers.
4       Q.  And do you also want to include
5   celebrities to generate some buzz for the show?
6       A.  Yeah --
7       MS. BART: Objection, form, and
8   asked and answered.
9       Q.  You can answer.
10      A.  Yeah. Yeah.
11      Q.  So in connection with this
12  particular show -- withdrawn.
13      MR. BROOKS: Let's mark as
14  Plaintiff's Exhibit 50 an e-mail -- this
15  is a string of e-mails in October 2008.
16      (Plaintiff's Exhibit 50, string of
17  e-mails, was marked for identification, as
18  of this date.)
19      Q.  The first e-mail appears to be from
20  Barbara Wilhelm Dwek, D-W-E-K. Is she somebody
21  who works at the gallery at which the show took
22  place?
23      A.  At that time I believe she did.
24      Q.  And there's an e-mail above that
25  from Karen Ho saying these are the people

Page 61

1       Gagosian
2   Barbara wants to invite to the dinner after
3   receiving LG's e-mail. And it says yes or no.
4   And then Melissa Lazarov wrote Karen Ho saying
5   will run these names by LG for approval.
6       MS. BART: Will you run these
7   e-mails.
8       MR. BROOKS: I'm sorry, you're
9   right. Will you run these names by LG
10  for approval. Thank you.
11  BY MR. BROOKS:
12      Q.  And then the final e-mail at the top
13  of the chain is from Vanessa Riding. Again, her
14  position?
15      A.  Personal assistant.
16      Q.  To you?
17      A.  Yes.
18      Q.  And it says before Larry approves
19  this list he would like to know if you have sold
20  any art to these people. If so, he would like
21  to see proof. Do you have any recollection of
22  that?
23      A.  No.
24      Q.  You don't know what kind of proof
25  you were requesting?

## Page 62

1        Gagosian
2        MS. BART: Objection, form.
3     A.   Well, I mean it could just be she
4  could just call me, you know, I mean she
5  wouldn't have to present me with an invoice.
6  I would take her word for it on the phone.
7  It's just a way of limiting the number of
8  guests. Every salesperson wants to invite a
9  bunch of their friends, so we try to vet them a
10 little bit.
11    Q.   Vet them in terms of what?
12    A.   In terms of whether they're going to
13 contribute either commercially or in some other
14 way.
15       MR. BROOKS: I'd like to mark as
16    Plaintiff's Exhibit 51 another chain of
17    e-mails dated October 31st, 2008.
18       (Plaintiff's Exhibit 51, e-mail
19    chain, was marked for identification, as
20    of this date.)
21    Q.   I think this might be a new name,
22 Andrea Crane with a C?
23    A.   Right.
24    Q.   Does she work for Gagosian
25 Galleries?

## Page 63

1        Gagosian
2     A.   Yes, she does.
3     Q.   What does she do?
4     A.   She's -- she works in our
5  impressionist department and she's a
6  salesperson.
7     Q.   And she was one of the people who
8  wanted to invite certain people to the dinner,
9  is that correct?
10    A.   Apparently.
11    Q.   At the top it says that Karen Ho is
12 saying I spoke to Andrea Crane and the other
13 invites are collectors and their parents are the
14 wealthiest people in Holland worth 5 billion.
15 Do you have any recollection of that?
16    A.   No.
17    Q.   Do you know who those people are?
18       MS. BART: Objection. I'm going to
19    instruct the witness not to disclose the
20    name of the clients.
21    A.   I don't recall. I don't know who
22 they are actually.
23       MR. BROOKS: We talked about the
24    invitation before briefly, so I'd like to
25    mark as Plaintiff's Exhibit 52 what

## Page 64

1        Gagosian
2  appears to be a copy of the invitation to
3  the Canal Zone show.
4        (Plaintiff's Exhibit 52, copy of
5     invitation to Canal Zone show, was marked
6     for identification, as of this date.)
7     Q.   Mr. Gagosian, do you recognize and
8  can you identify Plaintiff's Exhibit 52?
9     A.   Appears to be a facsimile of the
10 invitation.
11    Q.   Have you heard this particular
12 individual who's depicted in the invitation
13 referred to as the blue, B-L-U-E, Rasta man?
14    A.   Yeah --
15       MS. BART: Has he heard that?
16       MR. BROOKS: Yes.
17    A.   What do you mean have I heard it?
18    Q.   Have you heard that?
19    A.   I don't remember.
20    Q.   This invitation, is this the same
21 thing as what you were describing before as
22 being an announcement card?
23    A.   Correct.
24    Q.   And these were mailed out before the
25 show?

## Page 65

1        Gagosian
2     A.   Right.
3     Q.   Do you know how many were mailed
4  out?
5     A.   I don't know the exact number.
6     Q.   Would it be correct to say it was
7  thousands?
8        MS. BART: Objection, form, and
9     caution the witness not to guess.
10    A.   I really don't -- I don't know how
11 many we mail out. I really don't know that
12 number.
13    Q.   Did you review the invitation before
14 it was mailed out?
15    A.   I always do.
16    Q.   Did you have any input into which
17 image should be used in the invitation?
18    A.   Usually.
19    Q.   And in this case?
20    A.   I always have input. It's not --
21 I don't always have the last word however.
22    Q.   Do you know where that image was
23 taken from?
24       MS. BART: Objection, form.
25    A.   I really don't know.

