**WITHERS BERGMAN LLP**
Hollis Gonerka Bart (HB-8955)
Dara G. Hammerman (DH-1591)
Azmina Jasani (AJ – 4161)
430 Park Avenue, 10th Floor
New York, New York 10022
212.848.9800 (p)
212.848.9888 (f)
*Attorneys for Defendants Gagosian Gallery, Inc.*
*and Lawrence Gagosian*

**SHERIDAN FISHER & HAYES LLP**
Steven M. Hayes, Esq.
Hanly Conroy Bierstein
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6414
*Attorneys for Defendant Richard Price*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

PATRICK CARIOU,

                                  Plaintiff,

                    -against-

RICHARD PRINCE, GAGOSIAN GALLERY, INC.,
LAWRENCE GAGOSIAN, and RIZZOLI
INTERNATIONAL PUBLICATIONS, INC.,

                                  Defendants.

--------------------------------------------------------------------X

08 CIV 11327 (DAB)


# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................................iii

FACTUAL BACKGROUND.........................................................................................2

A. Appropriation Art, an Established Art Form .......................................................2

B. Richard Prince, a World-Renowned Appropriation Artist ..................................3

C. Prince's Creation of the *Canal Zone* Series.........................................................4

D. Gagosian Gallery's *Canal Zone* Exhibition.........................................................7

E. Cariou's Career as a Photographer .....................................................................8

F. Cariou's Creation of the Images in *Yes Rasta* ...................................................8

G. By Cariou's Own Design, the Market for his Images is Virtually Non-
Existent ...............................................................................................................10

ARGUMENT................................................................................................................12

PRINCE'S APPROPRIATIVE USE OF THE *YES RASTA* IMAGES WAS FAIR.....................12

A. Because the Paintings in Prince's *Canal Zone* Series Were Created With
New Insights, a Different Purpose, Message and New Meaning, the
Character and Purpose Prong of the Fair Use Defense Weighs Decidedly in
Defendants' Favor...............................................................................................13

 1. Prince's Use of the Images was Transformative...........................................14

 2. The Broader Public Benefit of the Public Exhibition, and Progress, of
Art Outweighs the Commercial Exploitation of the Paintings ....................16

 3. Although Not Dispositive, Prince Acted Properly and in Good Faith..........16

 4. Prince Had a Genuine Creative Rationale for Appropriating the Images....17

B. The Nature of Cariou's Work – Depicting, as Accurately as Possible, Real-
Life Images – Weighs in Favor of Fair Use.......................................................19

C. The Amount and Substantiality of the Images Prince Used was Reasonable....19

D. Prince's Use of the Images Did Not Usurp the Potential Market For, or
Value of, the *Yes Rasta* Images..........................................................................22

i

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d at 612-13 ................................... 19, 20

*Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) ............................................................... passim

*Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F.Supp. 2d 499, 509-10 (S.D.N.Y. 2009) ........................................................................................................................................... 15, 19

*Calloway v. Marvel Entm't. Group*, 1983 U.S. Dist. Lexis 10506, at **14-15 (S.D.N.Y. 1983). 13

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) ............................................ passim

*Consumers Union of the United States, Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1051 (2d Cir. 1983)........................................................................................................................................ 23

*Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1121 (D. Nev. 2006)............................................... 21

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985) ............................ 13

*Irwin v. ZDF Enters.* GMBH, 2006 U.S. Dist. Lexis 6156, at *9 n.1, 11-14 (S.D.N.Y. 2006).... 13

*Leibowitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998).......................... 15, 21

*NXIVM Corp. v. Ross Inst.* 364 F.3d 471, 479 (2d. Cir. 2004).................................. 16, 20, 22, 25

*Video-Cinema Films, Inc. v. Cable News Network, Inc.*, 2001 U.S. Dist. LEXIS 25687 *29 (S.D.N.Y. 2001).......................................................................................................................... 23

## Other Authorities

*Beyond Rogers v. Koons: A Fair Use Standard For Appropriation*, 93 Colum. L. Rev. 1473, 1478 (Oct. 1993)........................................................................................................................... 2

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990)................ 12

## **Preliminary Statement**

In creating the *Canal Zone* paintings, Richard Prince drew inspiration from the world around him to develop his artistic vision for a fantastical, post-apocalyptical world where all that remained was music and the bands to play it. In expressing that vision, Prince, in the tradition of other acclaimed appropriation artists, used raw materials appropriated from many sources, including pages torn from *Yes Rasta,* a book of photographs taken by Patrick Cariou of Rastafarians in their native Jamaican landscape, to convey new insights with a wholly new expressive meaning and message, the redemptive value of music and equality between the sexes. Through the use of established appropriative techniques, Prince expressed this genuine creative rationale, by collaging and scanning rescaled, altered, cropped images to which he added images of guitars, painterly elements, and historical art references as an homage to master painters he admires. In doing so, Prince achieved his goal of using only what was needed to transform the raw elements into a beautiful, completely new and contemporary take on the music scene having nothing to do with Rastafarians in their Jamaican landscape. As such, the exhibition and sale of the *Canal Zone* paintings by Prince, through the efforts of Gagosian Gallery and its owner, Lawrence Gagosian, does not compete with, and therefore could not ursurp the market for, Cariou's *Yes Rasta* images. Indeed, as of November 2008, when the *Canal Zone* exhibition opened, the market for Cariou's images was virtually non-existent due solely to choices Cariou made, and not any bad faith or unlawful conduct by defendants. When viewed in light of defendants' contribution to the broader public benefit of art, then, Prince's use of the *Yes Rasta* images was fair. The goal of copyright law to promote the progress of the arts would be better served by allowing Prince's use of the Images because to hold otherwise would effectively stifle, if not foreclose, an established art form that has been firmly entrenched in society and art history.

1

## **FACTUAL BACKGROUND**

### A.    **Appropriation Art, an Established Art Form**

Appropriation art can be traced back to the late 19th century when authors, composers and artists began borrowing from existing artworks, using fragments of them to create their own. Kenly Ames, *Beyond Rogers v. Koons: A Fair Use Standard For Appropriation*, 93 Colum. L. Rev. 1473, 1478 (Oct. 1993) ("Ames"). By the 20th century, incorporation of elements of popular culture and of existing works had become routine. *See* Ex A (Tate Collection Glossary definition of Appropriation Art).[1] In appropriating artwork, artists "encompass a wide variety of methods, ranging from the incorporation of a single element into a much larger work through collage techniques to the reproduction of an image without physical alteration, but reattributed to the appropriating artist." Ames at 1479. The collage technique takes pieces of photographs, fabric and other raw materials that are organized together and affixed to a surface, often a canvas, creating a layered effect, to produce a completely new work. *See* Ex B (Tate Collection Glossary definition of collage). By reusing a work and removing it from its usual context, appropriation artists aim to give new meaning to the work, questioning "the most fundamental perceptions, both literal and symbolic, on which society is based." Id. at 1482.

