UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
PATRICK CARIOU,

                    Plaintiff,

          -against-

RICHARD PRINCE, GAGOSIAN GALLERY, INC.,
LAWRENCE GAGOSIAN, and RIZZOLI
INTERNATIONAL PUBLICATIONS, INC.

                    Defendants.
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/18/11

08 Civ. 11327 (DAB)
MEMORANDUM & ORDER

DEBORAH A. BATTS, United States District Judge.


     This matter is now before the Court on cross-motions for

summary judgment.  Defendants Richard Prince, Gagosian Gallery,

Inc., and Lawrence Gagosian seek a determination that their use

of Plaintiff's copyrighted photographs was a fair use under the

relevant section of the Copyright Act, 17 U.S.C. §§ 107(1)-(4),

and that Plaintiff's claim for conspiracy to violate his rights

under the Copyright Act is barred by law.[1]  Plaintiff seeks

summary judgment in his favor on the issue of liability for

copyright infringement.

     For reasons detailed herein, the Court finds (1) that

_____

     [1]Named Defendant Rizzoli International Publications, Inc.
was voluntarily dismissed from this action by stipulation of
dismissal entered by the Court on February 5, 2010.

1

Defendants' infringing use of Plaintiff's copyrighted photographs was not fair use under the Copyright Act; and (2) that Plaintiff's conspiracy claim is barred by law.  Accordingly, Defendants' Motion is GRANTED in part, and Plaintiff's Motion is GRANTED in its entirety.

I. BACKGROUND

Familiarity with the affidavits, declarations, deposition transcripts, and other evidence before the Court is assumed, and the undisputed facts are set forth here only briefly.

Plaintiff Patrick Cariou ("Plaintiff" or "Cariou") is a professional photographer. PC Tr. 45-46, 279-80.[2] Cariou spent time with Rastafarians in Jamaica over the course of some six years, gaining their trust and taking their portraits. PC Tr. 34-48.  In 2000, Cariou published a book of photographs which were taken during his time in Jamaica. Brooks Decl. Ex. L. The book, titled Yes, Rasta and released by PowerHouse Books ("Yes, Rasta"), contained both portraits of Rastafarian individuals (and others) in Jamaica and landscape photos taken by Cariou in

_____

[2]"PC. Tr.," used herein, refers to the transcript of Patrick Cariou's deposition testimony. "RP Tr.," "CC Tr.," "LG Tr." and "AM Tr." refer to the deposition transcripts of Richard Prince, Christiane Celle, Lawrence Gagosian, and Alison McDonald, respectively.  Similarly, "RP. Aff." refers to the affidavit filed by Richard Prince.

Jamaica.[3] Id.

Cariou testified at length about the creative choices he made in determining which equipment to use in taking his photos, the staging choices he made when composing and taking individual photos, and the techniques and processes he used (and directed others to use) when developing the photos. See e.g., PC Tr. 49-66, 133-34, 137-38, 143-44, 152, 169.  Cariou also testified that he was heavily involved in the layout, editing, and printing of the Yes, Rasta book. Id.; PC Tr. at 180-208. According to the colophon page included in Yes, Rasta, Cariou is the sole copyright holder in the images that appear in Yes, Rasta. Brooks Decl. Ex. L.

Defendant Richard Prince ("Prince") is a well-known "appropriation artist" who has shown at numerous museums and other institutions, including a solo show at the Guggenheim Museum in New York City. RP Aff. ¶¶ 3, 5.  Defendant Gagosian Gallery, Inc. (the "Gallery") is an art dealer and gallery which represents Prince and markets the artworks he creates. LG Tr. 22-25; RP Tr. 270, 294.  Defendant Lawrence Gagosian ("Gagosian"; collectively with the Gallery, the "Gagosian Defendants") is the

---

[3]The portraits and landscape photographs Cariou published in Yes, Rasta are collectively referred to herein as the "Photos," "Cariou's Photos," or the "Yes, Rasta Photos."

President, founder, and owner of the Gagosian Gallery, Inc.  LG Tr. at 16.[4]

In or about December 2007 through February 2008, Prince showed artwork at the Eden Rock hotel in St. Barts. See RP Tr. at 187-88.  Among the works shown was a collage entitled Canal Zone (2007), which consisted of 35 photographs torn from Yes, Rasta and attached to a wooden backer board. See RP Decl. Comp. Ex. A. at 20-24; see also RP Tr. at 179-80.  Prince painted over some portions of the 35 photographs, and used only portions of some of the photos, while others were used in their entirety or nearly so. See generally RP Decl. Comp. Ex. A at 20-24.  Though Canal Zone (2007) was not sold, Prince sold other artworks at that show through Gagosian. RP Tr. 187-88, 197-98.  Portions of Canal Zone (2007) were reproduced in a magazine article about Prince's Canal Zone show at the Gagosian Gallery. RP Tr. at 198-201. Prince intended that Canal Zone (2007) serve as an introduction to the characters he intended to use in a screenplay and in a planned series of artworks, also to be entitled Canal Zone. RP Aff. ¶ 48.

Prince ultimately completed 29 paintings in his contemplated Canal Zone series, 28 of which included images taken from Yes,

---

[4]Gagosian testified that he "may have given" "a small piece" of the Gallery to his sister. LG Tr. at 17.

