UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

PATRICK CARIOU,

                           Plaintiff,

    -against-

RICHARD PRINCE, GAGOSIAN GALLERY,
INC. and LAWRENCE GAGOSIAN,

                        Defendants.

------------------------------------------------------------x

**08 Civ. 11327 (DAB)**

---

**MEMORANDUM OF LAW APPLYING THE SECOND CIRCUIT'S
FAIR USE STANDARD TO THE ANALYSIS OF THE FIVE ARTWORKS
THAT HAVE BEEN REMANDED TO THE DISTRICT COURT**

---

SCHNADER HARRISON SEGAL & LEWIS LLP
140 Broadway, Suite 3100
New York, New York 10005-1101
Telephone: 212-973-8000
Facsimile: 212-972-8798
*Attorneys for Plaintiff Patrick Cariou*

On the Brief:
Daniel J. Brooks, Esq.
Eric A. Boden, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................ 2

POINT I

    THE FIVE PAINTINGS THAT HAVE BEEN REMANDED FOR FAIR USE
    ANALYSIS ARE NOT TRANSFORMATIVE, OR, AT MOST, ARE
    VANISHINGLY TRANSFORMATIVE, INCREASING THE IMPORTANCE OF
    OTHER FACTORS – THE COMMERCIALITY OF THE SECONDARY USE,
    THE CREATIVITY OF  THE COPYRIGHTED WORKS, AND THE
    SUBSTANTIALITY OF THE COPYING – WHICH
    WEIGH HEAVILY AGAINST FAIR USE ....................................................... 2

    A.    The Five Paintings That Are the Subject of the Remand Contain
        Minimal Alterations of Cariou's Photographs ........................................ 2

    B.    The Second Circuit's Standard ................................................................ 5

    C.    Under the Second Circuit Majority's Standard, the Five Paintings
        That Are the Subject of this Remand Are not Transformative .............................. 7

        1. Graduation ........................................................................................ 7

        2. Meditation ........................................................................................ 8

        3. Canal Zone (2008) .......................................................................... 9

        4. Canal Zone (2007) .......................................................................... 9

        5. Charlie Company .......................................................................... 10

    D.    Because the Five Paintings That Are the Subject of the Remand Are
        not Transformative At All, or, At Most, Are Minimally Transformative,
        Other Factors Weighing Against Fair Use – the Commerciality Prong
        of the First Fair Use Factor, the Creativity of the Copyrighted Original,
        and the Substantiality of the Portion Used – Increase in Importance,
        Precluding any Finding of Fair Use .................................................................... 10

## TABLE OF CONTENTS (cont'd)

Page

POINT II

UNDER THE SECOND CIRCUIT'S STANDARD, THE FIVE PAINTINGS
THAT HAVE BEEN REMANDED FOR FAIR USE ANALYSIS ARE NOT
TRANSFORMATIVE BECAUSE PRINCE'S OWN CONDUCT, IN
APPARENTLY SETTING FIRE TO THE PAINTING *GRADUATION* AND
POSTING A VIDEO OF THAT DESTRUCTIVE ACT ON TWITTER, BELIES
ANY INTENTION TO ENRICH SOCIETY ...................................................................14

POINT III

GAGOSIAN GALLERY, INC. AND LAWRENCE GAGOSIAN ARE
SECONDARILY LIABLE FOR PRINCE'S INFRINGEMENT......................................18

CONCLUSION.....................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A & M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) .....................................................................19

*Arista Records LLC v. Doe*,
  604 F.3d 110 (2d Cir. 2010).......................................................................19

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994).................................................................6, 11, 12, 13

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)..........................................................................1

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998)........................................................................15

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985).....................................................................................14

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) .......................................................................19

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005).....................................................................................19

*Shapiro, Bernstein & Co., Inc. v. H.L. Green Co., Inc.*,
  316 F.2d 304 (2d Cir. 1963)....................................................................18, 19

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) .....................................................................14

### FEDERAL: CONSTITUTIONAL PROVISIONS

U.S. Const., Art. I, § 8, cl. 8.............................................................................14

### OTHER AUTHORITIES

Pierre N. Leval,
  *Toward a Fair Use Standard*,
  103 Harv. L. Rev. 1105 (1990) ........................................................13, 14, 15