Page 66

```
 1              Gagosian
 2      Q.   I think you said you weren't sure if
 3   celebrities were invited to the dinner, correct,
 4   this particular dinner?
 5      A.   I guess I meant I didn't know which
 6   ones. I don't remember. I don't remember if
 7   they were or who. I don't remember.
 8      Q.   Let me try to help you --
 9      A.   If you give me a name --
10      Q.   -- recollect.
11      A.   -- maybe I can respond.
12      Q.   Let's talk about musical artists
13   first. Bono?
14      A.   I don't remember.
15      Q.   Mick Jagger?
16      A.   I don't remember.
17      Q.   Sir Paul McCartney?
18      A.   I don't remember.
19      Q.   Jon Bon Jovi?
20      A.   I don't remember.
21      Q.   You know him, right?
22      A.   I know all those people.
23      Q.   Beyoncé?
24      A.   I don't remember.
25      Q.   Kanye West?
```

Page 67

```
 1              Gagosian
 2           MS. BART: I'm sorry, I couldn't
 3      hear the name.
 4      Q.   Kanye West?
 5      A.   Let me just say these people, all
 6   these people could have been invited but I don't
 7   have a specific recollection.
 8      Q.   Let me ask you about actors.
 9           Leonardo DiCaprio?
10      A.   I don't recall.
11      Q.   Tobey Maguire.
12      A.   I don't recall.
13      Q.   Philip Seymour Hoffman?
14      A.   I don't recall.
15      Q.   Renée Zellweger?
16      A.   I don't recall.
17      Q.   Penelope Cruz?
18      A.   I just don't have a memory like
19   that. You can list a hundred names, I just
20   don't remember who's on the list and who's not.
21      Q.   Let me ask you about people from
22   finance. Do you recall these people being
23   invited? Leon Black?
24      A.   He would -- he's on most of our --
25   on our list.
```

Page 68

```
 1              Gagosian
 2      Q.   And what does he do?
 3      A.   He's a financial guy in New York.
 4      Q.   A private equity fund?
 5      A.   Yes.
 6      Q.   Henry Kravis?
 7      A.   Yeah.
 8      Q.   He was invited?
 9      A.   You know, I don't -- let me tell
10   you, I don't remember -- I don't remember who
11   was on the guest list, but those are names that
12   are typically on our guest lists. So I would
13   assume they were invited, but I don't have a
14   specific recollection.
15      Q.   How about, do you know who Steven
16   A. Cohen is?
17      A.   I do.
18      Q.   Does he have a company called SAC, a
19   hedge fund?
20      A.   I believe so, yes.
21      Q.   Is he a fairly substantial
22   collector?
23           MS. BART: Objection, form.
24      A.   Yes, he is.
25      Q.   Sorry?
```

Page 69

```
 1              Gagosian
 2      A.   Yes, he's a substantial collector.
 3      Q.   For instance, he owns Damien Hirst's
 4   Shark?
 5           MS. BART: Objection, form.
 6      Q.   Correct?
 7      A.   Yes, he owns it.
 8      Q.   And Damien Hirst was invited to the
 9   show, right, to the dinner?
10      A.   Yeah, we represent Damien Hirst, so
11   we almost always invite artists that we
12   represent.
13      Q.   Do you represent John Currin?
14      A.   Yes, I do.
15      Q.   C-U-R-R-I-N.
16           Was he invited?
17      A.   Most likely.
18      Q.   Did Steven A. Cohen buy any of the
19   pieces that were part of the Canal Zone show?
20      A.   Yes, he did.
21      Q.   Do you remember which one or ones?
22      A.   I believe he bought one. I don't
23   recall the title of it.
24      Q.   And who is Michael Evans, do you
25   know?
```

## Page 70

        Gagosian
1   A.  I think he's a collector, yeah.
2   Q.  Did he buy one of the Canal Zone
3   paintings?
4   A.  I don't remember specifically.
5   Q.  Do you sometimes invite people who
6   are famous just for being famous to these shows,
7   if you know what I mean?
8       MS. BART:  Objection, form.  I don't
9       know what you mean.
10  A.  I don't understand the question.
11      MR. BROOKS:  Let's see if he knows.
12  BY MR. BROOKS:
13  Q.  Do you know who Baby Jane Holzer is?
14  A.  She's an art collector.
15  Q.  Was she invited?
16  A.  She could have been.
17      MS. BART:  Don't guess.
18  A.  I don't remember.  I don't remember
19  any of these names.
20  Q.  How about Nikki and Paris Hilton?
21  A.  That would surprise me.
22  Q.  How about Mary-Kate and Ashley
23  Olsen?
24  A.  Possible.

## Page 71

        Gagosian
1   Q.  Why would it surprise you if Nikki
2   and Paris Hilton were --
3   A.  Because they wouldn't be the type of
4   people I would invite to an opening.
5   Q.  How about the Bush daughters, Lauren
6   and Barbara Bush, the daughters of President
7   George W. Bush?
8   A.  They could have been.  We know them.
9   Q.  Tom Brady?
10  A.  I don't remember.  I just don't
11  remember these names.
12  Q.  All right.  I'm going to show you
13  Exhibit --
14      MS. BART:  I'm going to object to
15      this line of questioning, asking him to
16      testify about his memory about a guest
17      list.  But --
18  A.  Yeah, I don't get the -- I'm not
19  a lawyer, but I don't understand what the
20  importance is.
21      MS. BART:  Well, that's --
22  Q.  All right.  I'm going to show you
23  what was marked Tuesday when Mr. Prince
24  testified as Plaintiff's Exhibit 35.