Some examples of the most celebrated appropriation art include Dadaist Marcel Duchamp's Fountain (1917), in which he used a readymade urinal, rotated it ninety degrees and signed it with a pseudonym "R. Mutt," to reference a popular cartoon character. *See* Ex C (Tate

---

[1] "Ex __" refers to the exhibits attached to the accompanying Affidavit of Hollis Gonerka Bart ("Bart Aff."). "RP Aff." or "Prince Affidavit" refers to the accompanying Affidavit of Richard Prince in Support of Defendants' Joint Motion for Summary Judgment. "RP Tr." refers to the transcript of the Prince deposition taken on October 6, 2009, "LG Tr." refers to the transcript of the deposition of Lawrence Gagosian taken on October 8, 2009, "AP Tr." refers to the transcript of the deposition of Anthony Petrillose, taken on October 23, 2009, "PC Tr." refers to the transcript of the deposition of Patrick Cariou taken on January 12, 2010, "CC Tr." refers to the transcript of the deposition of Christiane Celle taken on January 26, 2010, excerpts of which are attached to Bart Aff. as Exhibits G, L, R, U, Y, respectively.

2

Collection description of Marcel Duchamp).  Another is pop-artist Andy Warhol, who created

iconic paintings using popular, commercial images and portrait paintings and recreated them

using bright colors, repetition, and his signature grid.  *See id.* at Ex D (MOMA description of

Warhol's Gold Marilyn Monroe 1962).  Other well-known appropriation artists include Pablo

Picasso, Georges Braque, Jasper Johns, Robert Rauschenberg, Sherrie Levine, Salvador Dali,

Jeff Koons and Prince.  *See* Ex A; *see also* Ex E, ¶ 18; Ex F (Guggenheim Release on Prince).

**B.      Richard Prince, a World-Renowned Appropriation Artist**

Prince's career as an appropriation artist began in 1977, when he re-photographed

discarded advertising images he salvaged while working in the tear-sheet department of Time

Life.  RP Aff. ¶ 5; RP Tr. 12-13, 48-49; *see also* RP Tr. 46.  Initially, Prince made collages with

the clippings, combining the images as if they were freeze frames from the same movie.  RP Aff.

¶ 5.  Over time, he began working with other artists' photographic images and re-photographing

them to place them in a wholly different context.  *Id.* at ¶ 6; *see also* RP Tr. 13-16.  In 1984,

Prince began a new body of works consisting of exact re-drawings of cartoons that evoke a mix

of cultural preferences, human desires and prejudices.  *Id.* at ¶ 7.  These works eventually led to

his pursuit of painting and the addition of painterly elements to his work.  *Id* at ¶ 7.  In the

ensuing years, his techniques expanded with his scribbled "Hippy Drawings" consisting of stick

figures with abstract, mask-like faces onto which he would paint circles over the eyes, nose and

mouth, known as his "lozenge" faces.  RP Aff. ¶ 8.  This body of work was followed by

sequential series such as the *Nurses* (2002-04), the *Check Paintings* (2004-05), the *De Kooning

Paintings* (2007-07), and the *Canal Zone* (2008).  RP Aff. ¶ 10.  With each successive series,

Prince broadened his gestural style with bright colors, dripping paint, bold brush strokes and

other painterly elements to create a layered effect.  *Id.* at ¶ 9.  Historically, Prince has gravitated

toward repetition, groupings and categories as he expresses himself taxonomically, based on the belief that objects are best understood in relation to other objects. *Id.* at ¶ 11.

Prince's appropriative style also is informed by trends in popular culture. *Id.* at ¶ 12. Prince's works feature guitars as a repetitive element, representing his love for music. *Id.* at ¶ 12. Prince is "always trying to hook [his] art up with musical terms." RP Tr. 43; *see also id.* at 125-26. Prince frequently pays homage in his works to master painters whose work he respects. RP Aff. ¶¶ 21, 27; RP Tr. 165-67; Ex F (Guggenheim Release on Prince). Prince aspires to create beautiful pieces of art, and believes that "artists ... should be as free as possible... in their studios." Price Aff. ¶ 3; RP Tr. 123. "Art is about freedom. It's not about being restricted. If I was restricted, then I couldn't transform these images . . . I believe artists     . . . should be as free as possible, yes, in their studios." *Id.* at 120-21.

Prince's works are considered among the most innovative art produced in the past 30 years. Ex F; *see also* Ex E at ¶ 28 (Prince is "an accomplished, educated and informed artist"). The work of Prince has been widely exhibited and is found in the permanent collections of major museums around the world. RP Aff. ¶ 3. In late 2007, the Solomon R. Guggenheim Museum in New York presented a major retrospective of his work, which filled the entire rotunda and two tower galleries. *Id.* at ¶ 3. *See also* Ex F. Prince's works also are sought by significant collectors. RP Aff. ¶ 4. He has an active and strong primary gallery market, with a strong secondary market at auctions and in private sales. *See* Ex H, Ex I. In 2008, *Overseas Nurse* sold at auction in London for approximately $8.4 million, the highest price for a work by Prince to date. *See* Ex J, Ex K.

**C.    Prince's Creation of the *Canal Zone* Series**

As detailed further in his affidavit, Prince's creation of the *Canal Zone* series evolved from the storyline of a cinematic "pitch" he began writing in 2007 entitled, *Eden Rock. See* RP

4

Aff. Ex A; *see also* RP Tr. 218, 232. The screenplay is his fantastical account of survivors of a worldwide nuclear attack whose cruise ships end up in St. Barts. *Id.; see also* RP Tr. 30, 192, 207-208. Forming separate "tribes" or "gangs," these survivors take over the resort hotels on the island and create their own post-apocalyptic society. *Id.* at ¶ 16; *see also* RP Tr. 207-08, 214-18.

For Prince, the creation of the *Canal Zone* series was the culmination of a confluence of events that came together when he heard his stepson playing the alternative music of the Easy Star All-Stars band in the album *Radiodread.* RP Aff. ¶ 17; RP Tr. 263-64, 266. The next day, Prince found a copy of *Yes Rasta* in a bookstore on St. Barts (Ex EE), and was drawn to the images in the book, given his inclusion of a reggae band as the Rastafarian "tribe" in his screenplay. RP Aff. ¶ 17; RP Tr. 150-51, 153-58, 158, 266. Drawing inspiration from his birthplace, the Panama Canal Zone, where he had recently visited, and the storyline of his *Eden Rock* screenplay, Prince imagined a make-believe, post-apocalyptic enclave, the Canal Zone, in which bands and music are the only things to survive. RP Aff. ¶ 16; RP Tr. 7, 30, 207-08, 218, 232, 251-52. As Prince explains it, "the redemptive value of music is one of the important concepts of this series." *Id.* at ¶ 22; *see also* RP Tr. 251-52 (Prince's *Canal Zone* Paintings represent a musical band).