<u>Rasta</u>.[5] <u>See</u> RP Decl. Comp. Ex. A.  Some of the paintings, like

"Graduation (2008)" and "Canal Zone (2008)," consist almost

entirely of images taken from <u>Yes, Rasta</u>, albeit collaged,

enlarged, cropped, tinted, and/or over-painted, while others,

like "Ile de France (2008)" use portions of <u>Yes, Rasta</u> Photos as

collage elements and also include appropriated photos from other

sources and more substantial original painting.[6] <u>See</u> RP Decl.

Comp. Ex. A (comparing Prince paintings with Cariou Photos used

therein); <u>compare</u> Brooks Decl. Ex. M (Canal Zone catalog) <u>with</u>

Brooks Decl. Ex. L (<u>Yes, Rasta</u> book).  In total, Prince admits

using at least 41 Photos from <u>Yes, Rasta</u> as elements of Canal

Zone Paintings. RP Decl. ¶ 24.

The Gallery showed 22 of the 29 Canal Zone paintings at one

of its Manhattan locations from November 8, 2008 to December 20,

2008. Brooks Decl. Ex. M at 1; LG Tr. at 25, 50; RP Aff. at Ex.

A.  The Gallery also published and sold an exhibition catalog

from that show, similarly entitled <u>Canal Zone</u>, which contained

---

[5]The allegedly infringing works in the Canal Zone series,
together with Canal Zone (2007), are referred to collectively
herein as the "Paintings," "Prince's Paintings," or the "Canal
Zone Paintings."

[6]In reaching its determination herein, the Court has
examined fully the exhibits and reproductions provided by the
Parties and has compared the 29 Canal Zone paintings with the
Yes, Rasta Photos. The Court sees no need to describe each work
in great detail.

reproductions of many of the Canal Zone Paintings (including some
Paintings which were not shown at the Gallery) and photographs of
Yes, Rasta Photos in Prince's studio. See Brooks Decl. Ex. M
(Canal Zone exhibition catalog).  The Gagosian employee who was
the Managing Editor of the catalog testified that she never
inquired as to the source of the Rastafarian photographs
contained therein.  AC Tr. at 42.

Other than by private sale to individuals Cariou knew and
liked, the Photos have never been sold or licensed for use other
than in the Yes, Rasta book. PC Tr. 86-94. However, Cariou
testified that he was negotiating with gallery owner Christiane
Celle ("Celle"), who planned to show and sell prints of the Yes,
Rasta Photos at her Manhattan gallery, prior to the Canal Zone
show's opening. PC Tr. at 96-98; see CC Tr. 39-40, 42-44.  Cariou
also testified that he intended in the future to issue artists'
editions of the Photos, which would be offered for sale to
collectors. PC Tr. 92-94; 97-98.

Celle originally planned to exhibit between 30 and 40 of the
Photos at her gallery, with multiple prints of each to be sold at
prices ranging from $3,000.00 to $20,000.00, depending on size.
CC Tr. at 40-42, 46, 66-68, 127-28, 153-55.  She also planned to
have Yes, Rasta reprinted for a book signing to be held during
the show at her gallery. CC Tr. at 87-88, 155-56.  However, when

6

Celle became aware of the Canal Zone exhibition at the Gagosian
Gallery, she cancelled the show she and Cariou had discussed. PC
Tr. at 98; CC Tr. 63-64, 71. Celle testified that she decided to
cancel the show because she did not want to seem to be
capitalizing on Prince's success and notoriety, CC Tr. at 89,
105-06, and because she did not want to exhibit work which had
been "done already" at another gallery, CC Tr. 89, 91, 105.


II. DISCUSSION

A. Summary Judgment

     A district court should grant summary judgment when there is
"no genuine issue as to any material fact," and the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P.
56(c); see also Hermes Int'l v. Lederer de Paris Fifth Ave.,
Inc., 219 F.3d 104, 107 (2d Cir. 2000). Genuine issues of
material fact cannot be created by mere conclusory allegations;
summary judgment is appropriate only when, "after drawing all
reasonable inferences in favor of a non-movant, no reasonable
trier of fact could find in favor of that party." Heublein v.
United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing
Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S.
574, 587-88 (1986)).

     In assessing when summary judgment should be granted, "there

must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). While a court must always "resolv[e] ambiguities and draw [ ] reasonable inferences against the moving party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson, 477 U.S. at 252), the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Id. at 12. Instead, when the moving party has documented particular facts in the record, "the opposing party must set forth specific facts showing that there is a genuine issue for trial." Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986)(quotation omitted). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Unsupported allegations in the pleadings thus cannot create a material issue of fact. Id.

A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but "'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable

8

inferences against the party whose motion is under consideration.'" Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (quoting Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d 305, 313-14 (2d Cir. 1981)).

To prevail on a copyright infringement claim, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. See Harper & Row, 471 U.S. at 548; Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., Inc., 499 US at 348, 363 (1991) (holding that alphabetical arrangement of names in telephone directory was not protected by copyright, since alphabetical arrangement "is not only unoriginal, it is practically inevitable."). To be "original," a copyrighted work must have been independently created by the author and must possess "at least some minimal degree of creativity," although "the requisite level of creativity is extremely low; even a slight amount will suffice." Id. at 345. "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." Id. (citation omitted).

"[T]he applicability of [the fair use defense to copyright infringement] presents mixed questions of law and fact," Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010) (citing Harper

& Row Pubs., Inc. v. Nation Enters., 471 U.S. 539, 560 (1985)),
but may nevertheless be determined on a motion for summary
judgment where the record contains facts sufficient to evaluate
each of the statutory factors, Harper & Row at 560.