## PRELIMINARY STATEMENT

On April 25, 2013, the Second Circuit reversed in part, vacated in part, and remanded this Court's March 18, 2011 decision granting the motion of plaintiff Patrick Cariou for summary judgment on the issue of the defendants' liability for copyright infringement. *See Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013). In granting Cariou's motion for summary judgment and denying the cross-motion of the defendants, Richard Prince, Gagosian Gallery, Inc., and Lawrence Gagosian, for summary judgment, this Court found that the defendants had failed to make out the affirmative defense of fair use. The Second Circuit held that this Court had employed a standard, with respect to the first fair use factor, which was too narrow and that a secondary work could be "transformative" even if it did not comment on the original or its author. *See* majority opinion, Ex. A to Declaration of Daniel J. Brooks dated August 1, 2013 ("Brooks Dec.") at 12. The Second Circuit held that twenty-five of the Richard Prince paintings which gave rise to this litigation (the "Paintings"), "many" of which used Cariou's photographs (the "Photographs") "in whole or substantial part" (*id.* at 19), were "transformative as a matter of law" (*id.* at 14), but that the remaining five "do not sufficiently differ from the photographs of Cariou's that they incorporate for us confidently to make a determination about their transformative nature as a matter of law." *Id.* at 20. With respect to those five Paintings, the Second Circuit stated: "[W]e remand to the district court, applying the proper standard, to consider in the first instance whether Prince is entitled to a fair use defense." *Id.* at 4.

On June 18, 2013, this Court entered an order requiring Cariou to "submit papers on the Second Circuit's standard and the five works still at issue no later than August 2, 2013." This memorandum of law, submitted in compliance with the Court's June 18, 2013 order, analyzes

the five Paintings under the Second Circuit's standard and demonstrates that none of them

constitutes fair use.  Accordingly, as to these five Paintings, summary judgment should again be

granted on the defendants' liability for copyright infringement.

It should be noted that, because Cariou believes that the Second Circuit's decision is

erroneous in a number of important respects, he plans to file a petition for a writ of certiorari

with the Supreme Court.  That petition is due within 90 days of the Second Circuit's June 10,

2013 denial of Cariou's petition for rehearing *en banc*.  Cariou does not ask for a stay of this

Court's June 18 order, but is providing this information regarding his intent to seek Supreme

Court review so that the Court can decide for itself whether or not to proceed at this time with its

review of the five remaining Paintings.

**ARGUMENT**

**POINT I**

**THE FIVE PAINTINGS THAT HAVE BEEN REMANDED FOR FAIR USE
ANALYSIS ARE NOT TRANSFORMATIVE, OR, AT MOST, ARE VANISHINGLY
TRANSFORMATIVE, INCREASING THE IMPORTANCE OF OTHER FACTORS –
THE COMMERCIALITY OF THE SECONDARY USE, THE CREATIVITY OF
THE COPYRIGHTED WORKS, AND THE SUBSTANTIALITY OF THE COPYING –
WHICH WEIGH HEAVILY AGAINST FAIR USE**

**A.     The Five Paintings That Are the Subject of the Remand Contain Minimal
Alterations of Cariou's Photographs**

All of the Paintings and Photographs appear in the Appendix to the Second Circuit's

opinion, available at http:www.ca2.uscourts.gov/11-1197apx.htm.  As the Second Circuit noted,

the five Paintings that were remanded made only "minimal alterations" to Cariou's Photographs.

2

*See* Brooks Dec., Ex. A at 20.  The five Paintings that are now before this Court are set forth below:



*Graduation*



*Meditation*



*Canal Zone (2008)*



*Canal Zone (2007)*



*Charlie Company*

### B.     The Second Circuit's Standard

The Second Circuit majority found that 25 of the Paintings were transformative as a matter of law.  As the Court stated:  "These twenty-five of Prince's artworks manifest an entirely different aesthetic from Cariou's photographs.  Where Cariou's serene and deliberately composed portraits and landscape photographs depict the natural beauty of Rastafarians and their surrounding environs, Prince's crude and jarring works, on the other hand, are hectic and provocative."  Brooks Dec., Ex. A at 12.  While the majority also mentioned that the Paintings and Photographs differed in their size, scale and media (*id.* at 12-13), those differences would

5

apply as well to the five Paintings that are before this Court on remand, meaning that those differences cannot be determinative. If they were, the majority would have held that all thirty of the Paintings were transformative as a matter of law.