## Page 72

        Gagosian
1   (Discussion off the record.)
2   Q.  So we're not marking this.  It was
3   marked Tuesday.
4   A.  This is a guest list.
5   Q.  That's what I'm going to ask you.
6       This is a --
7       MS. BART:  You've got 35 and 30 and
8       23.
9       MR. BROOKS:  That's a mistake.  It
10      should be just -- can you give us back
11      some.
12      MS. BART:  Yes.  Here you go.
13      MR. BROOKS:  Okay.  Thank you for
14      pointing that out.
15      MS. BART:  No problem.  Here you go.
16  BY MR. BROOKS:
17  Q.  Okay.  So now you should just have
18  Plaintiff's 35 in front of you, which is a
19  seven-page document.  Do you recognize it?
20  A.  Yeah.
21  Q.  This is the guest list from that
22  show?
23  A.  It seems to be.
24  Q.  And do you see Nikki and Paris

## Page 73

        Gagosian
1   Hilton?  It's alphabetical.
2   A.  There they are.
3   Q.  I don't want to belabor this and
4   spend a lot of time with it --
5       MS. BART:  Good.
6   Q.  -- but if you look at this, can you
7   recall which people, let's say on the first
8   page, actually attended at the dinner rather
9   than simply being invited, if you can
10  remember --
11  A.  Rather than what?
12  Q.  Actually attended the dinner rather
13  than simply being invited to the dinner?
14      MS. BART:  You want him to go
15      through this?
16  Q.  No, I mean on just the first page,
17  do you remember some -- specifically people that
18  were there?
19  A.  I really don't have a recollection.
20      MS. BART:  You shouldn't guess.
21  A.  I don't know.
22  Q.  No, I don't want you to guess.
23  A.  There's no way I can remember that.
24  Q.  All right.  Do you recall if you

Page 74

1        Gagosian
2  attended that particular dinner?
3        MS. BART: Objection, form, and
4    asked and answered.
5    Q.   At the Gramercy Park Hotel?
6    A.   I did. I think so.
7    Q.   I've noticed a number of models on
8  this list; Tom Brady's wife, Elle Macpherson;
9  Kate Moss; Christy Turlington; Lauren Hutton;
10 what's the reason for inviting models to a
11 dinner for an art opening?
12   A.   They look good at a dinner table.
13   Q.   Do you know who Alberto Mugrabi is?
14   A.   He's an art dealer and friend of
15 mine.
16   Q.   Do you know if he was at the dinner?
17        Do you know if he was at the dinner?
18   A.   I don't recall specifically.
19   Q.   Do you know if he bought one of the
20 works in the Canal Zone show?
21   A.   That I don't remember.
22   Q.   Do you know who Jeanne, J-E-A-N-N-E,
23 Greenberg hyphen Rohatyn, R-O-H-A-T-Y-N, is?
24   A.   I know who she is.
25   Q.   And who is she?

Page 75

1        Gagosian
2    A.   She's an art dealer and collector.
3    Q.   And did she buy one of the Richard
4  Prince Canal Zone paintings?
5    A.   She did buy one.
6    Q.   Do you remember which one?
7    A.   No, I don't.
8    Q.   And Philip and Stavros Niarchos,
9  they're on the list, do you know if either of
10 them attended?
11   A.   It's a father and son. I don't
12 remember. Maybe Stavros.
13   Q.   Are they in shipping?
14   A.   It's a family business. I don't
15 really know what they do.
16   Q.   Did either of them buy a Richard
17 Prince Canal Zone painting, if you know?
18        Did either of them buy a Richard
19 Prince Canal Zone painting?
20   A.   Philip. Philip did.
21   Q.   And is he the father or the son?
22   A.   He's the father.
23   Q.   And do you know Mark Jacobs?
24   A.   I do.
25   Q.   He's a designer?

Page 76

1        Gagosian
2    Q.   Do you know if a painting was held
3  for him or purchased by him?
4    A.   I don't think he bought one.
5  I don't recall him buying one.
6    Q.   Do you recall holding some of
7  the paintings for Leonardo DiCaprio and
8  Tobey Maguire?
9    A.   Yes, I do.
10   Q.   Do you know if either of them bought
11 any of these Richard Prince paintings?
12   A.   When you say either of them who are
13 you referring to?
14   Q.   Leonardo DiCaprio and Tobey Maguire?
15   A.   I don't think they bought -- at the
16 end of the day they didn't buy.
17   Q.   The painting or paintings that were
18 held, were they held for them jointly?
19        MS. BART: Objection, form.
20   Q.   If you remember.
21   A.   My recollection is that they were
22 going to buy one painting jointly.
23   Q.   Is that unusual?
24   A.   Extremely --
25        MS. BART: Objection, form.