To convey his message, Prince, in the tradition of Duchamp, used appropriated imagery, which included 41 images torn from the pages of *Yes Rasta* (collectively, the "Images"), and images of naked women, rock guitars and musicians' hands taken from several other sources. RP Aff. ¶ 24; PR Tr. 30 (Images were but one of the "recipe ingredients" that became the *Canal Zone* series); *see also* RP Tr. 170-71, 277-80 (guitars, naked women and Rastas were all ingredients in the Paintings, with the guitar being the primary one). In all but one of the works, *Canal Zone,* 2007, Prince digitally scanned and enlarged the images, applying some directly to the canvas as a backdrop for collaging, and others as cut-out collage elements. RP Aff. ¶ 26; RP

Tr. 40; 168-69.  In some of the works, Prince affixed the collage elements to other images with

scotch tape for further scanning, and in others he would apply the collage elements directly to the

canvas using his squeegee technique in which elements are affixed to the canvas with paint.[2]  RP

Aff. ¶ 26; *see also* RP Tr. 168-69; 331-37.  *Canal Zone*, 2007 consists of portions of 35

Rastafarian faces torn from pages in *Yes Rasta* and onto which Prince drew and painted

facemasks.  RP Aff. ¶ 48.  These were reordered and tacked to a board as means for Prince to

introduce the likely characters of his next series, the *Canal Zone*.  *Id.*

      Stylistic references to the history of art are a hallmark of Prince's *Canal Zone* Paintings

in which he pays homage to artists such as de Kooning, Cezanne, Warhol and Picasso.  RP Aff. ¶

21; RP Tr. at 165-66; 300-01.  For example, the enlarged hands in several Paintings represent a

transition from the *De Kooning* series, which emulated the compositional style of De Kooning's

hybrid creatures, and also is a reference to Cezanne's *Bathers*.  RP Aff. ¶ 21; *see also* RP Tr.

156, 166-67, 251-52; 264-65.  In the style of de Kooning's contorted facial features and

Picasso's primitive masks, Prince abstracted the faces found in many of the *Canal Zone*

Paintings with painterly elements, oil stick crayon, and the application of his signature "lozenge-

face" circles.  RP Aff. ¶ 21; *see also* RP Tr. 172-73.  As Prince explained in his deposition, he

was attempting to create an "unbelievably looking great painting that had to do with a kind of

rock-and-roll painting on the radical side, and on a conservative side, something to do with

Cezanne's *Bathers*."  *Id.* at 361.  "As I said, I'm trying to make a kind of fantastic, absolutely

hip, up to date, contemporary take on the music scene.  And it's my way of dealing with this idea

that I've always had, which are the three relationships that exist in the world, which are men and

---

[2] For a more detailed description of the transformative nature of the various elements and
techniques Prince used in the Paintings in the *Canal Zone* series, the Court is respectfully
referred to the Prince Affidavit at paragraphs 32 through 61 and Exhibit A thereto, which is a
Composite Exhibit describing the transformative elements of each of the Paintings, and
contrasting Cariou's stated purpose for each of the Images Prince lawfully appropriated from *Yes
Rasta*.

women, men and men, and women and women." *Id.* at 338-39.  In the *Canal Zone series,* Prince

emphasized equality between the sexes.  RP Aff. ¶ 61.

**D.    Gagosian Gallery's *Canal Zone* Exhibition**

Lawrence Gagosian is the founder and owner of the Gagosian Gallery, a leading

contemporary art gallery with eight locations worldwide.  Ex L at LG Tr. 16, 18-19.  Throughout

its history, Gagosian Gallery has dedicated itself to organizing important exhibitions of

contemporary art.  *See,* www.gagosian.com.  Since approximately 2005, Gagosian Gallery has

represented Prince in the marketing and exhibition of his artwork.  LG Tr. 24.

From about November 8, 2008 through December 20, 2008, Gagosian Gallery held the

*Canal Zone* Exhibition (the "Exhibition") at its gallery in Chelsea, featuring 22 of the 29

Paintings in the *Canal Zone* series.  Ex M; LG Tr. 25.  Gagosian Gallery sold 14 of the Paintings

through its promotion of the exhibition.  Ex N at Ex A.  Gagosian Gallery purchased four of the

Paintings, and some were traded in non-cash transactions for other works.  *Id.*

Gagosian Gallery spent approximately $434,730.47 organizing and marketing the

Exhibition.  Ex O at GGP0043144.  Advertisements for the Exhibition were featured in various

publications.  Ex P at GG0071-79.  Marketing efforts primarily targeted prominent collectors,

gallerists and museums, as they are the predominant market for Prince's artwork.  *See* Ex H.

Invitations to the Exhibition were sent to target consumers.  *See* LG Tr. 59-60; Ex Q.  Gagosian

Gallery also created a catalogue entitled *Canal Zone,* featuring Paintings in the Exhibition.  Bart

Aff. Ex M.  Rizzoli International planned to publish *Canal Zone* for distribution that was

scheduled to begin in September 2009, but Rizzoli backed out because of plaintiff's lawsuit.[3]

*See* AP Tr. 24.  Though not legally obligated to do so, Defendants withdrew the unsold

Paintings, pending this case.  RP Aff. ¶ 28.

---

[3] Plaintiff has since dismissed all claims against Rizzoli with prejudice.  *See* Ex S.

**E.     Cariou's Career as a Photographer**

Cariou is a Paris-based photographer who has published a number of photography books, including *Yes Rasta*, published in 2000 by powerHouse Books, Inc. ("powerHouse"). PC Tr. 45-46, 280, 285; Ex T ¶ 3; Ex E ¶ 3. For the past 20 years, Cariou has focused on portraiture photography and landscapes. PC Tr. 45-6, 280, 285. Sometime before 2004, Cariou stopped accepting commercial free-lance photography assignments to focus solely on his photography projects. PC Tr. 282. Two other books, entitled *Surfers* and *Trench Town Love*, containing Cariou's portraiture-style photographic images have been published. According to Cariou, his fourth book, featuring his Gypsy project, was finished in the fall of 2008, however, as of January 2010, he had no plans to publish this book. PC Tr. 286-7; *but see* CC Tr. 43-44. A few images from Cariou's *Yes Rasta* book and *Surfers* book were exhibited at a gallery in Paris in 2000. PC Tr. 234-235, 288-89. Images from his *Trench Town Love* series were exhibited in a small museum in Paris named La Villette for two months in 2009 as part of a group show. Ex V at 3(f); PC Tr. 288-90.

**F.     Cariou's Creation of the Images in *Yes Rasta***

According to Cariou, the approximately 100 images that appear in *Yes Rasta* were taken over a six-year period, during which time he continued his career as a professional photographer. AC at ¶ 16; PC Tr. 39-40. Cariou testified that he wanted to photograph Rastafarians in Jamaica because of his love for Reggae music, Jamaica, its culture, the "look" of the Rastafarians and because "no book ha[d] ever been done about Rastafarians." PC Tr. 35-6; Ex E ¶ 16; Ex Z. His intent was to document the Rastafarian culture and the surrounding landscapes, and to capture as closely as possible the subject being photographed. PC Tr. 36, 40-43, 45, 110, 166, 171; 172-73; 176-78; 265-66; *see also id.* at 120; 185-86 ("What I'm into is to make beautiful books."); [4]

---

[4] None of the images in *Yes Rasta* have titles. PC Tr. 77; *but see* RP Tr. 248-49 (for Prince, titles to the Paintings are an important component to the works and to "recontextualizing the image" and "create[] another type of subtext that you can read into the painting.").