B. Copyright in the Photos

    Cariou's ownership of a valid copyright in the Photos is
undisputed. However, Defendants assert that Cariou's Photos are
mere compilations of facts concerning Rastafarians and the
Jamaican landscape, arranged with minimum creativity in a manner
typical of their genre, and that the Photos are therefore not
protectable as a matter of law, despite Plaintiff's extensive
testimony about the creative choices he made in taking,
processing, developing, and selecting them.[7]

    Unfortunately for Defendants, it has been a matter of
settled law for well over one hundred years that creative
photographs are worthy of copyright protection even when they
depict real people and natural environments.  See, e.g.,
Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 60 (1884)

    ───────────

    [7]Defendant's arguments concerning whether ideas can be
protected by copyright are irrelevant to this case: Plaintiff
seeks recourse for Prince's use of his original creative works,
not for any use of or infringement on the ideas they portray.

(photographic portrait of Oscar Wilde was original creative work, since photographer posed the subject, selected his clothing, background, light and shade, and "suggest[ed] and evok[ed] the desired expression"); Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992) ("Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved."), cert. denied, 506 U.S. 934 (1992); Mannion v. Coors Brewing Co., 377 F. Supp. 2d 444,450 (S.D.N.Y. 2005) ("Almost any photograph 'may claim the necessary originality to support a copyright.'") (citation omitted); Eastern Am. Trio Prods., Inc. v. Tang Elec. Corp., 97 F. Supp. 2d 395, 417 (S.D.N.Y. 2000) (photographs of "common industrial items" were protectable); Monster Comm.'s, Inc. v. Turner Broad. Sys. Inc., 935 F. Supp. 490, 494 (S.D.N.Y. 1996) ("photographic images of actual people, places and events may be as creative and deserving of protection as purely fanciful creations").

Accordingly, Cariou's Photos are worthy of copyright protection.


C. Fair Use

From the infancy of copyright protection, some opportunity

11

for fair use of copyrighted materials has been thought necessary
to fulfill copyright's very purpose, "[t]o promote the Progress
of Science and useful Arts. . . ." Campbell v. Acuff-Rose Music,
Inc., 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8,
cl. 8). At the Constitutional level, while the "Copyright Clause
and the First Amendment [are] intuitively in conflict, [they]
were drafted to work together to prevent censorship" such that
"the balance between the First Amendment and copyright is
preserved, in part, by the idea/expression dichotomy and the
doctrine of fair use." Suntrust Bank, 268 F.3d at 1263 (citing
Eldred v. Reno, 239 F.3d 372, 375 (D.C. Cir. 2001) (quoting
Harper & Row, 471 U.S. at 560)).

    "Copyright law thus must address the inevitable tension
between the property rights it establishes in creative works,
which must be protected up to a point, and the ability of
authors, artists, and the rest of us to express them- or
ourselves by reference to the works of others, which must be
protected up to a point. The fair-use doctrine mediates between
the two sets of interests, determining where each set of
interests ceases to control." Blanch v. Koons, 467 F.3d 244, 250
(2d Cir. 2006); see also Warner Bros. Entertainment Inc., v. RDR
Books, 575 F.Supp.2d 513,540 (S.D.N.Y. 2008) ("At stake in this
case are the incentive to create original works which copyright

12

protection fosters and the freedom to produce secondary works which monopoly protection of copyright stifles—both interests benefit the public.") (quoting Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1109 (1990) (hereinafter "Leval") (noting that although "the monopoly created by copyright ... rewards the individual author in order to benefit the public[,]" on the other hand "the monopoly protection of intellectual property that impeded referential analysis and the development of new ideas out of old would strangle the creative process.")

The doctrine of Fair Use was codified in Section 107 of the 1976 Copyright Act. Section 107 calls for a four-factor test:

Limitations on exclusive rights: Fair use:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;

13

(3) the amount and substantiality of the portion used
in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for
or value of the copyrighted work.

17 U.S.C. § 107.

In applying the fair use doctrine, "[t]he task is not to be
simplified with bright-line rules, for the statute, like the
doctrine it recognizes, calls for case-by-case analysis."
Campbell, 510 U.S. at 577-78. In conducting that analysis, "all
[of the four factors] are to be explored, and the results weighed
together in light of the purposes of copyright." Id.


D. Applying the Four-Factor Analysis

1. The Purpose and Character of Prince's Use of the Photos

i. Transformative Use

"The central purpose of the inquiry into the first factor is
to determine, in Justice Story's words, whether the new work
merely supersede[s] the objects of the original creation or
instead adds something new, with a further purpose or different
character, altering the first with new expression, meaning, or
message; it asks, in other words, whether and to what extent the
new work is 'transformative.'" Salinger v. Colting, No. 09 Civ.
5095 (DAB), 641 F.Supp.2d 250, 256 (rev'd on other grounds 607

14

F.3d 68 (2d Cir. 2010); <u>Campbell</u>, 510 U.S. at 579 (internal
quotations and citations omitted). Although a transformative use
is not strictly required for the Defendant to establish the
defense of fair use, "the goal of copyright, to promote science
and the arts, is generally furthered by the creation of
transformative works. Such works thus lie at the heart of the
fair use doctrine's guarantee of breathing space  within the
confines of copyright, and the more transformative the new work,
the less will be the significance of other factors, like
commercialism, that may weigh against a finding of fair use." <u>Id.</u>
(citing <u>Sony Corp. of America v. Universal City Studios, Inc.</u>,
464 U.S. 417, 478-80 (U.S. 1984) (Blackmun, J., dissenting).