The majority explained that it "look[ed] at the artworks and the photographs side-by-side," concluding that 25 of the Paintings gave "Cariou's photographs a new expression, and employ[ed] new aesthetics with creative and communicative results distinct from Cariou's." *Id.* at 15. The majority noted, however, that mere differences between the original and secondary works did not necessarily compel a finding of fair use. "Our conclusion should not be taken to suggest, however, that any cosmetic changes to the photographs would necessarily constitute fair use. A secondary work may modify the original without being transformative." *Id.*

With respect to the five Paintings that are before this Court on remand, the Second Circuit majority believed that those Paintings "do not sufficiently differ from the photographs of Cariou's that they incorporate for us confidently to make a determination about their transformative nature as a matter of law." *Id.* at 20. The majority explained its uncertainty: "Although the minimal alterations that Prince made in those instances moved the work in a different direction from Cariou's classical portraiture and landscape photos, we can not say with certainty at this point whether those artworks present a 'new expression, meaning, or message.'" *Id.* (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).

The majority concluded, with respect to the five Paintings that are the subject of the remand, that "[e]ach of the artworks differs from, but is still similar in key aesthetic ways, to Cariou's photographs." *Id.* at 21. Because the Paintings were "aesthetically similar to Cariou's original work" (*id.* at 22), the majority concluded: "We believe the district court is best situated

to determine, in the first instance, whether such relatively minimal alterations render *Graduation*, *Meditation*, *Canal Zone (2007)*, *Canal Zone (2008)*, and *Charlie Company* fair uses (including whether the artworks are transformative) or whether any impermissibly infringes on Cariou's copyrights in his original photographs. We remand for that determination." *Id.*

### C.   Under the Second Circuit Majority's Standard, the Five Paintings That Are the Subject of this Remand Are not Transformative

In applying the standard set out by the Second Circuit majority, this Court should follow the majority's procedure of "looking at the artworks and the photographs side-by-side." *Id.* at 15.  Doing so compels the conclusion that these five Paintings are so "similar in key aesthetic ways" to Cariou's photographs," *id.* at 21, that they do not qualify as being "transformative."

#### 1.   *Graduation*

In *Graduation*, as the Second Circuit majority noted, "Cariou's original work is readily apparent: Prince did little more than paint blue lozenges over the subject's eyes and mouth, and paste a picture of a guitar over the subject's body." *Id.* at 6.  The focus of the Painting is firmly fixed on Cariou's Photograph of the man with the long dreadlocks in his jungle background. While the majority notes certain differences it perceives between the Painting and the Photograph – the blue tint, the supposedly softer focus on the background, the lozenges and enlarged hands possibly creating a "sense of discomfort" – the question is whether this Court perceives those minor differences and considers them not to be mere "cosmetic changes," but, rather, sufficiently transformative to present a "new expression, meaning, or message." Plainly, the eye of the observer is riveted on Cariou's distinctive, powerful image in both the Photograph and the Painting and, notwithstanding the minor cosmetic changes, the overwhelming

expression, meaning and message of *Graduation* cannot be separated from Cariou's image, without which there would be no Painting.  In those circumstances, *Graduation* cannot be deemed "transformative."

      2.     *Meditation*

As the Second Circuit majority stated, *Meditation*, like *Graduation*, "differs from, but is still similar in key aesthetic ways, to Cariou's photographs." *Id.* at 21.  The differences which are observable in *Meditation* are less pronounced than those in *Graduation*.  The focal point of both Paintings is Cariou's Photograph of the Rastafarian with long dreadlocks.  *Meditation*, however, does not have any blue tinting (or the noticeable addition of any color) and does not have the "enlarged hands" that are present in *Graduation*, creating a "sense of discomfort."  And while the majority notes that the background has been cut out of *Meditation* (whereas it is in softer focus in *Graduation*), some of the tropical foliage is still visible.  Finally, the majority's assertion that *Meditation* differs from Cariou's original Photograph in that Prince "switch[ed] the direction [the Rastafarian] is facing," *id.* at 21, is simply inaccurate.  The Appendix to the Second Circuit's opinion[1] clearly shows that Cariou's original Photograph of the Rastafarian with long dreadlocks is facing in exactly the same direction as the copied image of that man in *Graduation* and *Meditation*. *See* http:www.ca2.uscourts.gov/11-1197apx.htm.  In sum, *Meditation* differs from Cariou's original Photograph even less than *Graduation* does.  It, too,