Page 77

1        Gagosian
2    Q.   You can answer.
3    A.   Extremely.
4    Q.   All right. Could you look at
5  the invitation again one more time? It's
6  Exhibit 52.
7         Do you know if at the end of the
8  show excess invitations were left over?
9         Do you understand what I'm saying?
10   A.   Usually that's the case.
11   Q.   And are they then usually discarded?
12   A.   No, not as a rule. I think we --
13 I think we hold onto them. I don't think we
14 throw them away.
15   Q.   Do you ever sell them?
16   A.   I think we have from time to time.
17   Q.   To what types of entities do you
18 sell them to?
19        MS. BART: Objection, form. Are we
20    talking about this invitation or --
21        MR. BROOKS: Yes.
22        MS. BART: -- are we talking about
23    invitations generally?
24        MR. BROOKS: First in general and
25    then I'll get to this one.

## Page 110

```
 1            Gagosian
 2   remember?
 3       MS. BART: Objection, form.
 4   A.   There was, yeah, a large collage
 5   piece that Richard made.
 6   Q.   And was the subject -- withdrawn.
 7       Were the images in the collage
 8   Rastafarians?
 9       MS. BART: Objection, form.
10   Q.   You can answer.
11   A.   Yes.
12   Q.   And do you recall what the other
13   paintings were about, if you remember?
14   A.   They were not paintings about
15   Rastafarians, as I recall, they were different
16   subject matter.
17   Q.   Did it have anything -- did those
18   paintings have anything to do with this pitch,
19   which apparently was displayed on the wall of
20   that exhibition?
21   A.   It's possible. I don't recall.
22   Q.   Do you recall the pitch -- and I'm
23   just using Mr. Prince's term -- being on the
24   wall of that exhibition?
25   A.   I think so. I mean I know he was
```

## Page 111

```
 1            Gagosian
 2   debating whether to put it on or not. I think
 3   it ended up -- I don't remember if it ended up
 4   being on the wall or not. He was kind of torn
 5   about it.
 6       MR. BROOKS: Let's mark as -- so now
 7       we go back to number 54.
 8       (Plaintiff's Exhibit 54, e-mail, was
 9       marked for identification, as of this
10       date.)
11   Q.   This is in September of 2008. And
12   Allison McDonald is saying that Melissa Lazarov
13   I guess had requested that she send the Ding
14   Dong the Witch is Dead text to you to read.
15   It's attached but not final.
16       Do you have a recollection of that
17   happening in or about September 2008?
18   A.   No, I don't.
19   Q.   Again, I may have asked you this
20   before, but do you recall reading it before it
21   went into final?
22   A.   I don't remember.
23       MS. BART: The it?
24   Q.   The Ding Dong the Witch is Dead?
25   A.   I don't remember.
```

## Page 112

```
 1            Gagosian
 2   Q.   When you found out -- withdrawn.
 3       How did you find out that James Frey
 4   was going to be the author of this essay in the
 5   Canal Zone catalog?
 6   A.   I think Richard informed me.
 7   Q.   Did you know who James Frey was
 8   then?
 9   A.   Yes, I did.
10   Q.   Did you know he had written a memoir
11   called A Million Little Pieces?
12   A.   Yes.
13   Q.   That turned out not to be a memoir?
14   A.   I don't know what constitutes a
15   memoir.
16   Q.   Did you ever see -- did you see him
17   on the Oprah Winfrey show?
18   A.   I don't watch Oprah.
19   Q.   Do you know about that episode?
20   A.   It's pretty famous. Yes, I do.
21   Q.   Despite that, you didn't have an
22   objection to him being the person writing the
23   essay I take it?
24       MS. BART: Objection, form, and
25       argumentative.
```

## Page 113

```
 1            Gagosian
 2   A.   Absolutely not.
 3       MR. HAYES: I'm going to step out
 4   for just a minute, but keep going.
 5       MR. BROOKS: You sure?
 6       MR. HAYES: Yeah. Is it okay if I
 7   step out for a minute?
 8       MR. BROOKS: It's okay with me.
 9   I don't mind taking a break.
10       MR. HAYES: Pardon?
11       MR. BROOKS: I don't mind taking a
12   short break.
13       MS. BART: Why don't we just take a
14   short break --
15       MR. HAYES: I don't want to
16   interrupt --
17       THE WITNESS: Why are we taking a
18   break? Let's keep going.
19       MS. BART: All right. Well, if
20   you're all right to keep going --
21       MR. BROOKS: I think I might have to
22   have the same --
23       MS. BART: You need to take a break?
24       MR. BROOKS: I think I need to also.
25   I didn't take one -- I'm going to do my
```

### Page 114

1  Gagosian
2  best to expedite this. You're not going
3  to be here all day.
4      THE VIDEOGRAPHER: 12:13. Off the
5  record.
6      (Recess taken: 12:13 p.m.)
7      (Proceedings resumed: 12:16 p.m.)
8      THE VIDEOGRAPHER: 12:16. On the
9  record.
10     MR. BROOKS: Can you read back the
11 last question and answer, unless it's very
12 long.
13     I remember. I asked you if it was
14 okay --
15     (Record read.)
16 BY MR. BROOKS:
17  Q. Did you want Mr. Frey's name to be
18 on the title page of the Canal Zone exhibition
19 book?
20  A. I don't think I had any opinion on
21 that.
22     MR. BROOKS: Let's mark as
23 Plaintiff's Exhibit 55 an e-mail dated
24 September 25th, 2008.
25     MS. BART: Someone's at the door.