GGP0043115-6; *but see* RP Tr. 357-58 (in contrast to Cariou's images which capture what is actually there, Prince has "never been interested in what's actually there."). Cariou described the *Yes Rasta* project to powerHouse Books, in this way: "I told them that I wanted to have a book of photographs,...of portraiture, and I didn't want that book to look pop culture at all . . . ." *Id.* at 187. Cariou testified that powerHouse marketed *Yes Rasta* to consumers of artist books. *See id.* at 188; *but see* Ex W.

Cariou describes his portraiture style as "a static way of taking a picture of when someone is looking at you;" that is, it is staged and the subject knows he/she is being photographed. *Id.* at 45-46. To Cariou, it is the combination of the way the subject looks at the viewer, the way his body looks, the lighting and the quality of the black and white that make his images strikingly original. *See, e.g.,* PC Tr. 80-81; *but see* Ex CC (similar images from Internet).

Cariou explained that sometimes he would just snap a landscape shot while on his way to another destination, and sometimes he would choose background settings because he thought they would make a beautiful portrait, they suited the subject, were visually compelling, or created a tropical feel, or because they just "felt good" or it "felt right" and not because of any specific attribute about the particular setting. *Id.* at 51, 74, 84, 109-10, 112, 115; 151. Cariou also included photographs of marijuana plantations to depict a prominent feature of the Rastafarian and Jamaican cultures. *Id.* at 114-15; 118. Many of the Images were taken in the towns of Negril and Lucille and in other public places. *Compare* PC Tr. 6, 36-37, 73-74, 83-84, 128 *with* Ex E at ¶ 16. In many instances, Cariou blurred the landscape background to make the subject stand out. *See, e.g.,* PC Tr. 53-55, 123-24; 140-41. Cariou believes his landscape images in *Yes Rasta* are distinctive because they are his and because of the way the tropical landscape is organized in the book, adjacent to the portraiture shots. *Id.* at 67-68, 109; *see also id.* at 171. As

9

Cariou explained it, the reader must view the whole book to get the feel of the subject matter of each of the individual images in *Yes Rasta*.[5] *Id.* at 81.

## G.   By Cariou's Own Design, the Market for his Images is Virtually Non-Existent

Cariou has utilized an unconventional business model to manage and advance his career as a photographer, such that as of November 2008, the market for his photographic images was virtually nonexistent.  Information about Cariou's career as well as images from his books can be found at the website he set up years ago, www.patrickcariou.com.  Cariou says he does not maintain or monitor this website or check the email address listed on the webpage to see if he has had any inquiries concerning his work.  PC Tr. 239.  Visitors to Cariou's website can only purchase photographs if they contact him directly via the website.  *Id.* at 238-39.  Cariou testified that since its creation, no one has contacted him through the website to purchase any of his photographs. *Id.* at 239-40, 254, 260.

Cariou has only sold a few photographs, and by choice, all of these sales were to his friends or to people he liked depending on his mood.  Ex V at 1(c); *see also* PC Tr. 89, 92, 126, 157-58, 161, 237, 283-84.  In each instance, Cariou arbitrarily decided the price.  *See* PC Tr. 92. *Id.* at 221.  Moreover, in selecting artist editions for the works he sold, Cariou said he did not really give much thought to which photographs to select.  *Id.* at PC Tr. 93-94.  Likewise, Cariou has made little attempt to market the *Yes Rasta* images, and he has not given any of the 70 copies of *Yes Rasta* that he received free from the publisher to people who could help market the book. *Id.* at 103, 109, 116, 118, 121, 128, 129, 134, 139, 140, 142, 144, 153, 159, 221.

Cariou is not listed in the 2009 Art in America guide to galleries, museums and artists. *See generally* www.artinamerica.com.  Cariou also is not included in either of the Artnet

---

[5] For a detailed recitation of Cariou's stated reasons for photographing the Images, the Court is respectfully referred to the Composite Exhibit attached to the Prince Affidavit as Exhibit A.

databases, which is a valuable resource utilized by art appraisers, art dealers, museum curators, auction experts, and collectors to find artists. *See* www.artnet.com. Cariou's website does not list museum exhibitions featuring his work. Ex X at GG004340 – 43143. Other than the exhibition at Gallerie 213, Paris, Cariou has not exhibited or actively sought to exhibit the *Yes Rasta* Images in an effort to promote their sale. PC Tr. 232, 234-235, 288-89.

According to Cariou, exhibiting his works at the Clik Gallery was the first opportunity he considered to exhibit and sell the *Yes Rasta* Images. *Id.* at PC Tr. 95. Cariou testified that Christiane Celle ("Celle") planned to represent him on an exclusive basis for the exhibition. *Id.* Cariou claims that Celle backed away from doing the *Yes Rasta* show because she did not want to look opportunistic and ride on Prince's fame while his work was being exhibited at Gagosian. *Id.* at 100. Celle, however, has not foreclosed working with Cariou on future projects, and has even requested proofs from Cariou for other shows, but Cariou has not followed through with finalizing her representation of him. Bart Aff. Ex Y, CC Tr. 106, 133, 149; *see also* PC Tr. 103. After deciding not to move forward with the *Yes Rasta* exhibition, Celle also reached out to Cariou to inform him of her decision. CC Tr. 63. However, Cariou never responded. CC Tr. 63-65, 71. It was not until they spoke months later, when he called to ask her for help with this lawsuit, that Celle first informed Cariou that she had, for her own professional reasons, decided not to proceed with a show featuring the Images in *Yes Rasta*. *Id.* 71-73. Cariou has not approached anyone else about the possibility of helping him implement his plan to sell prints from his various bodies of work, including invoking his right under his agreement with powerHouse Cultural Entertainment, Inc. ("powerHouse") to permit others to publish his Images. *Id.* at 103, 230-231.

Cariou was not involved in the marketing, advertising, or publicity of *Yes Rasta*. *See id.* at 185, 212, 224. Cariou did not know how many *Yes Rasta* books were sold, whether it was out

11

of print, how many copies powerHouse still has available for sale, or whether powerHouse has

received inquires about the possible sale of *Yes Rasta*. *Id.* at 211, 218, 230, 268; *see also* RP Tr.

236 (*Yes Rasta* was out of print when Prince started to create the *Canal Zone* series).  Discovery

obtained from powerHouse shows that the market for *Yes Rasta* is very small. *See* Ex T at ¶ 4.

powerHouse published one edition of *Yes Rasta*, and has only sold 5,791 copies. *Id.* at ¶ 2, 3.