The inquiry into the first factor of the fair use test,
"'the purpose and character of the use,' may be guided by
the examples given in the preamble to § 107, looking to whether
the use is for criticism, or comment, or news reporting, and the
like." <u>Campbell</u>, 510 U.S. at 578-79 (citing 17 U.S.C. § 107)
(identifying parody as a use akin to the illustrative uses
identified in the preamble).

As the Second Circuit clearly noted in <u>Castle Rock</u>, the fact
that a work "recast[s], transform[s], or adapt [s] an original
work into a new mode of presentation," thus making it a

15

"derivative work" under 17 U.S.C. § 101, does not make the work "transformative" in the sense of the first fair use factor. Castle Rock, 150 F.3d at 143.  Nevertheless, Defendants invite this Court to find that use of copyrighted materials as raw materials in creating "appropriation art" which does not comment on the copyrighted original is a fair use akin to those identified in the preamble to § 107.

The cases Defendants cite for the proposition that use of copyrighted materials as "raw ingredients" in the creation of new works is per se fair use do not support their position, and the Court is aware of no precedent holding that such use is fair absent transformative comment on the original.  To the contrary, the illustrative fair uses listed in the preamble to § 107 — "criticism, comment, news reporting, teaching [...], scholarship, [and] research" — all have at their core a focus on the original works or their historical context, and all of the precedent this Court can identify imposes a requirement that the new work in some way comment on, relate to the historical context of, or critically refer back to the original works. See, e.g., Campbell, 510 U.S. at 579 (transformative use is use that "alter[s] the first with new expression, meaning, or message"); Bourne v. Twentieth Century Fox Film Corp., 602 F.Supp.2d 499 (S.D.N.Y. Mar. 15, 2009)(Batts, J.) (parody song which commented both on

16

the copyrighted original and on famous person associated with
original was transformative); <u>Blanch v. Koons</u>, 467 F.3d at 252-53
(use of copyrighted fashion advertisement as "raw material" was
transformative because artist used it to comment on the role such
advertisements play in our culture and on the attitudes the
original and other advertisements like it promote); <u>Liebowitz v.
Paramount Pictures Corp.</u>, 137 F.3d 109, 114 (2d Cir. 1998)
(superimposition of Leslie Nielsen's face on photo of body
intended to resemble pregnant Demi Moore commented on original
photo of Moore by holding its pretentiousness up to ridicule).
<u>C.f.</u> <u>Rogers v. Koons</u>, 960 F.2d 301, 310 (2d Cir. 1992), <u>cert.
denied</u>, 506 U.S. 934 (1992) (sculpture drawn from copyrighted
photograph was not fair use because while the sculpture was a
"satirical critique of our materialistic society, it is difficult
to discern any parody of [or comment on] the photograph . . .
itself.")

    "If an infringement of copyrightable expression could be
justified as fair use solely on the basis of the infringer's
claim to a higher or different artistic use . . . there would be
no practicable boundary to the fair use defense." <u>Rogers v.
Koons</u>, 960 F.2d at 310. The Court therefore declines Defendants'
invitation to find that appropriation art is <u>per se</u> fair use,
regardless of whether or not the new artwork in any way comments

17

on the original works appropriated.  Accordingly, Prince's Paintings are transformative only to the extent that they comment on the Photos; to the extent they merely recast, transform, or adapt the Photos, Prince's Paintings are instead infringing derivative works. See Castle Rock, 150 F.3d at 143.

Prince testified that he has no interest in the original meaning of the photographs he uses. See e.g., RP Tr. at 338. Prince testified that he doesn't "really have a message" he attempts to communicate when making art.  RP Tr. at 45-46.  In creating the Paintings, Prince did not intend to comment on any aspects of the original works or on the broader culture. See e.g., RP Tr. at 357-60; 362-64.  Prince's intent in creating the Canal Zone paintings was to pay homage or tribute to other painters, including Picasso, Cezanne, Warhol, and de Kooning, see RP Tr. at 164-67, 300-01, and to create beautiful artworks which related to musical themes and to a post-apocalyptic screenplay he was writing which featured a reggae band, see, e.g., RP Tr. 7, 30, 207-08, 218, 232, 251-52.  Prince intended to emphasize themes of equality of the sexes; highlight "the three relationships in the world, which are men and women, men and men, and women and women"; and portray a contemporary take on the music scene.  RP Tr. 338-39. With regard to the paintings in which Prince collaged guitars onto portraits of Rastafarian men

18

which were taken from Yes, Rasta, Prince testified that his message related to the fact that the men had become guitar players.  See, e.g., RP Tr. at 340 ("[H]e's playing the guitar now, it looks like he's playing the guitar, it looks as if he's always played the guitar, that's what my message was."); see also RP Tr. 166-68, 279.

Prince also testified that his purpose in appropriating other people's originals for use in his artwork is that doing so helps him "get as much fact into [his] work and reduce[] the amount of speculation." RP Tr. at 44.  That is, he chooses the photographs he appropriates for what he perceives to be their truth — suggesting that his purpose in using Cariou's Rastafarian portraits was the same as Cariou's original purpose in taking them: a desire to communicate to the viewer core truths about Rastafarians and their culture.  See Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 609 (2d Cir. 2006) (considering, in weighing transformativeness, whether the new purpose in using an original work was "plainly different from the original purpose for which it was created.")