---

[1]   The images (JPEG files) contained in the Appendix to the Second Circuit's opinion were provided, at the request of the Second Circuit Clerk, to the Court by counsel for the defendants. *See* Brooks Dec., ¶ 4 & Ex. C (e-mail to counsel from Second Circuit Clerk, dated August 3, 2012).

should be deemed not to be transformative, notwithstanding the "minimal alterations" it made to the source Photograph.  Brooks Aff., Ex. A at 20.

    3.    *Canal Zone (2008)*

    In this Painting, the same Rastafarian with the long dreadlocks is again depicted with "lozenges" and a guitar (but without enlarged hands) against a grid of Cariou landscapes cut out of *Yes Rasta*, enlarged and taped together on the canvas.  In other words, all of the rearranged images in this Painting are from Cariou's book, except the guitar and lozenges.  *See* http:www.ca2.uscourts.gov/11-1197apx.htm (showing the Cariou landscapes that were appropriated for this Painting).  The subject of this Painting (the Rastafarian with the long dreadlocks) is surrounded and engulfed by Cariou's landscapes.  As the Second Circuit recognized:  "The cumulative effect is of the subject in a habitat replete with lush greenery, not dissimilar from many of Cariou's *Yes Rasta* photographs."  Brooks Dec., Ex. A at 21.  Accordingly, *Canal Zone (2008)* is aesthetically similar to Cariou's original Photographs and has the same expressive character, precluding a finding of transformativeness.

    4.    *Canal Zone (2007)*

    In *Canal Zone (2007)*, Prince tore 31 pages out of *Yes Rasta*, doodled on them and affixed the pages to a plywood board.  *See* http:www.ca2.uscourts.gov/11-1197apx.htm.  Some of the images are of landscapes, which are unaltered.  Some of the portraits are completely recognizable, while others have been altered somewhat but are still recognizable.  As the Second Circuit majority stated:  "Prince created a gridded collage using 31 different photographs of Cariou's, many of them in whole or significant part, with alterations of some of those photographs limited to lozenges or cartoonish appendages painted or drawn on."  Brooks Dec.,

Ex. A at 21. The net effect is similar to flipping through *Yes Rasta*, after someone scribbled on some of its pages. These minimal differences from the originals plainly are not transformative.

### 5. *Charlie Company*

Referring to this Painting, the Second Circuit wrote: "In some works, such as *Charlie Company*, Prince did not alter the source photograph very much at all." *Id.* at 19. As the Second Circuit elaborated, "*Charlie Company* prominently displays four copies of Cariou's photograph of a Rastafarian riding a donkey, substantially unaltered, as well as two copies of a seated nude woman with lozenges covering all six faces. * * * *Charlie Company* is aesthetically similar to Cariou's original work because it maintains the pastoral background and individual focal point of the original photograph – in this case, the man on the burro." *Id.* at 21-22. By keeping the focus on Cariou's image, shot against a "serene," pastoral background, "depict[ing] the natural beauty of Rastafarians and their surrounding environs," *Charlie Company* lacks the "crude," "jarring" and "hectic" qualities that led the Second Circuit to conclude that 25 of the Paintings manifested an entirely different aesthetic from Cariou's Photographs, rendering those artworks "transformative." *Id.* at 12. Under that analysis, *Charlie Company* is not transformative.

> **D.** **Because the Five Paintings That Are the Subject of the Remand Are not Transformative At All, or, At Most, Are Minimally Transformative, Other Factors Weighing Against Fair Use – the Commerciality Prong of the First Fair Use Factor, the Creativity of the Copyrighted Original, and the Substantiality of the Portion Used – Increase in Importance, Precluding any Finding of Fair Use**

The transformativeness of a secondary work is only one prong of the first of four fair use factors. As recognized by the Second Circuit decision in this case, the less transformative the

secondary work, the more importance attaches to countervailing factors (the commerciality of the secondary use; the creative nature of the original copyrighted work; and the amount and substantiality of the portion used) which weigh against a finding of fair use. *Id.* at 16, 19, 20.