### Page 115

1  Gagosian
2     (Interruption.)
3     (Plaintiff's Exhibit 55, e-mail
4  dated September 25, 2008, was marked for
5  identification, as of this date.)
6     (Witness looks at exhibit.)
7  Q. Mr. Gagosian, this I think is a new
8  name I haven't seen before, Darlina Goldak,
9  G-O-L-D-A-K. Does she also work for you, if you
10 know?
11  A. I guess so.
12  Q. It says at the top, M. Laz, that's
13 Melissa Lazarov?
14  A. Mm-hmm, yes.
15  Q. And then it says, LG notes on
16 Prince. First, it says they would like the blue
17 man Rasta -- withdrawn -- they would like the
18 blue Rasta man on the cover.
19     Do you remember I asked you this
20 before if the figure on Exhibit 52 had ever been
21 known as a blue Rasta man?
22  A. I don't know.
23     MS. BART: Hold on.
24  Q. You still don't know? Okay.
25     MS. BART: Let's get Exhibit 52 in

### Page 116

1  Gagosian
2  front of him.
3  A. I don't remember.
4  Q. Okay. Now, down about eight lines
5  it says, Please include, quote, essay, unquote,
6  or, quote, text by James Frey, unquote, in the
7  title page, they want the book to come up if you
8  Google James Frey. Do you see that?
9  A. I do.
10  Q. And do you have any recollection of
11 making that wish known to anyone?
12  A. No.
13     MS. BART: I note that the Re line
14 reads, Subject, Richard Prince printing
15 layout notes from M. Laz.
16     MR. BROOKS: Right. And it says,
17 M. Laz LG notes on Prince right beneath
18 the subject line.
19 BY MR. BROOKS:
20  Q. Were you involved at all in the
21 pricing of the paintings that were part of the
22 Canal Zone show?
23  A. Yes.
24  Q. Can you tell us generally what role
25 you played in the pricing of the paintings?

### Page 117

1  Gagosian
2  A. It's the same role I play usually
3  with every artist. We have a conversation and
4  discuss where we think the appropriate price
5  level should be. And I sometimes also discuss
6  it with other people in the gallery just to get
7  different points of view and try to come up with
8  what seems like the right number.
9      MR. BROOKS: I'm going to mark as
10 Plaintiff's 56 a series of e-mails.
11     (Plaintiff's Exhibit 56, series of
12 e-mails, was marked for identification, as
13 of this date.)
14     MS. BART: Again, this is a
15 compilation as opposed to a single
16 sequence for the record?
17     MR. BROOKS: I don't know. It
18 looks that way. Well, I think I have to
19 withdraw that. I think the first two are
20 related to each other.
21     MS. BART: The Re lines are
22 different.
23 BY MR. BROOKS:
24  Q. Do you have 3123 through 31 -- 3123,
25 3124, and 3150, are those the pages?

Page 122

1    Gagosian
2    I'm going to spell this, S-I-M-U-N-O --
3    A. Simunovic.
4    Q. How do you pronounce it?
5    A. Simunovic.
6    Q. Simunovic, V-I-C.
7    He works for you?
8    A. Yes, he does.
9    Q. He says he's meeting with the guy
10   who bought apparently two paintings. I'm trying
11   to sell him more prints. I will give him a
12   preview of the upcoming show which he'll see in
13   person when we come to New York on November 10.
14   Is there any way to visit Richard's studio in
15   Rensselaerville the week of November 10? Studio
16   visits are a major seduction for this guy.
17   Do you recall getting that e-mail?
18   A. I don't have a specific recollection
19   of it.
20   Q. And do you recall responding to
21   Mr. Simunovic --
22   A. Simunovic.
23   Q. -- saying, Only if he buys another
24   painting, do you recall that?
25   A. No.

Page 123

1    Gagosian
2    Q. Do you recall who this guy is?
3    A. No, I don't.
4    Q. And at the top Nick Simunovic wrote
5    that she said everything else was sold. Do you
6    have any idea what that refers to?
7    A. Honestly, I don't.
8    Q. Did you keep track before the show
9    started of the amount of inventory that remained
10   of these paintings?
11   MS. BART: And these being the Canal
12   Zone?
13   MR. BROOKS: You're right.
14   Q. These Canal Zone paintings?
15   A. I don't understand the question.
16   Q. I'm going to rephrase it.
17   The show opened on November 8, 2008.
18   Prior to that were you doing anything personally
19   to keep track of how many of the paintings still
20   had not been sold?
21   A. I always did with every show.
22   I mean --
23   Q. At this point in time, right now as
24   we sit here today, some of the paintings have
25   not been sold, correct?