Cariou has earned $8,087.75 in royalties from the sale of *Yes Rasta*. *Id.* at 214-215; Ex T at ¶¶ 2,

3, and 6.  Although powerHouse has not foreclosed working with Cariou on future projects, a

hard cover edition of Yes Rasta is out of stock and a limited number of copies are available for

sale through the powerHouse website. *Id.* at Ex T, ¶¶ 8-9, 11.  Cariou claims his ability to sell

copies of *Yes Rasta* or to earn revenues from derivative works based on the Images has been

damaged due to defendants' alleged conduct. Ex E at ¶ 14.  Cariou, however, never intended to

continue with portrait photography, and it was not until recently that he allegedly "decided" he

was finally ready to market and sell his images.  PC Tr. 94-95, 235, 284-85, 286.

## ARGUMENT

### PRINCE'S APPROPRIATIVE USE OF THE *YES RASTA* IMAGES WAS FAIR

Section 107 of the Copyright Act is a codification of the common law tradition of fair use

adjudication, and requires courts to avoid a rigid application of the copyright statute that "would

stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music,*

*Inc.*, 510 U.S. 569, 577 (1994). *See also* Pierre N. Leval, *Toward a Fair Use Standard*, 103

Harv. L. Rev. 1105, 1107 (1990) ("Leval") ("Fair use should be perceived . . . as a rational,

integral part of copyright, whose observance is necessary to achieve the objectives of that law.").

"The ultimate test of fair use . . . is whether the copyright law's goal of 'promoting the Progress

of Science and useful Arts,' . . . 'would be better served by allowing the use than by preventing

it.'" *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (citations omitted).

In determining fair use, courts rely on four *non-exclusive*, statutory factors: 1) "the purpose and character of the use," 2) "the nature of the copyrighted work," 3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," and 4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. Since "no generally applicable definition [of the fair use doctrine] is possible . . . each case raising the question must be decided on its own facts." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). *See also Blanch*, 467 F.3d at 251 (*citing Campbell*, 510 U.S. at 577-78) ("determination of fair use defense is an open-ended and context-sensitive inquiry."). "Although '[f]air use is a mixed question of law and fact,' this court has on a number of occasions resolved fair use determinations at the summary judgment stage where . . . there are no genuine issues of material fact." *Blanch*, 467 F.3d at 250. When viewed in light of the pivotal role of the fair use defense in promoting the progress of arts and the public exhibition of art, Prince's appropriation of plaintiff's *Images* should be considered fair use as a matter of law.[6]

**A.    Because the Paintings in Prince's *Canal Zone* Series Were Created With New Insights, a Different Purpose, Message and New Meaning, the Character and Purpose Prong of the Fair Use Defense Weighs Decidedly in Defendants' Favor**

The first factor, the purpose and character of the use, lies at the heart of the fair use inquiry, and is often considered the key factor in determining fair use. *See Campbell*, 510 U.S. at 579. In evaluating the purpose and character prong, courts in this Circuit consider whether the use was transformative, for a commercial purpose, and in bad faith, as well as the rationale for the use. *See, e.g., Blanch,* at 476 F.3d at 251-56.

---

[6] Plaintiff's Fifth Claim for Relief, "Conspiracy by [Defendants] to Violate Plaintiff's Rights Under the Copyright Act" must be dismissed because there is no cause of action under New York for conspiracy to violate the Copyright Act, and such claims are preempted by the Copyright Act. *Calloway v. Marvel Entm't. Group*, 1983 U.S. Dist. Lexis 10506, at **14-15 (S.D.N.Y. 1983); *Irwin v. ZDF Enters. GMBH*, 2006 U.S. Dist. Lexis 6156, at *9 n.1, 11-14 (S.D.N.Y. 2006).

1.    Prince's Use of the Images was Transformative

In determining whether the secondary work is transformative, the central inquiry is

whether it "merely 'supersedes the objects' of the original creation, or instead adds something

new, with a further purpose or different character, altering the first with new expression,

meaning, or message…in other words, whether and to what extent the new work is

'transformative.' Although such transformative use is not absolutely necessary for a finding of

fair use, the goal of copyright, to promote science and arts, is generally furthered by the creation

of transformative works. Such transformative works thus lie at the heart of the fair use

doctrine's guarantee of breathing space." *Id.* at 251 *quoting Campbell*, 510 U.S. at 579 (citations

omitted). The secondary use adds value where the copyrighted expression in the original work

"is used as raw material, transformed in the creation of new information, new aesthetics, new

insights and understandings – this is the very type of activity that the fair use doctrine intends to

protect for the enrichment of society." *Id.* (citations omitted).

Here, Cariou's stated goal was to create a beautiful portraiture book, which accurately

depicts members of the Rastafarian culture in their native Jamaican landscapes. PC Tr. 35-36,

51, 132, 134, 141, 186, 265-66; *see also* Ex 2. In other words, Cariou's objective in taking the

Images was to document the Rastafarian culture as reality. *See, e.g.*, Ex AA. Prince, in contrast,

is "not interested in what is actually there," and is instead "really interested in making art

that…transforms something that's already existed without getting involved in the original intent

of the image." RP Tr. 167, 358.

In furtherance of that artistic purpose, Prince appropriated the Images, along with other

raw materials, and used them for an entirely different artistic and expressive purpose, which was

to create his vision of a fantastical post-apocalyptical world set in a place which no longer exists,

while paying homage to master painters. RP Aff. ¶ 21; *see, e.g.* RP Tr. 30, 165-67; 341, 365.

One of his creative message for the *Canal Zone* series was to have "music groups and music

14

itself be the surviving, if not redeeming, fact of life in the post-apocalyptic world I imagined in my screenplay. The redemptive value of music is one of the important concepts and messages of this series." RP Aff. ¶ 22; *see also* RP Tr.338-40. Prince added guitars to the Paintings to establish groupings of men and men, men and women, and women and women as musical bands, to connote equality between the sexes (RP Aff. ¶ 22) and to further the band and music theme that was one of the centerpieces of his *Canal Zone* series (RP Tr. 279; 338-39. RP Aff. ¶¶ 22 , 32, 44, 45, 46, 53, 55, 65 and Ex A to RP Aff.).

As detailed further in the Prince Affidavit, Prince's juxtaposition of collaged and other elements in each of the Paintings combined to create a fictionalized world that transforms the individual raw elements used in the Painting into a completely new expression and a different message that had nothing to do with capturing as accurately as possible the Rastafarian culture in native landscapes in Jamaica.[7] On this record, the first, and arguably most compelling, fair use factor, weighs decisively in favor of a finding that Prince's appropriative use of rescaled, altered, cropped reproductions of the Images as raw materials in the Paintings, is transformative and should therefore be considered fair use. *See, e.g., Blanch*, 467 F.3d at 252-53 (use of copyrighted work as "raw material" to further creative objectives "sharply different" from those of copyright owner "confirms the transformative nature of the use."); *Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F.Supp.2d 499, 509-10 (S.D.N.Y. 2009) (Batts, J.) ("The Second Circuit found it 'plain' that superimposing the face of Leslie Neilsen on a photographed body intended to look like Demi Moore's was 'transformative' of Leibovitz's original photograph.") citing *Leibowitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998).