On the facts before the Court, it is apparent that Prince did not intend to comment on Cariou, on Cariou's Photos, or on aspects of popular culture closely associated with Cariou or the

19

Photos when he appropriated the Photos, and Price's own testimony
shows that his intent was not transformative within the meaning
of Section 107, though Prince intended his overall work to be
creative and new.

As this Court and others in this jurisdiction have found,
where a work is not "consistently transformative," and "lacks
restraint in using [Plaintiff's] original expression for its
inherent . . . aesthetic value," the "transformative character of
[that work] is diminished." Salinger v. Colting, No. 09 Civ. 5095
(DAB), 641 F.Supp.2d 250, 262 (rev'd on other grounds 607 F.3d 68
(2d Cir. 2010)); Warner Bros. Enter. Inc. v. RDR Books 575
F.Supp.2d 513, 544 (S.D.N.Y. 2008) (citing Bill Graham Archives
v. Dorling Kindersley Ltd., 448 F.3d 605 (2d Cir. 2006). See
Suntrust Bank, 268 F.3d at 1280 (Marcus, J., concurring) (finding
that issue of transformative character cuts "decisively in
[Defendant's] favor" where the ratio of "the borrowed and the new
elements" is "very low, and the incongruity between them wide").

Accordingly, while there may be some minimal transformative
element intended in Prince's use of the Photos, the overall
transformativeness varies from work to work depending on the
amount of copying. In the works most heavily drawn from Cariou's
Photos, such as those in which Prince uses entire photographs or

20

unaltered portraits taken from Yes, Rasta, there is vanishingly little, if any, transformative element; in those where Cariou's Photos play a comparatively minor role, Defendant has a stronger argument that his work is transformative of Cariou's original Photos.[8] Overall, because the transformative content of Prince's paintings is minimal at best, and because that element is not consistent throughout the 28 paintings in which Prince used the Photos, the "transformative use" prong of the first § 107 factor weighs heavily against a finding of fair use.

### ii. Commerciality

The second prong of the first factor of the § 107 test asks whether the otherwise infringing work "serves a commercial purpose or nonprofit educational purpose." Suntrust Bank, 268 F.3d at 1269 (citing § 107(1)). The less transformative a work, the more importance should be attached to "the extent of its

---

[8]Many of the Paintings which have the strongest claim to transformative use are also those in which the amount and substantiality of the Photos used is least reasonable: those which feature, as their central elements, strikingly original Rastafarian portraits taken from Yes, Rasta Photos. See discussion of third Section 107 factor, infra. For that reason, even the most transformative Paintings have only a weak claim to fair use, since the four § 107 factors must be "weighed together in light of the purposes of copyright." Campbell, 510 U.S. at 577-78.

commerciality" in determining whether the first factor favors a
finding of fair use. Campbell, 510 U.S. at 580-81 (if "the
commentary has no critical bearing on the substance or style of
the original composition . . . the claim to fairness in borrowing
from another's work diminishes accordingly (if it does not
vanish), and other factors, like the extent of its commerciality
loom larger."); see American Geophysical Union v. Texaco Inc., 60
F.3d 913, 922 (2d Cir. 1995) ("The greater the private economic
rewards reaped by the secondary user (to the exclusion of broader
public benefits), the more likely the first factor will favor the
copyright holder and the less likely the use will be considered
fair.") "[C]ourts are more willing to find a secondary use fair
when it produces a value that benefits the broader public
interest." Blanch v. Koons, 467 F.3d 244, 253-54.
"Notwithstanding the fact that artists are sometimes paid and
museums sometimes earn money, the public exhibition of art is
widely . . . considered to have value that benefits the wider
public interest." Id. (citations and internal quotations
omitted).

     The Canal Zone show at the Gagosian Gallery was advertised
in seven different newspapers, five of which included
reproductions of Cariou's Photos as altered by Prince. AM Tr. at
42-50; LG Tr. at 36. The Gagosian Defendants sent some 7,500

22

invitation cards, featuring a reproduction of a Prince work containing a Cariou Photo, to clients of the Gallery, LG Tr. at 35, AM Tr. at 29-33, and sold the leftover invitations to a poster company, AM Tr. at 55-59. As a result of these and other marketing efforts, Gagosian Gallery sold eight of the Canal Zone Paintings for a total of $10,480,000.00, 60% of which went to Prince and 40% of which went to Gagosian Gallery. Brooks Dec. Ex. P ¶ 2 and Ex. A; LG Tr. at 48. Seven other Canal Zone Paintings were exchanged for art with an estimated value between $6,000,000.00 and $8,000,000.00. Brooks Dec. Ex P ¶ 3; LG Tr. at 136-37, 149-50. Gagosian Gallery sold $6,784.00 worth of Canal Zone exhibition catalogs. Brooks Dec. Ex. P ¶ 4. The facts before the Court do not establish whether any of the Paintings have ever been made available for public viewing other than when they were offered for sale at the Gallery.