As the Second Circuit noted, the first fair use factor, the purpose and character of the use, "also requires that we consider whether the allegedly infringing work has a commercial or nonprofit educational purpose." *Id.* at 15. In that regard, the Second Circuit stated: "Although there is no question that Prince's artworks are commercial, we do not place much significance on that fact due to the transformative nature of the work." *Id.* at 16. As the Court explained, "[t]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* (quoting *Campbell*, 510 U.S. at 579). As *Campbell* demonstrates, the converse is true as well: "If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, *like the extent of its commerciality, loom larger*." *Campbell*, 510 U.S. at 580 (emphasis supplied). Accordingly, the non-existent, or, at most, trivial nature of the transformativeness of these five Paintings causes the commerciality of Prince and Gagosian's exploitation of Cariou's copyrighted images to loom larger, tipping the first fair use factor firmly against fair use.

Similarly, while acknowledging that, under the second fair use factor, the nature of the copyrighted work, Cariou's creative Photographs were within the core of copyright's protective purpose (Brooks Dec., Ex. A at 18-19), the Second Circuit held that this did not matter much at all, given the transformative nature of 25 of Prince's artworks. "Here, there is no dispute that

Cariou's work is creative and published.  Accordingly, this factor weighs against a fair use

determination.  However, just as with the commercial character of Prince's work, this factor

'may be of limited usefulness where,' as here, 'the creative work of art is being used for a

transformative purpose.'"  *Id.* at 19 (citation omitted).  The Second Circuit majority discounted

the importance of the second fair use factor because of its belief that 25 of Prince's Paintings

were transformative. Because, however, the five Paintings currently before this Court have no

transformative value, or, at most, vanishingly little in the way of transformativeness, the creative

nature of Cariou's copyrighted work increases in importance, causing the second fair use factor

to weigh heavily against a finding of fair use.

As for the third fair use factor, "the amount and substantiality of the portion used in

relation to the copyrighted work as a whole," the Second Circuit majority recognized that

"many" of Prince's Paintings used Cariou's Photographs in "whole or substantial part."  That

certainly is true of the five Paintings that are presently before this Court on remand.

Nevertheless, the Second Circuit endorsed this type of substantial copying – even, implicitly, of

unlimited copying – provided it was done for a transformative purpose.  As the Court stated:

"The secondary use 'must be [permitted] to 'conjure up' *at least* enough of the original' to fulfill

its transformative purpose."  *Id.* at 20 (quoting *Campbell*, 510 U.S. at 588) (emphasis and

alteration in original).  *Campbell* actually approved substantial copying only for purposes of

parody, where it is necessary to "conjure up" enough of the original to make recognizable the

original work that is being ridiculed.  *Campbell*, 510 U.S. at 588.  Even, however, extending the

"conjure up" doctrine beyond parody to cover any "transformative purpose," as the Second

Circuit has now done, does not support a finding of fair use regarding the five Paintings that are

before the Court on remand.  To the contrary, under the Second Circuit's standard, because the

12

five Paintings have little or no transformative value, the substantiality of the appropriation militates strongly against fair use.

Accordingly, under the Second Circuit's standard, the commerciality of the marketing of these five non-transformative, or minimally transformative, Paintings; the creativity of Cariou's original Photographs; and the substantiality of Prince's wholesale copying cause the first, second and third fair use factors to tip decidedly against the fair use defense. That leaves the fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work."

The Second Circuit held that this factor weighed in favor of fair use. Brooks Dec., Ex. A at 16-18. While Cariou believes that this conclusion is one of several important errors in the Second Circuit decision, and intends to raise that contention, among others, in his petition for a writ of certiorari, the Second Circuit's conclusion regarding the fourth fair use factor is, of course, binding for present purposes. The question becomes how to aggregate the four factors.