Page 124

1    Gagosian
2    A. That's correct.
3    Q. Do you know where they're located?
4    A. I think some are in storage. I
5    don't know specific locations.
6    Q. Are any of them available for public
7    viewing currently, the unsold ones?
8    A. I don't know.
9    Q. I take it your company has a storage
10   facility?
11   MS. BART: Objection to form.
12   Q. Somewhere?
13   A. Yes.
14   Q. Do you have a photographer who works
15   for you, his first name is Rob, and I'm not
16   finding his last name right now?
17   A. Yes, I do.
18   Q. What's his last name?
19   A. McKeever.
20   Q. I asked if he works for you. He
21   works for your company, is that right?
22   A. That's right.
23   Q. Okay.
24   MR. BROOKS: We're going to mark as
25   Plaintiff's Exhibit 58 a series of e-mails

Page 125

1    Gagosian
2    that were produced by the Gagosian
3    defendants.
4    (Plaintiff's Exhibit 58, series of
5    e-mails, was marked for identification, as
6    of this date.)
7    MS. BART: I'll note for the record
8    that these are just a composite grouping
9    of e-mails.
10   BY MR. BROOKS:
11   Q. Mr. Gagosian, let me know when
12   you're ready.
13   A. I'm ready.
14   Q. Okay. The first page of Exhibit 58,
15   before we get to what it shows, at the bottom
16   Rob has written, I still need to shoot these,
17   can I do them on Friday at Crozier?
18   Is that your Rob McKeever?
19   A. Yes.
20   Q. And do you have a practice of having
21   him photograph each of the paintings before it
22   goes in a show?
23   MS. BART: Objection, form.
24   Q. You can answer.
25   A. Yes.

Page 126

1     Gagosian
2  Q. Do you know if he did it in this
3  case?
4  A. I would assume so.
5  Q. Is that how you were able to send
6  JPEGs to various people?
7     MS. BART: Objection, form, and
8     mischaracterizes his prior testimony.
9  Q. You can answer.
10 A. Yeah. Yes.
11 Q. Now, this indicates that Steven
12 Cohen purchased Especially Around Midnight, do
13 you see that?
14 A. Where are we, what page?
15 Q. There's like a chart at the top --
16 A. Oh, yeah.
17 Q. The last entry indicates Steven
18 Cohen purchased Especially Around Midnight, do
19 you see that?
20 A. Yes.
21 Q. Is that your recollection?
22 A. I know he painted -- purchased a
23 painting. I don't recall the title.
24 Q. Okay. And the location given for
25 that particular painting is CFA21. Do you have

Page 127

1     Gagosian
2  any idea what that refers to?
3  A. Not really.
4  Q. And then it also indicates that --
5  A. Oh, wait, I think I do actually.
6  Q. What is it?
7  A. Crozier Fine Art on 21st Street,
8  their 21st Street location.
9  Q. So that's where Rob was going to go
10 to film, to photograph these?
11 A. That I don't know.
12 Q. And what does Crozier Fine Art have
13 to do with your business, your company?
14 A. They're a commercial art storage
15 company.
16 Q. Then the document also indicates
17 that Michael Evans and Lise, L-I-S-E, Evans
18 bought Mr. Jones, does that accord with your
19 recollection?
20 A. I don't have a recollection, but I
21 take it at face value.
22 Q. Did you know they bought something?
23 A. I had -- I think I remember.
24 Q. And there, the location for that
25 one, 555 West 24th Street, is that your gallery,

Page 128

1     Gagosian
2  one of your two galleries in Chelsea?
3  A. Yes, it is.
4  Q. Is that the gallery where the Canal
5  Zone exhibition took place?
6  A. Yes.
7  Q. On the next page Betsy Biscone,
8  Mr. Prince's studio manager, is writing to
9  Melissa Lazarov and copying you to the effect
10 that Mr. Jones was sold to somebody for
11 2-million dollars. Do you see that?
12 A. Yes, I do.
13 Q. And then it has instructions for
14 invoicing that person. Do you see that?
15    It's been redacted, but there
16 appears --
17 A. Yes, I see it.
18 Q. And then the invoice is supposed to
19 be faxed to that person. Do you see that?
20 A. Yeah, I do.
21 Q. And then the work should be sent
22 to the above-mentioned address, which has been
23 redacted, in other words, deleted, in DE.
24    Do you see that?
25 A. Yes.

Page 129

1     Gagosian
2  Q. Could you turn to the next page,
3  please. This is from Melissa Lazarov saying
4  that you just met with somebody who was going to
5  buy two Richard Prince paintings, Back to the
6  Garden and Cookie Crumble. Do you see that?
7  A. Yes.
8  Q. Oh, and a third one, a Rasta
9  collage. Do you see those three?
10 A. Yes, I do.
11 Q. Now, do you know who that person
12 was?
13 A. I don't recall.
14 Q. Do you know if somebody bought those
15 three works?
16 A. I don't recall.
17 Q. Could you turn to the next page,
18 please. Who is Rupert Burgess?
19 A. He is -- he's an art adviser.
20 Q. And it says, Dear Rupert -- this is
21 from Melissa Lazarov -- Larry met with somebody
22 and they are purchasing the attached. Please
23 advise how you want me to invoice.
24    And then, again, it refers to the
25 same three works as the previous page, Back to

Page 134

1           Gagosian
2       MR. BROOKS: Well, let me -- that's
3   a bad question.
4       A.  That's a bad question.
5       Q.  Let me rephrase it.
6       A.  I'm just agreeing.
7       Q.  I agree.
8           Did this investigation have to do
9   with evasion on Mr. Waksal's part of sales tax
10  in connection with purchases of art from your
11  gallery?
12          MS. BART: Objection, form. And
13  I'll note specifically the use of the word
14  invasion -- evasion.
15          MR. BROOKS: Yes, I did.
16      A.  So what are you asking again?
17          MR. BROOKS: I'm going to ask the
18  court reporter to read it again. And your
19  lawyer has objected, so she can object
20  again if she wants as many times as she
21  wants, but I'd like you to answer the
22  question. And then that's the last
23  question I have on this issue.
24          (Record read.)
25          MS. BART: Then there was an