---

[7] As the layering of the raw materials and other elements used in the Painting is difficult to appreciate from a view of the *Canal Zone* book or the photographs attached to the Prince Affidavit, the defendants invite the Court to inspect the Paintings in person at either Prince's studio in Rensselaerville, New York or in a gallery space in Manhattan should the Court wish to confirm Prince's sworn statements concerning the manner in which he used the Images.

2.     The Broader Public Benefit of the Public Exhibition, and Progress,
       of Art Outweighs the Commercial Exploitation of the Paintings

While courts will consider the commercial nature of the secondary use when it is an

untransformed duplication of the original, any significance attributable to the commercialism

factor should be discounted where, as here, the second use is demonstrably transformative. *See*

*Blanch v. Koons,* 467 F.3d 244, 254 (citing *Campbell*, 510 U.S. at 579) ("The more

transformative the new work, the less will be the significance of other factors, like

commercialism, that may weigh against a finding of fair use."); *see also* Point A(1). In any

event, given the importance placed on encouraging the creative expression of art, the net

economic gains derived from the Paintings to which defendants stipulated (*see* Ex N), should

give way to the broader public benefits to be derived from the public exhibition of works of art

by Prince. *See id.* at 253-54 ("courts are more willing to find a secondary use fair when it

produces a value that benefits the broader public interest . . . Notwithstanding the fact that artists

are sometimes paid and museums sometimes earn money, the public exhibition of art is widely

and we think properly considered to 'have value that benefits the broader public interest.'"). As

such, little weight, if any, should be afforded to the commercialism factor.

3.     Although Not Dispositive, Prince Acted Properly and in Good Faith

Although consideration of the propriety of an alleged infringer's conduct is an integral

part of the analysis, it is not, even when undertaken in bad faith, dispositive of either the first

factor or the fair use defense. *NXIVM Corp. v. Ross Inst.* 364 F.3d 471, 479 (2d. Cir. 2004)

citing *Campbell*, 510 U.S. at 585 n.18. In any event, as Prince did not act in bad faith when he

used the Images to create the Paintings, the good faith factor weighs in Prince's favor.

Cariou readily admits that Prince is a well-known appropriation artist. (Ex E ¶ 18).

"Appropriation art" is defined as taking "possession of another's imagery (or sounds), often

without permission, reusing it in a context which differs from its original context, most often in

16

order to examine issues concerning originality or to reveal meaning not previously seen in the original." Ex BB. Thus, appropriation art necessarily entails a taking and repurposing of another image and turning it into something else – a construct that is the very essence of the fair use doctrine. As such, Prince's use of the Images was consonant with an established art form for which he is well-known; that is, taking raw elements and turning them into something new. *See, e.g.,* RP Tr. 120-21, 123. Indeed, that Prince would not object to his own images being copied and sold for a profit, illustrates his belief in appropriation art as an art form, his commitment to the promotion of the arts, and in turn, his lack of bad faith. RP Tr. 88 ("I'm all for it."), 123 (artistic freedom is for all artists: "It could be an art student. I would encourage it.").

In any event, Cariou's claim that Prince appropriated the Images without Cariou's permission (Ex E ¶ 19; RP Tr. 28), in itself, does not constitute bad faith. *Blanch*, 467 F.3d at 256 ("We are aware of no controlling authority to the effect that the failure to seek permission for copying, in itself, constitutes bad faith and the cases addressing bad faith tend to arise in circumstances strikingly different from the situation here."). Even plaintiff's allegation of "continued distribution" of Prince's work after plaintiff notified him of his copyright infringement claim (Ex E ¶ 27), "is of no relevance to the fair use equation . . . because [i]f the use is otherwise fair, then no permission need be sought or granted . . . ." *Id.* Besides, upon learning of this lawsuit, defendants pulled the remaining Paintings pending resolution of this lawsuit out of respect for the judicial process. RP Aff. ¶ 28.

    4.    <u>Prince Had a Genuine Creative Rationale for Appropriating the Images</u>

For Prince, his decision to appropriate the Images was part of a fluid creative process that was inspired by a series of chance events, which happened while he was working on his *Eden Rock* screenplay. *See* RP Tr. 266; RP Aff. ¶ 16. Specifically, when Prince first saw a copy of *Yes Rasta*, he immediately made a connection between the images in the book and the jungles he

had seen on a recent visit to Panama. RP Tr. 158, 161; RP Aff. ¶ 17. The day before, he had seen "monumental cruise ships" in the harbor in St. Barts and he thought they should be in the screenplay. RP Tr. 266; RP Aff. ¶ 17. In thinking about who should be on the ship, the idea of a reggae band popped into his head. *Id.* At the time, he had been listening to Radiodread, an album that sampled and replicated Radiohead, in a reggae manner. RP Tr. 263-64; RP Aff. ¶ 17. As Prince explained, "I was very much into that album, I played it over and over. And then the next day I walk into a bookstore and what do I pick up, a book that had pictures of Rastas in them and I said to myself, hmm, something is in the air. It was pure chance." *Id.* "It's that notion of when worlds collide." RP Tr. 263; RP Aff. ¶ 17. Prince had been looking for black and white images of figures so that he could put them next to his *de Kooning* women, as a transition from that series. RP Tr. 264, 251; RP Aff. ¶ 17.

At the time he was painting his *de Kooning* series, Prince was already thinking about the *Canal Zone* series, and his desire to pay homage to de Kooning through that series. RP Tr.156-57, 165-66; RP Aff. ¶¶ 21, 38, 39, 40, 41, 42, 43, 46, 47, 51, 53, 62, 63. Working in the style of de Kooning, Picasso, and Warhol, and using the composition of Cezanne's *Bathers* along with other raw elements (*i.e.*, "ingredients"), Prince transformed the images he had torn from the pages in *Yes Rasta.* RP Tr. 167, 264, 277-79; RP Aff. ¶¶ 27, 42, 53, 63; *see also* Point A(1). The sincerity of Prince's artistic vision is further confirmed by the fact that he also used an image of a Rastafarian he came across in a book on Bob Marley. *Id.* at 162, 263; *see also* RP Aff. ¶ 24 and Ex M at p. 13-14. Prince, who two years earlier, had "started drawing directly in the book like [he] had done before in a book of De Kooning's work" (RP Tr. 151), was inspired by the Images because the Rastafarian culture was a subject he knew nothing about, and Prince often puts himself in a position to discover new things. *Id.* at 156. Thus, Prince's explanation for using the Images, particularly when viewed in light of the entirely different expressive

18

purpose of the *Canal Zone* series (*see* A(1)), reveals a genuine creative rationale for his appropriative use of the Images that supports a fair use defense.[8] *See Blanch*, 467 F.3d at 255 (Koon's sworn explanation for use of original work sufficient to carry justification prong of first fair use factor) cited in *Bourne*, 602 F.Supp.2d 499, 507-08 ("Second Circuit has given weight to an artist's own explanation of their creative rationale when conducting fair use analysis").