This Court recognizes the inherent public interest and cultural value of public exhibition of art and of an overall increase in public access to artwork. However, the facts before the Court show that Defendants' use and exploitation of the Photos was also substantially commercial, especially where the Gagosian Defendants are concerned. Accordingly, given the overall low transformative content of Prince's Paintings, the commerciality prong of the first § 107 factor weighs against a finding of fair use.

23

### iii. Bad Faith

The first § 107 factor requires the Court to consider "the propriety of a defendant's conduct," which is an integral part of the Court's analysis of the character of the use. <u>NXIVM Corp. v. Ross Inst.</u>, 364 F.3d 471, 478 (2d Cir. 2004) (citations omitted). Though not in itself determinative, "it has been considered relevant within this subfactor that a defendant could have acquired the copyrighted [material] legitimately." <u>Id.</u>

Here, Prince testified that he does not have a different standard or weigh different considerations when appropriating works with a disclosed author than he does when using materials that are in the public domain; to Prince, the question of whether an image is appropriate for his use is "just a question of whether [he] like[s] the image." RP Tr. at 100.  Prince's employee contacted the publisher of <u>Yes, Rasta</u> to purchase additional copies of the book, but apparently neither Prince nor his employee ever asked the publisher about licensing or otherwise sought permission to use <u>Yes, Rasta</u> or the Photos contained therein legitimately. RP Tr. 236-41, 183.  Nor did Prince attempt to contact Cariou by email and inquire about usage rights to the Photos, even though <u>Yes, Rasta</u> clearly identified Cariou as the sole copyright holder and even though Cariou's publicly-accessible website includes an email address at which he

24

may be reached. <u>See</u> PC Tr. 238-40, 254, 260. Under these
circumstances, Prince's bad faith is evident.  Moreover, since
the record establishes that the Gagosian Defendants were aware
that Prince is an habitual user of other artists' copyrighted
work, without permission, and because the record is equally clear
that the Gagosian Defendants neither inquired into whether Prince
had obtained permission to use the Photos contained in the Canal
Zone Paintings nor ceased their commercial exploitation of the
Paintings after receiving Cariou's cease-and-desist notice, the
bad faith of the Gagosian Defendants is equally clear.


    Because Prince's use was at most only minimally
transformative of Cariou's Photos, because the use was
substantially though not exclusively commercial, and because
Prince and the Gagosian Defendants acted in bad faith, the first
factor in the fair use analysis weighs heavily in favor of
Plaintiff.


## 2. The Nature of the Copyrighted Work

    "The more the copyrighted matter is at the center of the
protected concerns of the copyright law, the more the other
factors, including justification, must favor the secondary user

in order to earn a fair use finding." Leval at 1122. "The
statutory articulation of this factor derives from Justice
Story's mention ... of the 'value of the materials used.'
Justice Story's word choice is more communicative than our
statute's 'nature of,' as it suggests that some protected matter
is more 'valued' under copyright that others. This should not be
seen as an invitation to judges to pass on [artistic] quality,
but rather to consider whether the protected [work] is of the
creative or instructive type that the copyright laws value and
seek to foster." Id. at 1117. A key distinction that has emerged
"in the decisions evaluating the second factor [is] whether the
work is expressive or creative, such as a work of fiction, or
more factual, with a greater leeway being allowed to a claim of
fair use where the work is factual or informational." 2 Abrams,
The Law of Copyright, § 15:52 (2006).

Here, the Court finds that Cariou's Photos are highly
original and creative artistic works and that they constitute
"creative expression for public dissemination" and thus "fall[]
within the core of the copyright's protective purposes."
Campbell, 510 U.S. at 586. Consequently, this factor weighs
against a finding of fair use.

3. <u>The Amount and Substantiality of the Portion Used</u>

The "amount and substantiality of the portion of the copyrighted work used [] must be examined in context [and] the inquiry must focus on whether the extent of [the] copying is consistent with or more than necessary to further the purpose and character of the use." <u>Castle Rock</u>, 150 F.3d at 144 (<u>quoting</u> <u>Campbell</u>, 510 U.S. at 586-87) (internal quotations omitted). The Court must examine not only "the quantity of the materials used, but their quality and importance too." <u>Warner Bros. Enter., Inc.</u>, 575 F.Supp. at 546 (<u>quoting</u> <u>Campbell</u> 510 U.S. at 587).

"[W]hatever the use, generally it may not constitute a fair use if the entire work is reproduced." <u>Weissmann v. Freeman</u>, 868 F.2d 1313, 1325 (2d Cir. 1989) (<u>citing</u> 3 Nimmer on Copyright § 13.05[A] at 13-80). Moreover, the amount and substantiality factor weighs in favor of the copyright holder "where the portion used was essentially the heart of the copyrighted work." <u>Wright</u> <u>v. Warner Books, Inc.</u>, 953 F.2d 731, 738 (2d Cir. 1991)(<u>quoting</u> <u>Harper & Row</u>, 471 U.S. at 565) (internal quotations omitted).

"As the statutory language indicates, a taking may not be excused merely because it is insubstantial with respect to the *infringing* work." <u>Harper & Row v. Nation Enters.</u>, 471 U.S. at 565 (citation omitted)(emphasis in original)(quoting Judge Learned

27

Hand, who "cogently remarked, 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate.'")

In a number of his Paintings, Prince appropriated entire Photos, and in the majority of his Paintings, Prince appropriated the central figures depicted in portraits taken by Cariou and published in Yes, Rasta. Those central figures are of overwhelming quality and importance to Cariou's Photos, going to the very heart of his work. Accordingly, the amount of Prince's taking was substantially greater than necessary, given the slight transformative value of his secondary use, and the third factor weighs heavily against a finding of fair use.