Guidance has been provided by Judge Leval in his much-quoted article (Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)) ("Leval"), which was relied upon not only by the Supreme Court in *Campbell*, but also by the Second Circuit in this case. The use of the term "transformative" in connection with the application of the first fair use factor was pioneered in that article. As Judge Leval stated, the first fair use factor, "'the purpose and character of the use' raises the question of justification." Leval at 1111 (citation omitted). Judge Leval further posited that "the answer to the question of justification turns primarily on whether, and to what extent, the challenged use is *transformative*." *Id.* (emphasis in original).

Judge Leval addressed the proper balancing of the fair use factors when a secondary use is not transformative, and thus lacks justification, but the market for the original has not been

impaired.  As he wrote:

> When the secondary use does substantially interfere with the
> market for the copyrighted work, as was the case in [*Harper &
> Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985)],
> this factor powerfully opposes a finding of fair use.  But the
> inverse does not follow.  The fact that the secondary use does not
> harm the market for the original gives no assurance that the
> secondary use is justified.  Thus, notwithstanding the importance
> of the market factor, especially when the market is impaired by the
> secondary use, it should not overshadow the requirement of
> justification under the first factor, without which there can be no
> fair use. *Id.* at 1124.

This approach to reconciling a lack of market harm with an absence of transformative

justification was quoted in its entirety and endorsed by the Ninth Circuit in *Worldwide Church of*

*God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000).  This aggregation

of the fair use factors is equally consistent with the Second Circuit's standard in this case,

inasmuch as the Second Circuit's decision rests substantially on Judge Leval's article.


## POINT II

**UNDER THE SECOND CIRCUIT'S STANDARD, THE FIVE
PAINTINGS THAT HAVE BEEN REMANDED FOR FAIR USE
ANALYSIS ARE NOT TRANSFORMATIVE BECAUSE PRINCE'S
OWN CONDUCT, IN APPARENTLY SETTING FIRE TO THE PAINTING
*GRADUATION* AND POSTING A VIDEO OF THAT DESTRUCTIVE ACT
ON TWITTER, BELIES ANY INTENTION TO ENRICH SOCIETY**


Again quoting Judge Leval, the Second Circuit explained the purpose of copyright law:

"The purpose of copyright law is '[t]o promote the Progress of Science and useful Arts . . . .'

U.S. Const., Art. I, § 8, cl. 8.  As Judge Pierre Leval of this court has explained, '[t]he copyright

is not an inevitable, divine, or natural right that confers on authors the absolute ownership of their creations. It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public.'" Brooks Dec., Ex. A at 9-10 (quoting Leval at 1107). Accordingly, the Second Circuit reasoned, a secondary use that transforms an original copyrighted work "'is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.'" *Id.* at 11 (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.,* 150 F.3d 132, 142 (2d Cir. 1998)).

Society is only enriched, however, by artworks that actually remain available for viewing. As the Second Circuit stated, "the destruction of Prince's artwork would be improper and against the public interest." Brooks Dec., Ex. A at 23, n.5. That, however, is just what Prince apparently has done. According to his own tweet, Prince claims to have set fire to *Graduation.* A still from the video that Prince tweeted of this destructive act is reproduced in a recent newspaper article. *See* Dan Duray, *Video Shows Richard Prince Burning Still Disputed 'Canal Zone' Painting,* N.Y. OBSERVER, June 7, 2013, available at http://galleristny.com/2013/06/video-shows-richard-prince-burning-still-disputed-canal-zone-painting. (*See* Brooks Dec., Ex. D).

Prince's own wanton conduct negates any intent to enrich society not only with respect to *Graduation,* which he apparently incinerated, but also with respect to: *Meditation,* which appropriated the same image and altered it in similar fashion; and *Canal Zone (2008),* in which the same similarly-modified image is at the center of Prince's Painting. *Canal Zone (2007)* also appropriated the image upon which *Graduation* is based. While *Charlie Company* is based on a different Cariou Photograph, Prince's cavalier attitude to his own work casts doubt on whether any of these five Paintings represents "the very type of activity that the fair use doctrine intends

to protect for the enrichment of society." Brooks Dec, Ex. A at 11 (citations and quotation marks omitted).