Page 135

1           Gagosian
2   objection to form.
3       A.  That was the point of the
4   investigation, sales tax by Waksal.
5       Q.  Okay.
6           MR. BROOKS: Let's mark as
7   Plaintiff's 59 a couple of additional
8   e-mails -- actually, one e-mail dated
9   September 11, 2008.
10          (Plaintiff's Exhibit 59, e-mail
11  dated September 11, 2008, was marked for
12  identification, as of this date.)
13      Q.  It appears you were CCed on this
14  e-mail, Mr. Gagosian. Do you see that?
15      A.  Yes.
16      Q.  And the subject is Evans RP
17  purchase, and attached is the Mr. Jones
18  painting, right?
19      A.  Right.
20      Q.  Do you know Mr. Evans?
21          MS. BART: Objection, form.
22      A.  No, I don't.
23      Q.  Do you know if he lives in Delaware?
24      A.  I don't know him. I don't know
25  where he lives.

Page 136

1           Gagosian
2       Q.  Did you barter a Larry Rivers
3   painting in exchange for some of these Richard
4   Prince Canal Zone paintings?
5       A.  Yes, we did.
6           MS. BART: We being?
7       A.  Richard and I made a trade, yeah.
8       Q.  I don't know if barter is the right
9   word. You exchanged?
10      A.  Yeah, trade, yeah.
11      Q.  And the painting that you gave him
12  was called Dying and Dead Veteran, by Larry
13  Rivers?
14      A.  Correct.
15      Q.  1961 or something?
16      A.  Right.
17      Q.  Is that right?
18      A.  That's right.
19      Q.  Were you the owner of that painting?
20          MS. BART: Objection, form.
21      A.  Yes, I was.
22      Q.  How much did you pay for it?
23      A.  I don't remember.
24      Q.  How much is it worth?
25      A.  I don't know.

Page 137

1           Gagosian
2       Q.  How much did you think it was worth
3   when you traded it?
4           MS. BART: Objection, form, calls
5   for speculation.
6       A.  Three, four million I think.
7   I don't know. It's hard to say.
8       Q.  Mr. Rivers passed away, right?
9       A.  A few years ago.
10          MR. BROOKS: As Plaintiff's
11  Exhibit 60 let's mark two pages Bates
12  stamped PR127 and 128.
13          (Plaintiff's Exhibit 60, PR127 and
14  128, was marked for identification, as of
15  this date.)
16      Q.  Mr. Gagosian, take your time, but
17  I just want to tell you we obtained these two
18  pages from Mr. Prince's counsel in this case.
19      A.  Okay.
20      Q.  So there are five images here. The
21  first one is the Larry Rivers painting, correct?
22      A.  That's right.
23      Q.  Is this one of a series of veterans
24  paintings that Mr. Rivers did?
25      A.  Yes, it is.

Page 146

1        Gagosian
2    Q.  So therefore the other three don't
3  have an asking price right now?
4    A.  They do not.
5    Q.  Are they in storage?
6    A.  I believe they're all in storage.
7    Q.  If you look back at Exhibit 58, we
8  were looking at that before. The last three
9  pages which we looked at before indicate sales
10 of Back to the Garden, Cookie Crumbles, and an
11 untitled Rasta 2008 dot 0044. Do you remember
12 we looked at this?
13   A.  Right.
14   Q.  And there were two different prices
15 given?
16   A.  Right.
17   Q.  Do you know if these paintings were
18 actually sold?
19       MS. BART: Objection, form, and
20   asked and answered.
21   Q.  You can answer.
22   A.  What did I answer?
23   Q.  I don't know, because I'm not sure
24 I asked it.
25   A.  I believe they were sold.

Page 147

1        Gagosian
2       MS. BART: Hold on one second.
3    (Discussion off the record.)
4       MS. BART: I think the witness would
5    like to clarify the record.
6  BY MR. BROOKS:
7    Q.  Go ahead.
8    A.  I don't know if it's relevant, but
9  they were not sold for money, they were sold
10 through exchange. I didn't receive any funds.
11   Q.  Now, are you talking about Back to
12 the Garden?
13   A.  These three pictures.
14       MS. BART: That you just made
15   reference to.
16   A.  That we just referenced.
17   Q.  Okay, but just for the record --
18   A.  They were not sold for money. It
19 was an exchange.
20   Q.  Okay. You're talking about Back to
21 the Garden --
22   A.  I'm talking about the three
23 paintings on this invoice.
24   Q.  Cookie Crumbles and an untitled --
25   A.  Right.