### B.    The Nature of Cariou's Work – Depicting, as Accurately as Possible, Real-Life Images – Weighs in Favor of Fair Use

Because Prince's use of the Images was transformative, the second fair use factor, the nature of the work, arguably is of limited usefulness since the use was intended to further a wholly different artistic purpose, and not to exploit the "creative virtues" of the Images. *See Blanch v. Koons*, 467 F.3d 244, 257 citing *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d at 612-13. In any event, because the images in Cariou's *Yes Rasta* book were published with the stated goal of depicting real-life images of Rastafarians in their native Jamaican landscape (*see* Ex Z), which, according to Cariou, are destined to have historical significance (PC Tr. 284-86), the second prong should weigh in favor of fair use. *See Blanch*, 467 F.3d 256 ("greater leeway being allowed to a claim of fair use where the work is factual or information, and [] the work is published"); *see also Blanch v. Koons*, 396 F. Supp. 2d 476, 481-82 (S.D.N.Y. 2005)(fair use factor favored defendant where image "not sufficiently original to deserve much copyright protection."); CC Tr. 160.

### C.    The Amount and Substantiality of the Images Prince Used was Reasonable

The third fair use factor considers whether "'the quantity and value of the materials used,' are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. *See*

---

[8] Cariou has suggested in his February 8, 2010 letter to the Court (Ex Z) that a work must comment on the original work to be transformative. This is not the law. While a transformative work may comment on the original work, it is not a prerequisite to finding that the secondary work is transformative. *See Blanch,* 467 F.3d at 255.

*also Blanch v.* 467 F.3d 244, 257 (whether copying was "excessive, beyond his 'justified' purpose for doing so."). This analysis focuses not only on the quantity of the materials used, but also their quality and importance. *Campbell*, 510 U.S. at 587; *Graham*, 448 F.3d 608, 613. The analysis "must take into account that 'the extent of permissible copying varies with the purpose and character of the use'" and the review is undertaken in reference to the original work.[9] *Graham*, 448 F.3d 608, 613 (citing *Campbell*, 510 U.S. at 586-87).

In this case, then, analysis of the amount and substantiality prong must begin with Cariou's testimony that the images in his *Yes Rasta* book need to be viewed as a whole in order to appreciate the distinctiveness of the individual images. PC Tr. 61-62, 81, 117. By his own admission, then, the individual Images are not particularly distinctive. Indeed, images strikingly similar to Cariou's images of Rastafarians, tropical landscapes and marijuana plantations can be readily found on the Internet (Ex CC), thereby demonstrating that the importance of the individual Images is marginal. *See Blanch*, 396 F. Supp. 2d at 467 at 482. Cariou's testimony also shows that the importance of the Images is as part of a collection of approximately 105 images in the *Yes Rasta* book, for which the copyright was registered as a compilation (Ex DD). Prince's use is thus diminutive and becomes inconsequential when viewed in light of Prince's overall creative and artistic purpose for the *Canal Zone* series. *See, e.g., NXIVM Corp.*, 364 F.3d at 481 (rejected "heart of the work" theory where plaintiff conceded book was an assemblage, and it reflected "no objective core").

Even when viewed individually, however, the quantity and value of the Images Prince used in his Paintings are reasonable to carry out that artistic purpose, particularly given the importance placed on the furtherance of the arts. Though Cariou has represented to this Court that Prince engaged in wholesale copying of entire original works, it is important to note that

---

[9] As such, Prince's enthusiastic appreciation for the images in *Yes Rasta* is not determinative, as plaintiff urges in his February 8, 2010 letter to the Court. *See NXIVM Corp.*, 364 F.3d at 480-81.

none of the Paintings incorporate the actual original works, the photographs themselves. Rather, the appropriative use was made of Images which plaintiff had already reproduced, altered and published in book format in *Yes Rasta*. *See* PC Tr. 204-205. Moreover, as can be readily seen from a comparison of the Images in *Yes Rasta* and those use in the *Canal Zone* series (*see* PR Aff. Ex A), in all but three of the Paintings, *Djuna Barnes, Natalie Barney, Renee Vivien and Romaine Brooks*, 2008, *On the Beach, On the Beach*, 2008, and *Graduation*, 2008, Prince appropriated only portions of the Images, and in all instances, did so solely to the extent necessary to further his unique artistic purpose and message. *See id. at* ¶¶ 55, 51, 32 and Ex A to Prince's Aff.

In the three instances where Prince used an entire Image, the amount and substantiality of the Images used is not fatal to defendants' fair use defense because Prince's artistic expression in those three Paintings, a fantastical post-apocalyptical survivor society on St. Barts, is entirely different from Cariou's artistic purpose of creating a beautiful book containing images that depict as realistically as possible Rastafarians in their native Jamaican landscapes. *See Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1121 (D. Nev. 2006); *see also Leibovitz* (fair use found even where entire photograph replicated to look precisely like original). Moreover, these three Images were altered, cropped and used solely as a backdrop for other raw elements painterly techniques. *Campbell*, 510 U.S. at 586-87 ("[T]he extent of permissible copying varies with the purpose and character of the use"; therefore, this inquiry requires the court to return to the first factor).

Given the purpose of the copyright law to progress the arts and encourage artistic freedom, the amount and substantiality factor should weigh in favor of fair use, particularly since, as demonstrated below, there has been no usurpation of the market for Cariou's *Yes Rasta* book or the photographs contained therein. *See* Leval at 1123-24 (amount and substantiality factor must be evaluated "in relation to the copyright objectives; they must consider the

justification for the secondary use and the *realistic risk* of injury to the entitlements of authorship.") (emphasis added).

**D.    Prince's Use of the Images Did Not Usurp the Potential Market For, or Value of, the *Yes Rasta* Images**

In his February 8 letter to the Court, Cariou points to Celle's decision not to go forward with a six-week show featuring Cariou's *Yes Rasta* images to support his view that the exhibition of the Paintings has resulted in "Potential Harm to the Market for Plaintiff's Photographs and Prints." Ex 2; PC Tr. 98-100.  However, even if Celle's testimony about her reputational concerns of not wanting to be seen as riding on Prince's coattails (CC Tr. 88-90) can be reconciled with her testimony that she went with another artist due to timing constraints because Cariou did not respond for months to her attempts to reach him (*id.* at 64-65), Celle's decision is not the sort of harm the Copyright Act protects. *See NXIVM Corp.,* 364 F.3d at 482 (affirming holding that Goldie Hawn's cancellation of visit with plaintiff after defendants disseminated allegedly infringing materials is not a cognizable harm under Copyright Act).  "In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivative, but whether the secondary use usurps the market of the original work." *Id.* at 481-82 (citing *Campbell,* 510 U.S. at 593).  "The focus here is whether defendants are offering a market substitute for the original." *Id.* at 481.  Here, there is no evidence that Prince's creation or defendants' exhibition and sale of the Paintings usurped, or was offered as a substitute for, Cariou's *Yes Rasta* images.