## 4. The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work

The fourth fair use factor requires courts "to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." Campbell, 510 U.S. at 590 (internal quotations omitted). The inquiry "must take account not only of harm to the original but also of harm to the market for derivative works." Id. Harm to the market for derivatives weighs against a finding

28

of fair use "because the licensing of derivatives is an important
economic incentive to the creation of originals." Id. at 593.
"Potential derivative uses include only those that creators of
original works would in general develop or license others to
develop." Warner Bros. Enter., Inc., 575 F.Supp. at 549 (quoting
Campbell, 510 U.S. at 592) (internal quotation marks omitted).
See also id. at 550-51 (finding that where Defendant's derivative
work "is only marginally transformative, [it] is likely to
supplant the market for [Plaintiff's derivative work]") (citing
Campbell, 510 U.S. at 591).

     Defendants' protestations that Cariou has not marketed his
Photos more aggressively (or, indeed, as aggressively as Prince
has marketed his Paintings) are unavailing.  As the Second
Circuit has previously emphasized, the "potential market" for the
copyrighted work and its derivatives must be examined, even if
the "author has disavowed any intention to publish them during
his lifetime," given that an author "has the right to change his
mind" and is "entitled to protect his opportunity to sell his
[works]." J.D. Salinger v. Random House, Inc., 811 F.2d 90, 99
(2d Cir. 1987) (emphasis omitted); see Castle Rock, 150 F.3d at
145-46 (finding the fourth factor to favor Plaintiff even where
Plaintiff "has evidenced little if any interest in exploiting
this market for derivative works" because copyright law must

"respect that creative and economic choice"). The fact that Plaintiff has not marketed his work more aggressively is therefore irrelevant.

Here, it is undisputed that a gallery owner discontinued plans to show the <u>Yes, Rasta</u> Photos, and to offer them for sale to collectors, because she did not want to appear to be capitalizing on Prince's Paintings and did not want to show work which had been "done already" at the nearby Gagosian Gallery. CC Tr. 89, 91, 105. It is therefore clear that the market for Cariou's Photos was usurped by Defendants. Moreover, licensing original works for secondary use by other artists is the kind of derivative use "that creators of original works would in general develop," <u>Warner Bros. Enter., Inc.</u>, 575 F.Supp. at 549, and widespread unlicensed use in new artworks would destroy the market for such licenses, <u>see</u> <u>Campbell</u>, 510 U.S. at 590. Accordingly, the Court finds that Prince has unfairly damaged both the actual and potential markets for Cariou's original work and the potential market for derivative use licenses for Cariou's original work.

Because Defendants' secondary use has unfairly damaged the original market for the Photos and, if widespread, would likely destroy an identifiable derivative market for the Photos, the fourth § 107 factor weighs against a finding of fair use.

## 5. Aggregate Analysis

The Court has considered the four factors set forth in §
107, and found that none favors a finding of fair use. Moreover,
"the monopoly created by copyright" does not unduly "impede[]
referential analysis [or] the development of new ideas out of
old" when copyright law is enforced under circumstances like
those presented here. Leval at 1109. Accordingly, the purposes
of copyright are best served by extending protection to Cariou's
Photos.

Having conducted a case-specific analysis of the four
factors laid out in 17 U.S.C. § 107 in light of the purposes of
copyright, the Court finds that Defendants are not entitled to
the defense of fair use.


## E. Liability of the Gagosian Defendants

Copyright infringement has two elements: "(1) ownership of a
valid copyright, and (2) copying of constituent elements of the
work which are original." Feist, 499 U.S. at 361.

Here, it is uncontroverted that the Gagosian Defendants
copied original constituent elements of Cariou's copyrighted
Photos when they published the Canal Zone exhibition catalog,
created and distributed invitation cards featuring reproductions

31

of Cariou's Photos, and otherwise distributed reproductions of
Cariou's work as appropriated by Prince.  Moreover, by exhibiting
and selling Prince's unauthorized works, the Gagosian Defendants
infringed Cariou's exclusive rights, as copyright owner of the
Photos, to reproduce, prepare derivative works based upon,
distribute, sell, and display the Photographs.  <u>See</u> Copyright
Act, 17 U.S.C. § 106(1), (2), (3), and (5).  The Court therefore
finds the Gagosian Defendants directly liable for copyright
infringement.

The Gagosian Defendants are also liable as vicarious and
contributory infringers.

"The concept of vicarious copyright infringement was
developed in the Second Circuit as an outgrowth of the agency
principles of *respondiat superior*." <u>Faulkner v. Nat'l Geo. Soc.</u>,
211 F.Supp.2d 450, 472 (S.D.N.Y. 2002)(citations omitted).
"Vicarious liability extends beyond an employer/employee
relationship to cases in which a defendant has the right and
ability to supervise the infringing activity and also has a
direct financial interest in such activities. Benefit and control
are the signposts of vicarious liability." <u>Id.</u> (citations
omitted).