How Prince could have set *Graduation* on fire also is unclear and, because it relates to the transformativeness *vel non* of that Painting, should be clarified by defendants when they respond to this submission. According to defendants, *Graduation* was traded to Lawrence Gagosian for a Larry Rivers painting on March 13, 2009. *See* Declaration of Daniel J. Brooks dated May 7, 2010 in support of Cariou's motion for summary judgment (S.D.N.Y. Dkt. 54), Ex. P, ¶ 3(a) and summary, attached as Ex. A to Ex. P, at 2. After this Court ordered the impoundment and possible destruction of the Paintings, the parties entered into a stipulation of counsel (Brooks Dec., Ex. E) pursuant to which the unsold Paintings were to remain stored "at a location mutually agreeable to the parties" from which none of the Paintings "shall be moved without written consent of all the parties." Brooks Dec., Ex. E at 1. Pursuant to that stipulation, the Paintings were inspected by counsel for Cariou and a "catalogue" was prepared of the stored Paintings, both of which demonstrated that *Graduation* (even though it supposedly had been traded) was stored in a secure warehouse in Long Island City, where it should still be located. *See* Brooks Dec., ¶ 7.

One answer to this riddle may be that Prince produced more than one version of *Graduation* and that the one that was apparently set on fire is different than the version in the Long Island City warehouse. This, however, would conflict with what defendants told the Second Circuit when they appealed and would call into question the supposed uniqueness (and, therefore, transformativeness) of this particular Painting (and, also, of its twin, *Meditation*). *See* Joint Brief for Defendants-Appellants at 53, *Cariou v. Prince*, No. 11-1197 (2d Cir. Oct. 26, 2011) ("Prince's works, by their very nature, do not supersede or supplant Cariou's intended

market.  Unlike Cariou's photographs which are easily reproducible, and which have been sold almost exclusively in book form, Prince's thirty works are massive, *unique and one-of-a-kind* works designed for sale to a very limited audience and commanding market prices that range in the hundreds of thousands to millions of dollars.") (emphasis supplied).

When they explain whether, contrary to what they told the Second Circuit, there was more than one version of *Graduation*, defendants should also clear up the confusion about how many versions exist of *Meditation*.  As noted, *supra*, at 8, the Second Circuit mistakenly believed that, in *Meditation*, Prince had switched the direction in which the Rastafarian with long dreadlocks was facing.  *See* Brooks Dec., Ex. A at 21.  In fact, however, the Appendix to the Second Circuit's opinion (reproducing JPEG images provided by defendants at the request of the Second Circuit Clerk (*see* Brooks Dec., ¶ 4 & Ex. C)) dispels that mistaken belief, showing that the image of the Rastafarian is facing in exactly the same direction in *Meditation* and in *Graduation* as in Cariou's original source Photograph.  *See* http:www.ca2.uscourts.gov/11-1197apx.htm.

The source of the Second Circuit's mistaken belief is an affidavit (and accompanying "Composite Exhibit") filed by Richard Prince, sworn to May 13, 2010, in support of defendants' motion for summary judgment ("Prince Aff.") (S.D.N.Y. Dkt. 49), where Prince explained how he supposedly created *Meditation*: "In creating *Meditation*, I used the same image of the guitar-playing Rastafarian found in *Graduation*.  I rotated, and altered the size of, the image, and taped it onto a plain white canvas.  * * * The male who appears in *Meditation* represents the same musician that appears in *Graduation*. However, I switched the direction he was facing, and the guitar, as musicians often switch instruments as part of a performance, to further my reference to an ongoing musical performance in this series of Paintings."  Prince Aff. ¶ 33.  Attached to this

Prince affidavit, and reproduced in the joint appendix which was before the Second Circuit, is a "Composite Exhibit," which shows the Rastafarian in *Meditation* facing in the opposite direction from the Rastafarian in *Graduation* and from Cariou's original source Photograph, just as Prince stated in his affidavit. *See* Prince Aff., Composite Ex. A (S.D.N.Y. Dkt. 53 filed May 17, 2010). Hence, there apparently are at least two different *Meditation* Paintings.

The unavoidable conclusion is that *Graduation* and *Meditation* (as well as perhaps other Prince Paintings), rather than being "unique and one-of-a-kind works" painstakingly crafted for the edification of the public, are merely flammable, disposable mass-produced commodities, which are commercially-exploitative without being transformative.