Page 148

1        Gagosian
2    Q.  Oh, okay. They were exchanged?
3    A.  That's right.
4    Q.  And with whom were they exchanged?
5    A.  A client.
6    Q.  And what did you get in exchange?
7    A.  I got a sculpture.
8    Q.  What did Mr. Prince get?
9    A.  Mr. Prince got the money. I paid
10 him money and I got a sculpture.
11   Q.  Somebody else, who -- and I take it
12 your counsel is directing you not to identify
13 the other person, is that right?
14       MS. BART: We would prefer not.
15   A.  That's been my instruction in
16 general, not to identify people.
17   Q.  It's not important for this
18 question, so I'm not -- I don't really care.
19 It doesn't matter. Somebody --
20       MS. BART: Mr. X.
21   Q.  -- we'll call him again Mr. X --
22 well, let's call him Mr. Y because we already
23 had Mr. X.
24       Mr. Y gave you a sculpture? I mean
25 I'm not sure I'm following you. What did Mr. Y

Page 149

1        Gagosian
2  give you?
3    A.  I'll tell you exactly what happened,
4  okay. Mr. Y was interested in buying some of
5  these paintings, but then they decided that they
6  were having a cash flow issue or whatever and so
7  they suggested that I take a work of art that
8  they owned in lieu of cash payment as an even
9  exchange for those three paintings.
10   Q.  So Mr. Y or they, whoever -- is it
11 more than one person? You can tell me that.
12   A.  There's one person.
13   Q.  One person. So Mr. Y --
14   A.  Right.
15   Q.  -- got those three paintings --
16   A.  That's right.
17   Q.  Back to the Garden, Cookie
18 Crumbles --
19   A.  Right.
20   Q.  -- and one of the untitled
21 paintings?
22   A.  That's right.
23   Q.  And in exchange you got a sculpture?
24   A.  That's right.
25   Q.  By whom?

Page 150

1            Gagosian
2      A.   Richard Serra.
3      Q.   And what's the value of that
4   sculpture?
5           MS. BART:  Objection, form.
6      A.   Three to four-million dollars.
7      Q.   And who owns the Richard Serra
8   sculpture now?
9      A.   I own it.
10          MS. BART:  Personally?
11     Q.   And what did -- personally?
12     A.   I mean the gallery owns it.
13     Q.   What did Mr. Prince get?
14     A.   He got his percentage of the
15  agreed-upon prices.
16     Q.   Okay.  I think I understand.
17  Thank you.
18          I'm going to show you what was
19  marked Tuesday as Plaintiff's Exhibit 36.
20          Before we get into this document,
21  when did you exchange Cookie Crumbles, Back to
22  the Garden, and the untitled Rasta for the
23  sculpture?
24     A.   I don't -- I don't know the exact
25  time.

Page 151

1            Gagosian
2      Q.   Was it this year?
3      A.   It was probably early in the year.
4   I would just -- I'm just guessing.
5           MS. BART:  Don't guess.
6      A.   I don't recall.  I don't recall.
7      Q.   Just going back to Exhibit 58
8   briefly.  This exchange about those three
9   paintings having been sold was in September
10  2008, does that help you at all?
11     A.   What are you -- does it help me with
12  what?
13     Q.   To remember -- I could be
14  misspeaking.  Hold on a second.
15          Yeah, September 2008 is -- these
16  e-mails in Exhibit 58 say it was in September
17  2008 that Back to the Garden, Cookie Crumbles,
18  and the untitled Rasta were sold.  Does that --
19  it might not --
20     A.   It doesn't really help in this
21  particular case because initially it was going
22  to be a cash transaction, and then there was
23  quite a bit of time, and then they said we don't
24  have the cash, will you do this.
25     Q.   Okay, I got it.

Page 152

1            Gagosian
2           So now in Exhibit 36 the first page
3   of Exhibit 36 is entitled February 2009 Sales
4   Accounting.  Do you have any idea what that is?
5   It's on the Gagosian Gallery
6   letterhead.
7           MS. BART:  It's this page right
8   here.
9      A.   Oh.  This is a reconciliation of
10  sales I guess.
11     Q.   Is it a form your company sends out
12  normally?
13     A.   I'm not familiar with the form.
14          MR. BROOKS:  We're going to have to
15  take a short break.
16          THE WITNESS:  That's all we do is
17  break here.
18          MR. BROOKS:  Well, he's run out of
19  film.
20          THE VIDEOGRAPHER:  1:01 p.m.  Off
21  the record.  End of tape 2.
22          (Recess taken: 1:01 p.m.)
23          (Proceedings resumed: 1:12 p.m.)
24          THE VIDEOGRAPHER:  1:12.  On the
25  record.  Beginning of tape 3.

Page 153

1            Gagosian
2   BY MR. BROOKS:
3      Q.   I had shown you Plaintiff's
4   Exhibit 36, and if you look through it, it shows
5   sales and moneys transmitted to Mr. Prince.
6           For instance, let's just take the
7   first one on the second page, it shows -- it
8   seems to show that the Canal Zone painting was
9   sold for 1.2 million and that Mr. Prince
10  received 60 percent of that, namely $720,000.
11          Do you see that?
12          Do you see that?
13     A.   Yeah.
14     Q.   Okay.  And it goes on from there
15  painting by painting, and then also there are
16  some sheets like this -- and I'm referring to
17  PR000120 -- which seem to summarize at least
18  some of these sales -- for instance, this is
19  that Mr. Jones painting we talked about before,
20  sold for 2 million that Mr. Prince would get
21  60 percent of that 1.2 million.
22          Do you see that?
23     A.   Yes.
24     Q.   Are these documents familiar to you
25  at all?