At the time the *Canal Zone* series was exhibited at Gagosian Gallery, the market for Cariou's *Yes Rasta* images was virtually non-existent.  Other than the creation and publication of the image in the *Yes Rasta* book in 2000 and his non-committal communications with Celle about a possible show in the spring of 2009 (CC Tr. 66), Cariou has not actively tried to license, market, promote, exhibit or actively sell any of the *Yes Rasta* images. *See supra* Factual

Background G. Instead, Cariou intentionally limited the sale of his works to his friends or people he likes. Ex V at 1(c); PC Tr. 89, 92, 126, 157, 158, 161. To date, Cariou has only sold six *Yes Rasta* images for €1,500 to €2,000. Cariou purportedly had no intention of making any of his portraiture work available to the public until his fourth and final book of *Gypsies* portraits was completed, which (purportedly) happened in the fall of 2008. PC Tr. 286; *but see* CC Tr. 43-44 (Cariou told her it was not done as of the fall 2008). Cariou, having completed the last book, intends to move on from portraiture photography altogether. PC Tr. 286. Thus, it was factually impossible to usurp a market that, by Cariou's own design did not exist.

Second, even if Celle's speculation that she would have done well with Cariou's *Yes Rasta* images (CC Tr. 82) could be spun as a forecast of the potential market for those images, Cariou cannot show that the *Canal Zone* Paintings compete in the same market. *See Consumers Union of the United States, Inc. v. Gen. Signal Corp.,* 724 F.2d 1044, 1051 (2d Cir. 1983) ("[w]here the copy does not compete in any way with the original, this concern [regarding usurping the market] is absent."); *accord Video-Cinema Films, Inc. v. Cable News Network, Inc.,* 2001 U.S. Dist. LEXIS 25687 *29 (S.D.N.Y. 2001) ("If the allegedly infringing use is not in competition with the copyrighted use, the fair use defense is ordinarily sustained.") (citations and internal quotations omitted). Prince is a well-known appropriation artist whose wholly fictionalized works containing pop cultural messages are displayed in major museums around the world. AC ¶ 18; RP Aff. ¶¶ 3, 12. Consumers of his works are museums, galleries and private collectors of contemporary art, and his works are regularly offered at auction. RP Aff. ¶ 3. Four of the Paintings were sold for prices ranging between $400,000 and $2,430,000. Ex N. Cariou, in contrast, is an established portraiture photographer, who has had a couple of shows in the last ten years, and who is known for creating beautiful photography books that capture with great accuracy the essence of his subjects. PC Tr. 45-46, 288-90; *Yes Rasta* (inside jacket cover); CC

Tr. 42-46. As there is no similarity between the styles, concepts, mediums, price ranges or the markets of Cariou and Prince, the *Canal Zone* Paintings in no way compete with the *Yes Rasta*, and certainly are not a substitute for them.[10]

Moreover, as Prince intended to, and did, create Paintings that were transformative (RP Aff. ¶¶ 21, 64), there is no derivative market for Cariou to tap into that is in any way related to Prince's use of portions of the Images. *Blanch*, 467 F.3d at 258 (existence of derivative market for original work must be related to use by defendant); *see also Campbell*, 510 U.S. at 59 (where second use is "transformative," "market substitution is at least less certain, and market harm may not be so readily inferred.").

Finally, the record reveals that notwithstanding Celle's stated reluctance to proceed with a *Yes Rasta* show due to professional considerations, she was quite adamant when she finally spoke to Cariou on or about February 2009, that he do his own *Yes Rasta* show; she urged him to do a reprint of *Yes Rasta* (it was out of print) "because it is a very important book;" she was insistent on purchasing additional *Yes Rasta* books; she felt she could sell prints of images from *Yes Rasta* for between $3,000 and $20,000, depending on the size; and she remained willing to represent him, even though it took him several months to return her call. *See* CC Tr. 52-53, 82, 102, 104-05, 107-08, 155. As Celle put it, "I was very committed, I wanted to represent him. We agree on it but we never really pursue it." *Id.* at 133. PC Tr. 286-7 (powerHouse also is still interested in working with Cariou). On this record, then, the fourth factor weighs in favor of

---

[10] While Celle (also represented by plaintiff's counsel) testified that her recently-opened (June 2009) gallery, which sells prints of photographic works ranging from $3,000 to $20,000, also markets to entertainers, people in the fashion industry, decorators and others (CC Tr. at 67-68, 128, 137, 154-155; *see also* Ex Z), any evidence of an actual overlap between the consumers of the Paintings and consumers of prints of the images in the *Yes Rasta* book (and none was adduced) does not show that in marketing and exhibiting the Paintings, defendants were offering a market substitute for Cariou's *Yes Rasta* prints.

24

Prince, as his use of the Images did not usurp the potential market for or value of the *Yes Rasta* images. *See Blanch*, 467 F.3d at 258; *NXIVM Corp.*, 364 F.3d at 481-82.

## CONCLUSION

When weighed in light of the purposes of copyright to progress the arts, Prince's use of portions of Cariou's Images should be considered fair because, as demonstrated herein and in the accompanying exhibits, Prince's Paintings, having been created in good faith and a with genuine creative rationale to convey new insights, a different purpose and new meaning, are transformative and contribute to the broader public benefit of art; and the quantity and value of the Images Prince used in his Paintings was reasonable to carry out his genuine artistic purpose, which was to transform Cariou's fact-based Images into a completely different expressive purpose that does not compete with and therefore does not usurp Cariou's market for the Images. Accordingly, for all of the reasons set forth herein and in the accompanying exhibits, defendants Prince, Gagosian Gallery and Lawrence Gagosian respectfully request that the Court enter an order granting them summary judgment on their fair use defense and dismissing plaintiff's conspiracy claim as it is frivolous and preempted by federal copyright law, and for such other and further relief to which the defendants are entitled.

Dated: May 14, 2010
      New York, New York

WITHERS BERGMAN LLP

By: _____
     Hollis Gonerka Bart (HB-8955)
     Dara G. Hammerman (DH-1591)
     Azmina Jasani (AJ- 4161)
     430 Park Avenue, 10th Floor
     New York, NY  10022-3505
     Phone:  (212) 848-9800
     Fax:  (212) 848-9888
     *Attorneys for Defendants Gagosian Gallery*
     *Inc. and Lawrence Gagosian*

By: _____
     Steven M. Hayes, Esq. (SH-2926)
     Hanly Conroy Bierstein
     Sheridan Fisher & Hayes LLP
     112 Madison Avenue
     New York, NY 10016-7416
     (212) 784-6414
     *Attorneys for Defendant Richard Prince*