Here, the record establishes that Gagosian was "handling

32

everything" to do with the marketing of the Canal Zone Paintings
beginning at the time Price first showed Canal Zone (2007), which
Prince thought of as a "preview" of the characters he would use
in the Canal Zone Paintings, in December, 2007. See, e.g., RP Tr.
at 185-87 (describing Gagosian's role in the Eden Rock show and
describing Gagosian's home as an "off-off-off Broadway" location
where previously unseen paintings could be shown and sold). The
Court therefore finds that the Gagosian Defendants had the right
and ability to supervise Price's work, or at the very least the
right and ability (and perhaps even responsibility) to ensure
that Prince obtained licenses to use the Photos before they made
Prince's Paintings available for sale.  The financial benefit of
the infringing use to the Gagosian Defendants is self-evident.
Accordingly, the Gagosian Defendants are liable as vicarious
infringers.

     "One who, with knowledge of the infringing activity,
induces, causes, or materially contributes to the infringing
conduct of another, may be held liable as a contributory
infringer." Faulkner, 211 F.Supp.2d at 473 (citations and
quotations omitted) In other words, "the standard for
contributory infringement has two prongs, the 'knowledge' prong
and the 'material contribution' prong." Id. "Knowledge of the
infringing activity may be actual or constructive . . . In other

words, this prong is satisfied if the defendant knew or should have known of the infringing activity at the time of its material contribution." Id. at 474 (citations and quotations omitted). "Advertising or otherwise promoting an infringing product or service may be sufficient to satisfy the material contribution prong." Id. at 473-74.

Here, the Gagosian Defendants were well aware of (and capitalized on) Prince's reputation as an appropriation artist who rejects the constricts of copyright law, but they never inquired into the propriety of Prince's use of the Photos.  The Court concludes that the Gagosian Defendants knew or should have known of the infringement at the time that they reproduced, advertised, marketed, and otherwise promoted the Paintings. Accordingly, the Court finds that the Gagosian Defendants are liable as contributory infringers.

Because Plaintiff has established a prima facie case of copyright infringement as against all Defendants, and because the defense of fair use does not apply, Plaintiff's Motion for Summary Judgment on the issue of liability is GRANTED in its entirety.

34

F. Plaintiff's Claim for Conspiracy Under the Copyright Act

Defendants argue that Plaintiff's fifth claim for relief, which charges conspiracy to violate his rights under the Copyright Act, must be dismissed as failing to state a claim on which relief may be granted.

No Party has called the Court's attention to any Second Circuit or Supreme Court authority which provides that a cause of action for conspiracy to violate the Copyright Act may lie under New York or Federal law. Nor is conspiracy proscribed by the Copyright Act itself. <u>See</u> <u>generally</u> Copyright Act, 17 U.S.C. § 501 <u>et seq.</u>; <u>Calloway v. Marvel Entertainment Group</u>, No. 82 Civ. 8697 (RWS), 1983 WL 1152, at *5 (S.D.N.Y. 1983).

In the absence of contrary authority, the Court finds Judge Sweet's reasoning in <u>Irwin v. ZDF Enterprises GmbH</u>, No. 04 CIV. 8027 (RWS), 2006 WL 374960 (S.D.N.Y. February 16, 2006) persuasive. In <u>Irwin</u>, Judge Sweet considered whether the Copyright Act foreclosed a common law conspiracy claim based on copyright infringement and determined that "[b]ecause copyright law already recognizes the concepts of contributory infringement and vicarious copyright infringement . . . which extend joint and several liability to those who participate in the copyright infringement . . . [a] civil conspiracy claim does not add

35

substantively to the underlying federal copyright claim  . . ."
Irwin at *4 (citations and quotations omitted).

The Court therefore finds that Plaintiff's Fifth Cause of
Action must be dismissed.


III. CONCLUSION


For reasons stated herein, the Court GRANTS Plaintiff's
Motion for Summary Judgment on the issues of copyright
infringement, fair use, and liability.  The Court DENIES
Defendants' Motion for Summary Judgment except as pertains to
Plaintiff's Fifth Cause of Action, for conspiracy, which is
DISMISSED.


It is further ORDERED:

That, pursuant to 17 U.S.C. § 502, Defendants, their
directors, officers, agents, servants, employees, and attorneys,
and all persons in active concert or participation with them, are
hereby enjoined and restrained permanently from infringing the
copyright in the Photographs, or any other of Plaintiff's works,
in any manner, and from reproducing, adapting, displaying,

publishing, advertising, promoting, selling, offering for sale, marketing, distributing, or otherwise disposing of the Photographs or any copies of the Photographs, or any other of Plaintiff's works, and from participating or assisting in or authorizing such conduct in any way.

That Defendants shall within ten days of the date of this Order deliver up for impounding, destruction, or other disposition, as Plaintiff determines, all infringing copies of the Photographs, including the Paintings and unsold copies of the Canal Zone exhibition book, in their possession, custody, or control and all transparencies, plates, masters, tapes, film negatives, discs, and other articles for making such infringing copies.

That Defendants shall notify in writing any current or future owners of the Paintings of whom they are or become aware that the Paintings infringe the copyright in the Photographs, that the Paintings were not lawfully made under the Copyright Act of 1976, and that the Paintings cannot lawfully be displayed under 17 U.S.C. § 109(c).

That the Parties shall appear before this Court on May 6,

37

2011 at 11:00am for a status conference regarding damages,

profits, and Plaintiff's costs and reasonable attorney's fees.


SO ORDERED.

Dated:    New York, New York

          March 1*, 2011

                              *Deborah A. Batts*

                              Deborah A. Batts
                      United States District Judge

38