## POINT III

### GAGOSIAN GALLERY, INC. AND LAWRENCE GAGOSIAN ARE SECONDARILY LIABLE FOR PRINCE'S INFRINGEMENT

Gagosian Gallery, Inc. and its owner, Lawrence Gagosian (collectively, the "Gagosian Defendants") are not only directly liable for copyright infringement with respect to these five Paintings, which they advertised, exhibited and offered for sale, but are also secondarily liable as vicarious and contributory copyright infringers.

Vicarious liability derives from *respondeat superior*, rendering liable those having a financial interest in and the right and ability to supervise primary infringers, even if they merely provide a venue and lack knowledge of, or control over, the process of infringement. *Shapiro, Bernstein & Co., Inc. v. H.L. Green Co., Inc.*, 316 F.2d 304, 307-08 (2d Cir. 1963) (department store vicariously liable for its concessionaire's sales of bootleg records even though it had no knowledge of or participation in the manufacture of the records), cited with approval, *Metro-*

*Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 931 n.9 (2005). The Gagosian

Defendants had a financial interest in the Paintings (receiving 40% of the sales proceeds) and the

absolute right to control the exhibition, pricing and sale of the Paintings. The Gagosian

Defendants' claim that they lacked control of Prince's "creative process" is irrelevant, just as it

was in *Shapiro, Bernstein*, because they had complete control of the exhibition and offering for

sale of the Paintings. There is nothing unfair about this outcome because the very purpose of

vicarious liability is to protect copyright owners, who lack any control over primary infringers,

by encouraging those with the power to police infringing conduct to do so, "thus placing

responsibility where it can and should be effectively exercised." *Shapiro, Bernstein*, 316 F.2d at

308.

> The Gagosian Defendants are also secondarily liable as contributory infringers. Although

they claim that they did not have actual knowledge that Prince was infringing Cariou's

copyright, that claim, aside from being preposterous, is also legally irrelevant inasmuch as actual

knowledge is not an element of contributory infringement. Contributory infringement requires

only constructive, not actual, knowledge of the primary infringement. *Arista Records LLC v.*

*Doe*, 604 F.3d 110, 118 (2d Cir. 2010) ("contributory infringement liability is imposed on

persons who 'know or have reason to know' of the direct infringement"), quoting *A & M*

*Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001) and citing *In re Aimster*

*Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("[w]illful blindness is knowledge"). The

Gagosian Defendants received Cariou's cease-and-desist letter on December 11, 2008, which

provided detailed information about Cariou's copyright ownership of the Photographs, and yet,

turning a blind eye, continued exhibiting and selling the Paintings and catalogues for many more

months, even though they clearly had "reason to know" of the primary infringement by Prince.

Recognizing that these continued sales, after their receipt of the cease-and-desist letter, were improper, the defendants falsely claimed, in this Court, that while they did not cease those activities on December 11, 2008, they did so shortly thereafter, when this action was commenced on December 30, 2008.  As the defendants claimed in their memorandum of law in support of their cross-motion for summary judgment (S.D.N.Y. Dkt. 50), at 17: "Besides, upon learning of this lawsuit, defendants pulled the remaining Paintings pending resolution of this lawsuit out of respect for the judicial process."  This was blatantly false, inasmuch as Paintings continued to be sold well after the commencement of this action, including *Graduation*, which was traded in March 2009, *Inquisition*, which was sold for $800,000 in June 2009 (*see* Brooks Dec., dated May 7, 2010 (S.D.N.Y. Dkt. 54), Ex. P, summary attached as Ex. A to Ex. P, at 2, 4) and *It's All Over*, which was sold for $1.1 million in August 2009 (*see* Brooks Dec. in opposition to defendants' motion for summary judgment, dated June 11, 2010 (S.D.N.Y. Dkt. 56), Ex. B, at 142-44).

## CONCLUSION

For the foregoing reasons, application of the Second Circuit's fair use standard renders all of the defendants liable for copyright infringement with respect to each of the five Paintings that are the subject of the Second Circuit's remand.

Dated: New York, New York
       August 1, 2013

SCHNADER HARRISON SEGAL & LEWIS LLP

By: _____
      Daniel J. Brooks
      Eric A. Boden
140 Broadway, Suite 3100
New York, New York 10005
(212) 973-8000
*Attorneys for Plaintiff Patrick Cariou*