Exhibit A

11-1197-cv
Patrick Cariou v. Richard Prince, et al.

| | |
|---|---|
| 1 | **UNITED STATES COURT OF APPEALS** |
| 2 | FOR THE SECOND CIRCUIT |
| 3 | |
| 4 | August Term, 2011 |
| 5 | (Argued: May 21, 2012      Decided: April 25, 2013) |
| 6 | Docket No. 11-1197-cv |
| 7 | |
| 8 | PATRICK CARIOU, |
| 9 | *Plaintiff-Appellee,* |
| 10 | v. |
| 11 | RICHARD PRINCE, |
| 12 | *Defendant-Appellant,* |
| 13 | GAGOSIAN GALLERY, INC., LAWRENCE GAGOSIAN, |
| 14 | *Defendants-Cross-Defendants-Appellants.* |

15  Before: B.D. PARKER, HALL, and WALLACE,[*] *Circuit Judges.*
16
17
18   Appeal from a judgment of the United States District Court for the Southern District of
19  New York (Batts, *J.*), on Plaintiff-Appellee Patrick Cariou's claim that Defendant-Appellant
20  Richard Prince's artworks infringe on Cariou's registered copyrights in certain photographs.  We
21  conclude that the district court applied the incorrect standard to determine whether Prince's
22  artworks make fair use of Cariou's copyrighted photographs.  We further conclude that all but
23  five of Prince's works do make fair use of Cariou's copyrighted photographs.  With regard to the
24  remaining five Prince artworks, we remand to the district court to consider, in the first instance,
25  whether Prince is entitled to a fair use defense.
26   REVERSED in part, VACATED in part, and REMANDED.
27   B.D. PARKER, *J.*, delivered the opinion of the Court, in which HALL, *J.*, joined.
28  WALLACE, *J.*, filed an opinion concurring in part and dissenting in part.

---

 [*] The Honorable J. Clifford Wallace, United States Circuit Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.

1     _____

2     JOSHUA I. SCHILLER (Jonathan D. Schiller, George F.
3       Carpinello, *on the brief*), Boies, Schiller & Flexner
4       LLP, New York, NY, *for Defendant-Appellant*
5       *Richard Prince.*

6     HOLLIS ANNE GONERKA BART, CHAYA WEINBERG-
7       BRODT, DARA G. HAMMERMAN, AZMINA N. JASANI,
8       Withers Bergman LLP, New York, NY, *for*
9       *Defendants-Appellants Gagosian Gallery, Inc.* and
10       *Lawrence Gagosian.*

11     DANIEL J. BROOKS (Seth E. Spitzer, Eric A. Boden, *on*
12       *the brief*), Schnader Harrison Segal & Lewis LLP,
13       New York, NY, *for Plaintiff-Appellee Patrick*
14       *Cariou.*

15     ANTHONY T. FALZONE, JULIE A. AHRENS, DANIEL K.
16       NAZER, Stanford Law School Center for Internet
17       and Society, Stanford, CA; VIRGINIA RUTLEDGE,
18       New York, NY; ZACHARY J. ALINDER, JOHN A.
19       POLITO, Bingham McCutchen LLP, San Francisco,
20       CA, *for Amicus The Andy Warhol Foundation for*
21       *the Visual Arts.*

22     JOSEPH C. GRATZ, Durie Tangri, LLP, San Francisco,
23       CA; OLIVER METZGER, Google Inc., Mountain
24       View, CA, *for Amicus Google Inc.*

25     CLIFFORD M. SLOAN, BRADLEY A. KLEIN, Skadden,
26       Arps, Slate, Meagher & Flom LLP, Washington,
27       DC, *for Amici The Association of Art Museum*
28       *Directors, The Art Institute of Chicago, The*
29       *Indianapolis Museum of Art, The Metropolitan*
30       *Museum of Art, The Museum of Modern Art,*
31       *Museum Associates d.b.a. Los Angeles County*
32       *Museum of Art, The New Museum, The Solomon R.*
33       *Guggenheim Foundation, The Walker Art Center,*
34       and *The Whitney Museum of American Art.*

35     MICHAEL WILLIAMS, DALE M. CENDALI, CLAUDIA
36       RAY, Kirkland & Ellis LLP, Washington, DC, *for*

2

1    *Amici American Society of Media Photographers,*
2    *Inc.,* and *Picture Archive Council of America.*

3    _____
4    BARRINGTON D. PARKER, *Circuit Judge*:

5        In 2000, Patrick Cariou published *Yes Rasta*, a book of classical portraits and landscape

6    photographs that he took over the course of six years spent living among Rastafarians in Jamaica.

7    Richard Prince altered and incorporated several of Cariou's *Yes Rasta* photographs into a series

8    of paintings and collages, called *Canal Zone*, that he exhibited in 2007 and 2008, first at the

9    Eden Rock hotel in Saint Barthélemy ("St. Barth's") and later at New York's Gagosian Gallery.[1]

10    In addition, Gagosian published and sold an exhibition catalog that contained reproductions of

11    Prince's paintings and images from Prince's workshop.

12        Cariou sued Prince and Gagosian, alleging that Prince's *Canal Zone* works and exhibition

13    catalog infringed on Cariou's copyrights in the incorporated *Yes Rasta* photographs.  The

14    defendants raised a fair use defense.  After the parties cross-moved for summary judgment, the

15    United States District Court for the Southern District of New York (Batts, *J.*) granted Cariou's

16    motion, denied the defendants', and entered a permanent injunction.  It compelled the defendants

17    to deliver to Cariou all infringing works that had not yet been sold, for him to destroy, sell, or

18    otherwise dispose of.

19        Prince and Gagosian principally contend on appeal that Prince's work is transformative

20    and constitutes fair use of Cariou's copyrighted photographs, and that the district court imposed

21    an incorrect legal standard when it concluded that, in order to qualify for a fair use defense,

_____

[1] We refer to Gagosian Gallery and its owner Lawrence Gagosian collectively as "Gagosian" or the "Gallery."

3

1    Prince's work must "comment on Cariou, on Cariou's Photos, or on aspects of popular culture

2    closely associated with Cariou or the Photos." *Cariou v. Prince*, 784 F. Supp. 2d 337, 349

3    (S.D.N.Y. 2011).  We agree with Appellants that the law does not require that a secondary use

4    comment on the original artist or work, or popular culture, and we conclude that twenty-five of

5    Prince's artworks do make fair use Cariou's copyrighted photographs.  With regard to the

6    remaining five artworks, we remand to the district court, applying the proper standard, to

7    consider in the first instance whether Prince is entitled to a fair use defense.[2]

8                                          **BACKGROUND**

9            The relevant facts, drawn primarily from the parties' submissions in connection with their

10   cross-motions for summary judgment, are undisputed.  Cariou is a professional photographer

11   who, over the course of six years in the mid-1990s, lived and worked among Rastafarians in

12   Jamaica.  The relationships that Cariou developed with them allowed him to take a series of

13   portraits and landscape photographs that Cariou published in 2000 in a book titled *Yes Rasta*.  As

14   Cariou testified, *Yes Rasta* is "extreme classical photography [and] portraiture," and he did not

15   "want that book to look pop culture at all."  Cariou Dep. 187:8-15, Jan. 12, 2010.

16           Cariou's publisher, PowerHouse Books, Inc., printed 7,000 copies of *Yes Rasta*, in a

17   single printing.  Like many, if not most, such works, the book enjoyed limited commercial

18   success.  The book is currently out of print.  As of January 2010, PowerHouse had sold 5,791

19   copies, over sixty percent of which sold below the suggested retail price of sixty dollars.

20   PowerHouse has paid Cariou, who holds the copyrights to the *Yes Rasta* photographs, just over

---

[2] The district court's opinion indicated that there are twenty-nine artworks at issue in this case.  *See Cariou*, 784 F. Supp. 2d at 344 nn.5, 6.  There are actually thirty.

1    $8,000 from sales of the book.  Except for a handful of private sales to personal acquaintances,

2    he has never sold or licensed the individual photographs.

3          Prince is a well-known appropriation artist.  The Tate Gallery has defined appropriation

4    art as "the more or less direct taking over into a work of art a real object or even an existing work

5    of art."  J.A. 446.  Prince's work, going back to the mid-1970s, has involved taking photographs

6    and other images that others have produced and incorporating them into paintings and collages

7    that he then presents, in a different context, as his own.  He is a leading exponent of this genre

8    and his work has been displayed in museums around the world, including New York's Solomon

9    R. Guggenheim Museum and Whitney Museum, San Francisco's Museum of Modern Art,

10    Rotterdam's Museum Boijmans van Beuningen, and Basel's Museum fur Gegenwartskunst.  As

11    Prince has described his work, he "completely tr[ies] to change [another artist's work] into

12    something that's completely different."  Prince Dep. 338:4-8, Oct. 6, 2009.

13          Prince first came across a copy of *Yes Rasta* in a bookstore in St. Barth's in 2005.

14    Between December 2007 and February 2008, Prince had a show at the Eden Rock hotel in St.

15    Barth's that included a collage, titled *Canal Zone (2007)*, comprising 35 photographs torn out of

16    *Yes Rasta* and pinned to a piece of plywood.  Prince altered those photographs significantly, by

17    among other things painting "lozenges" over their subjects' facial features and using only

18    portions of some of the images.  In June 2008, Prince purchased three additional copies of *Yes

19    Rasta*.  He went on to create thirty additional artworks in the *Canal Zone* series, twenty-nine of

20    which incorporated partial or whole images from *Yes Rasta*.[3]  The portions of *Yes Rasta*

_____

[3] Images of the Prince artworks, along with the *Yes Rasta* photographs incorporated
therein, appear in the Appendix to this opinion.  The Appendix is available at
http://www.ca2.uscourts.gov/11-1197apx.htm.

1   photographs used, and the amount of each artwork that they constitute, vary significantly from

2   piece to piece.  In certain works, such as *James Brown Disco Ball*, Prince affixed headshots from

3   *Yes Rasta* onto other appropriated images, all of which Prince placed on a canvas that he had

4   painted.  In these, Cariou's work is almost entirely obscured.  The Prince artworks also

5   incorporate photographs that have been enlarged or tinted, and incorporate photographs

6   appropriated from artists other than Cariou as well.  *Yes Rasta* is a book of photographs

7   measuring approximately 9.5" x 12".  Prince's artworks, in contrast, comprise inkjet printing and

8   acrylic paint, as well as pasted-on elements, and are several times that size.  For instance,

9   *Graduation* measures 72 3/4" x 52 1/2" and *James Brown Disco Ball* 100 1/2" x 104 1/2".  The

10   smallest of the Prince artworks measures 40" x 30", or approximately ten times as large as each

11   page of *Yes Rasta*.

 

12   Patrick Cariou, Photographs from *Yes Rasta*, pp. 11, 59      Richard Prince, *James Brown Disco Ball*

13   In other works, such as *Graduation*, Cariou's original work is readily apparent: Prince did

14   little more than paint blue lozenges over the subject's eyes and mouth, and paste a picture of a

15   guitar over the subject's body.

1

   

2    Patrick Cariou, Photograph from *Yes Rasta*, p. 118        Richard Prince, *Graduation*

3          Between November 8 and December 20, 2008, the Gallery put on a show featuring

4    twenty-two of Prince's *Canal Zone* artworks, and also published and sold an exhibition catalog

5    from the show.  The catalog included all of the *Canal Zone* artworks (including those not in the

6    Gagosian show) except for one, as well as, among other things, photographs showing *Yes*

7    *Rasta* photographs in Prince's studio.  Prince never sought or received permission from Cariou to

8    use his photographs.

9          Prior to the Gagosian show, in late August, 2008, a gallery owner named Cristiane Celle

10    contacted Cariou and asked if he would be interested in discussing the possibility of an exhibit in

11    New York City.  Celle did not mention *Yes Rasta*, but did express interest in photographs Cariou

12    took of surfers, which he published in 1998 in the aptly titled *Surfers*.  Cariou responded that

13    *Surfers* would be republished in 2008, and inquired whether Celle might also be interested in a

14    book Cariou had recently completed on gypsies.  The two subsequently met and discussed

15    Cariou's exhibiting work in Celle's gallery, including prints from *Yes Rasta*.  They did not select

16    a date or photographs to exhibit, nor did they finalize any other details about the possible future

17    show.

7

1         At some point during the *Canal Zone* show at Gagosian, Celle learned that Cariou's

2    photographs were "in the show with Richard Prince." Celle then phoned Cariou and, when he

3    did not respond, Celle mistakenly concluded that he was "doing something with Richard Prince .

4    . . . [Maybe] he's not pursuing me because he's doing something better, bigger with this person. .

5    . . [H]e didn't want to tell the French girl I'm not doing it with you, you know, because we had

6    started a relation and that would have been bad." Celle Dep. 88:15-89:7, Jan. 26, 2010. At that

7    point, Celle decided that she would not put on a "Rasta show" because it had been "done

8    already," and that any future Cariou exhibition she put on would be of photographs from *Surfers*.

9    Celle remained interested in exhibiting prints from *Surfers*, but Cariou never followed through.

10         According to Cariou, he learned about the Gagosian *Canal Zone* show from Celle in

11    December 2008. On December 30, 2008, he sued Prince, the Gagosian Gallery, and Lawrence

12    Gagosian, raising claims of copyright infringement. *See* 17 U.S.C. §§ 106, 501. The defendants

13    asserted a fair use defense, arguing that Prince's artworks are transformative of Cariou's

14    photographs and, accordingly, do not violate Cariou's copyrights. *See, e.g., Campbell v. Acuff-*

15    *Rose Music, Inc.*, 510 U.S. 569, 578-79 (1994). Ruling on the parties' subsequently-filed cross-

16    motions for summary judgment, the district court (Batts, *J.*) "impose[d] a requirement that the

17    new work in some way comment on, relate to the historical context of, or critically refer back to

18    the original works" in order to be qualify as fair use, and stated that "Prince's Paintings are

19    transformative only to the extent that they comment on the Photos." *Cariou v. Prince*, 784 F.

20    Supp. 2d 337, 348-49 (S.D.N.Y. 2011). The court concluded that "Prince did not intend to

21    comment on Cariou, on Cariou's Photos, or on aspects of popular culture closely associated with

22    Cariou or the Photos when he appropriated the Photos," *id.* at 349, and for that reason rejected

8

1   the defendants' fair use defense and granted summary judgment to Cariou.  The district court also

2   granted sweeping injunctive relief, ordering the defendants to "deliver up for impounding,

3   destruction, or other disposition, as [Cariou] determines, all infringing copies of the Photographs,

4   including the Paintings and unsold copies of the *Canal Zone* exhibition book, in their

5   possession." *Id.* at 355.[4]  This appeal followed.

6                                    **DISCUSSION**

7                                          **I.**

8          We review a grant of summary judgment *de novo*.  *See Blanch v. Koons*, 467 F.3d 244,

9   249-50 (2d Cir. 2006).  The well known standards for summary judgment set forth in Rule 56(c)

10   apply.  *See* Fed. R. Civ. P. 56.  "Although fair use is a mixed question of law and fact, this court

11   has on numerous occasions resolved fair use determinations at the summary judgment stage

12   where . . . there are no genuine issues of material fact."  *Blanch*, 467 F.3d at 250 (quotation

13   marks and brackets omitted); *see also Harper & Row, Publishers, Inc. v. Nation Enters.*, 471

14   U.S. 539, 560 (1985); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d

15   Cir. 1998).  This case lends itself to that approach.

16                                          **II.**

17          The purpose of the copyright law is "[t]o promote the Progress of Science and useful Arts

18   . . . ."  U.S. Const., Art. I, § 8, cl. 8.  As Judge Pierre Leval of this court has explained, "[t]he

19   copyright is not an inevitable, divine, or natural right that confers on authors the absolute

20   ownership of their creations.  It is designed rather to stimulate activity and progress in the arts for

---

[4] At oral argument, counsel for Cariou indicated that he opposes the destruction of any of the works of art that are the subject of this litigation.

1    the intellectual enrichment of the public."  Pierre N. Leval, *Toward a Fair Use Standard*, 103

2    Harv. L. Rev. 1105, 1107 (1990) (hereinafter "Leval").  Fair use is "necessary to fulfill [that]

3    very purpose."  *Campbell*, 510 U.S. at 575.  Because "'excessively broad protection would stifle,

4    rather than advance, the law's objective,'" fair use doctrine "mediates between" "the property

5    rights [copyright law] establishes in creative works, which must be protected up to a point, and

6    the ability of authors, artists, and the rest of us to express them- or ourselves by reference to the

7    works of others, which must be protected up to a point."  *Blanch*, 467 F.3d at 250 (brackets

8    omitted) (quoting Leval at 1109).

9           The doctrine was codified in the Copyright Act of 1976, which lists four non-exclusive

10   factors that must be considered in determining fair use.  Under the statute,

11   [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment,
12   news reporting, teaching (including multiple copies for classroom use),
13   scholarship, or research, is not an infringement of copyright.  In determining
14   whether the use made of a work in any particular case is a fair use the factors to be
15   considered shall include –

16            (1) the purpose and character of the use, including whether such use is of a
17            commercial nature or is for nonprofit educational purposes;

18            (2) the nature of the copyrighted work;

19            (3) the amount and substantiality of the portion used in relation to the
20            copyrighted work as a whole; and

21            (4) the effect of the use upon the potential market for the value of the copyrighted
22            work.

23   17 U.S.C. § 107.  As the statute indicates, and as the Supreme Court and our court have

24   recognized, the fair use determination is an open-ended and context-sensitive inquiry.  *Campbell*,

25   510 U.S. at 577-78; *Blanch*, 467 F.3d at 251.  The statute "employs the terms 'including' and

1   'such as' in the preamble paragraph to indicate the illustrative and not limitative function of the

2   examples given, which thus provide only general guidance about the sorts of copying that courts

3   and Congress most commonly had found to be fair uses." *Campbell*, 510 U.S. at 577-78

4   (quotation marks and citation omitted). The "ultimate test of fair use . . . is whether the copyright

5   law's goal of 'promoting the Progress of Science and useful Arts' . . . would be better served by

6   allowing the use than by preventing it." *Castle Rock*, 150 F.3d at 141 (brackets and citation

7   omitted).

8           The first statutory factor to consider, which addresses the manner in which the copied

9   work is used, is "[t]he heart of the fair use inquiry." *Blanch*, 467 F.3d at 251. We ask

10          whether the new work merely 'supersedes the objects' of the original creation, or
11          instead adds something new, with a further purpose or different character, altering
12          the first with new expression, meaning, or message[,] . . . in other words, whether and
13          to what extent the new work is transformative. . . . [T]ransformative works . . . lie
14          at the heart of the fair use doctrine's guarantee of breathing space . . . .

15  *Campbell*, 510 U.S. at 579 (citations and some quotation marks omitted) (quoting *Folsom v.*

16  *Marsh*, 9 F. Cas. 342, 348 *No. 4,901) (C.C.D. Mass. 1841) (Story, *J.*)). "If 'the secondary use

17  adds value to the original – if [the original work] is used as raw material, transformed in the

18  creation of new information, new aesthetics, new insights and understandings – this is the very

19  type of activity that the fair use doctrine intends to protect for the enrichment of society.'" *Castle*

20  *Rock*, 150 F.3d at 142 (quoting Leval 1111). For a use to be fair, it "must be productive and

21  must employ the quoted matter in a different manner or for a different purpose from the

22  original." Leval at 1111.

23          The district court imposed a requirement that, to qualify for a fair use defense, a

24  secondary use must "comment on, relate to the historical context of, or critically refer back to the

1    original works." *Cariou*, 784 F. Supp. 2d at 348.  Certainly, many types of fair use, such as satire

2    and parody, invariably comment on an original work and/or on popular culture.  For example, the

3    rap group 2 Live Crew's parody of Roy Orbison's "Oh, Pretty Woman" "was clearly intended to

4    ridicule the white-bread original." *Campbell*, 510 U.S. at 582 (quotation marks omitted).  Much

5    of Andy Warhol's work, including work incorporating appropriated images of Campbell's soup

6    cans or of Marilyn Monroe, comments on consumer culture and explores the relationship

7    between celebrity culture and advertising.  As even Cariou concedes, however, the district court's

8    legal premise was not correct.  The law imposes no requirement that a work comment on the

9    original or its author in order to be considered transformative, and a secondary work may

10   constitute a fair use even if it serves some purpose other than those (criticism, comment, news

11   reporting, teaching, scholarship, and research) identified in the preamble to the statute.  *Id.* at

12   577; *Harper & Row*, 471 U.S. at 561.  Instead, as the Supreme Court as well as decisions from

13   our court have emphasized, to qualify as a fair use, a new work generally must alter the original

14   with "new expression, meaning, or message." *Campbell*, 510 U.S. at 579; *see also Blanch*, 467

15   F.3d at 253 (original must be employed "in the creation of new information, new aesthetics, new

16   insights and understandings" (quotation marks omitted)); *Castle Rock*, 150 F.3d at 142.

17          Here, our observation of Prince's artworks themselves convinces us of the transformative

18   nature of all but five, which we discuss separately below.  These twenty-five of Prince's artworks

19   manifest an entirely different aesthetic from Cariou's photographs.  Where Cariou's serene and

20   deliberately composed portraits and landscape photographs depict the natural beauty of

21   Rastafarians and their surrounding environs, Prince's crude and jarring works, on the other hand,

22   are hectic and provocative.  Cariou's black-and-white photographs were printed in a 9 1/2" x 12"

1    book.  Prince has created collages on canvas that incorporate color, feature distorted human and

2    other forms and settings, and measure between ten and nearly a hundred times the size of the

3    photographs.  Prince's composition, presentation, scale, color palette, and media are

4    fundamentally different and new compared to the photographs, as is the expressive nature of

5    Prince's work.  *See Campbell*, 510 U.S. at 579.

6          Prince's deposition testimony further demonstrates his drastically different approach and

7    aesthetic from Cariou's.  Prince testified that he "[doesn't] have any really interest in what

8    [another artist's] original intent is because . . . what I do is I completely try to change it into

9    something that's completely different. . . . I'm trying to make a kind of fantastic, absolutely hip,

10   up to date, contemporary take on the music scene."  Prince Dep. 338:4-339:3, Oct. 6, 2009.  As

11   the district court determined, Prince's *Canal Zone* artworks relate to a "post-apocalyptic

12   screenplay" Prince had planned, and "emphasize themes [of Prince's planned screenplay] of

13   equality of the sexes; highlight 'the three relationships in the world, which are men and women,

14   men and men, and women and women'; and portray a contemporary take on the music scene."

15   *Cariou*, 784 F. Supp. 2d at 349; *see* Prince Dep. 339:3-7, Oct. 6, 2009.

16         The district court based its conclusion that Prince's work is not transformative in large

17   part on Prince's deposition testimony that he "do[es]n't really have a message," that he was not

18   "trying to create anything with a new meaning or a new message," and that he "do[es]n't have

19   any . . . interest in [Cariou's] original intent."  *Cariou*, 784 F. Supp. 2d at 349; *see* Prince Dep.

20   45:25-46:2, 338:5-6, 360:18-20, Oct. 6, 2009.  On appeal, Cariou argues that we must hold

21   Prince to his testimony and that we are not to consider how Prince's works may reasonably be

22   perceived unless Prince claims that they were satire or parody.  No such rule exists, and we do

23   not analyze satire or parody differently from any other transformative use.

13

1   It is not surprising that, when transformative use is at issue, the alleged infringer would

2 go to great lengths to explain and defend his use as transformative.  Prince did not do so here.

3 However, the fact that Prince did not provide those sorts of explanations in his deposition –

4 which might have lent strong support to his defense – is not dispositive.  What is critical is how

5 the work in question appears to the reasonable observer, not simply what an artist might say

6 about a particular piece or body of work.  Prince's work could be transformative even without

7 commenting on Cariou's work or on culture, and even without Prince's stated intention to do so.

8 Rather than confining our inquiry to Prince's explanations of his artworks, we instead examine

9 how the artworks may "reasonably be perceived" in order to assess their transformative nature.

10 *Campbell*, 510 U.S. at 582; *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 113-14 (2d

11 Cir. 1998) (evaluating parodic nature of advertisement in light of how it "may reasonably be

12 perceived").  The focus of our infringement analysis is primarily on the Prince artworks

13 themselves, and we see twenty-five of them as transformative as a matter of law.

14   In this respect, the Seventh Circuit's recent decision in *Brownmark Films, LLC v.*

15 *Comedy Partners*, 682 F.3d 687 (7th Cir. 2012), is instructive.  There, the court rejected the

16 appellant's argument that copyright infringement claims cannot be disposed of at the motion-to-

17 dismiss stage, and affirmed the district court's dismissal of such a claim under Fed. R. Civ. P.

18 12(b)(6).  *Brownmark Films*, 682 F.3d at 690.  Considering whether an episode of the animated

19 television show *South Park* presented a parody (and therefore a protected fair use) of a viral

20 internet video titled "What What (In The Butt)," the court concluded that "[w]hen the two works

21 . . . are viewed side-by-side, the *South Park* episode is clearly a parody of the original . . . video."

22 *Id.* at 692.  For that reason, "the only two pieces of evidence needed to decide the question of fair

23 use in [*Brownmark* were] the original version of [the video] and the episode at issue." *Id.* at 690.

1          Here, looking at the artworks and the photographs side-by-side, we conclude that Prince's

2     images, except for those we discuss separately below, have a different character, give Cariou's

3     photographs a new expression, and employ new aesthetics with creative and communicative

4     results distinct from Cariou's.  Our conclusion should not be taken to suggest, however, that any

5     cosmetic changes to the photographs would necessarily constitute fair use.  A secondary work

6     may modify the original without being transformative.  For instance, a derivative work that

7     merely presents the same material but in a new form, such as a book of synopses of televisions

8     shows, is not transformative.  *See Castle Rock*, 150 F.3d at 143; *Twin Peaks Prods., Inc. v.*

9     *Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1378 (2d Cir. 1993).  In twenty-five of his artworks, Prince

10    has not presented the same material as Cariou in a different manner, but instead has "add[ed]

11    something new" and presented images with a fundamentally different aesthetic.  *Leibovitz*, 137

12    F.3d at 114.

13         The first fair use factor – the purpose and character of the use – also requires that we

14    consider whether the allegedly infringing work has a commercial or nonprofit educational

15    purpose.  *See, e.g., Blanch*, 467 F.3d at 253.  That being said, "nearly all of the illustrative uses

16    listed in the preamble paragraph of § 107, including news reporting, comment, criticism,

17    teaching, scholarship, and research . . . are generally conducted for profit."  *Campbell*, 510 U.S.

18    at 584 (quotation marks omitted).  "The commercial/nonprofit dichotomy concerns the unfairness

19    that arises when a secondary user makes unauthorized use of copyrighted material to capture

20    significant revenues as a direct consequence of copying the original work."  *Am. Geophysical*

21    *Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994).  This factor must be applied with caution

22    because, as the Supreme Court has recognized, Congress "could not have intended" a rule that

1    commercial uses are presumptively unfair. *Campbell*, 510 U.S. at 584  Instead, "[t]he more

2    transformative the new work, the less will be the significance of other factors, like

3    commercialism, that may weigh against a finding of fair use." *Id.* at 579.  Although there is no

4    question that Prince's artworks are commercial, we do not place much significance on that fact

5    due to the transformative nature of the work.

6           We turn next to the fourth statutory factor, the effect of the secondary use upon the

7    potential market for the value of the copyrighted work, because such discussion further

8    demonstrates the significant differences between Prince's work, generally, and Cariou's.  Much

9    of the district court's conclusion that Prince and Gagosian infringed on Cariou's copyrights was

10   apparently driven by the fact that Celle decided not to host a *Yes Rasta* show at her gallery once

11   she learned of the Gagosian *Canal Zone* show.  The district court determined that this factor

12   weighs against Prince because he "has unfairly damaged both the actual and potential markets for

13   Cariou's original work and the potential market for derivative use licenses for Cariou's original

14   work." *Cariou*, 784 F. Supp. 2d at 353.

15          Contrary to the district court's conclusion, the application of this factor does not focus

16   principally on the question of damage to Cariou's derivative market.  We have made clear that

17   "our concern is not whether the secondary use suppresses or even destroys the market for the

18   original work or its potential derivatives, but whether the secondary use *usurps* the market of the

19   original work." *Blanch*, 467 F.3d at 258 (quotation marks omitted) (emphasis added); *NXIVM*

20   *Corp. v. Ross Inst.*, 364 F.3d 471, 481-82 (2d Cir. 2004).  "The market for potential derivative

21   uses includes only those that creators of original works would in general develop or license

22   others to develop." *Campbell*, 510 U.S. at 592.  Our court has concluded that an accused

16

1   infringer has usurped the market for copyrighted works, including the derivative market, where

2   the infringer's target audience and the nature of the infringing content is the same as the original.

3   For instance, a book of trivia about the television show *Seinfeld* usurped the show's market

4   because the trivia book "substitute[d] for a derivative market that a television program copyright

5   owner . . . would in general develop or license others to develop." *Castle Rock*, 150 F.3d at 145

6   (quotation marks omitted).  Conducting this analysis, we are mindful that "[t]he more

7   transformative the secondary use, the less likelihood that the secondary use substitutes for the

8   original," even though "the fair use, being transformative, might well harm, or even destroy, the

9   market for the original." *Id.*

10        As discussed above, Celle did not decide against putting on a *Yes Rasta* show because it

11   had already been done at Gagosian, but rather because she mistakenly believed that Cariou had

12   collaborated with Prince on the Gagosian show.  Although certain of Prince's artworks contain

13   significant portions of certain of Cariou's photographs, neither Prince nor the *Canal Zone* show

14   usurped the market for those photographs.  Prince's audience is very different from Cariou's, and

15   there is no evidence that Prince's work ever touched – much less usurped – either the primary or

16   derivative market for Cariou's work.  There is nothing in the record to suggest that Cariou would

17   ever develop or license secondary uses of his work in the vein of Prince's artworks.  Nor does

18   anything in the record suggest that Prince's artworks had any impact on the marketing of the

19   photographs.  Indeed, Cariou has not aggressively marketed his work, and has earned just over

20   $8,000 in royalties from *Yes Rasta* since its publication.  He has sold four prints from the book,

21   and only to personal acquaintances.

17

1          Prince's work appeals to an entirely different sort of collector than Cariou's.  Certain of

2    the *Canal Zone* artworks have sold for two million or more dollars.  The invitation list for a

3    dinner that Gagosian hosted in conjunction with the opening of the *Canal Zone* show included a

4    number of the wealthy and famous such as the musicians Jay-Z and Beyonce Knowles, artists

5    Damien Hirst and Jeff Koons, professional football player Tom Brady, model Gisele Bundchen,

6    *Vanity Fair* editor Graydon Carter, *Vogue* editor Anna Wintour, authors Jonathan Franzen and

7    Candace Bushnell, and actors Robert DeNiro, Angelina Jolie, and Brad Pitt.  Prince sold eight

8    artworks for a total of $10,480,000, and exchanged seven others for works by painter Larry

9    Rivers and by sculptor Richard Serra.  Cariou on the other hand has not actively marketed his

10   work or sold work for significant sums, and nothing in the record suggests that anyone will not

11   now purchase Cariou's work, or derivative non-transformative works (whether Cariou's own or

12   licensed by him) as a result of the market space that Prince's work has taken up.  This fair use

13   factor therefore weighs in Prince's favor.

14         The next statutory factor that we consider, the nature of the copyrighted work, "calls for

15   recognition that some works are closer to the core of intended copyright protection than others,

16   with the consequence that fair use is more difficult to establish when the former works are

17   copied."  *Campbell*, 510 U.S. at 586.  We consider "'(1) whether the work is expressive or

18   creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual

19   or informational, and (2) whether the work is published or unpublished, with the scope for fair

20   use involving unpublished works being considerably narrower.'"  *Blanch*, 467 F.3d at 256

21   (quoting 2 Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006)).

18

1        Here, there is no dispute that Cariou's work is creative and published.  Accordingly, this

2    factor weighs against a fair use determination.  However, just as with the commercial character

3    of Prince's work, this factor "may be of limited usefulness where," as here, "the creative work of

4    art is being used for a transformative purpose." *Bill Graham Archives v. Dorling Kindersley*

5    *Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006).

6        The final factor that we consider in our fair use inquiry is "the amount and substantiality

7    of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).  We ask

8    "whether the quantity and value of the materials used[] are reasonable in relation to the purpose

9    of the copying." *Blanch*, 467 F.3d at 257 (quotation marks omitted).  In other words, we

10    consider the proportion of the original work used, and not how much of the secondary work

11    comprises the original.

12        Many of Prince's works use Cariou's photographs, in particular the portrait of the

13    dreadlocked Rastafarian at page 118 of *Yes Rasta*, the Rastafarian on a burro at pages 83 to 84,

14    and the dreadlocked and bearded Rastafarian at page 108, in whole or substantial part.  In some

15    works, such as *Charlie Company*, Prince did not alter the source photograph very much at all.  In

16    others, such as *Djuana Barnes, Natalie Barney, Renee Vivien and Romaine Brooks take over the*

17    *Guanahani*, the entire source photograph is used but is also heavily obscured and altered to the

18    point that Cariou's original is barely recognizable.  Although "[n]either our court nor any of our

19    sister circuits has ever ruled that the copying of an entire work *favors* fair use[,] . . . . courts have

20    concluded that such copying does not necessarily weigh against fair use because copying the

21    entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham*, 448

22    F.3d at 613.  "[T]he third-factor inquiry must take into account that the extent of permissible

23    copying varies with the purpose and character of the use." *Id.* (internal quotation marks omitted).

1      The district court determined that Prince's "taking was substantially greater than

2  necessary." *Cariou*, 784 F. Supp. 2d at 352.  We are not clear as to how the district court could

3  arrive at such a conclusion.  In any event, the law does not require that the secondary artist may

4  take no more than is necessary. *See Campbell*, 510 U.S. at 588; *Leibovitz*, 137 F.3d at 114.  We

5  consider not only the quantity of the materials taken but also "their quality and importance" to

6  the original work. *Campbell*, 510 U.S. at 587.  The secondary use "must be [permitted] to

7  'conjure up' *at least* enough of the original" to fulfill its transformative purpose. *Id*. at 588

8  (emphasis added); *Leibovitz*, 137 F.3d at 114.  Prince used key portions of certain of Cariou's

9  photographs.  In doing that, however, we determine that in twenty-five of his artworks, Prince

10  transformed those photographs into something new and different and, as a result, this factor

11  weighs heavily in Prince's favor.

12      As indicated above, there are five artworks that, upon our review, present closer

13  questions.  Specifically, *Graduation*, *Meditation*, *Canal Zone (2008)*, *Canal Zone (2007)*, and

14  *Charlie Company* do not sufficiently differ from the photographs of Cariou's that they

15  incorporate for us confidently to make a determination about their transformative nature as a

16  matter of law.  Although the minimal alterations that Prince made in those instances moved the

17  work in a different direction from Cariou's classical portraiture and landscape photos, we can not

18  say with certainty at this point whether those artworks present a "new expression, meaning, or

19  message." *Campbell*, 510 U.S. at 579.

20      Certainly, there are key differences in those artworks compared to the photographs they

21  incorporate. *Graduation*, for instance, is tinted blue, and the jungle background is in softer focus

22  than in Cariou's original.  Lozenges painted over the subject's eyes and mouth – an alteration

1  that appears frequently throughout the *Canal Zone* artworks – make the subject appear

2  anonymous, rather than as the strong individual who appears in the original.  Along with the

3  enlarged hands and electric guitar that Prince pasted onto his canvas, those alterations create the

4  impression that the subject is not quite human.  Cariou's photograph, on the other hand, presents

5  a human being in his natural habitat, looking intently ahead.  Where the photograph presents

6  someone comfortably at home in nature, *Graduation* combines divergent elements to create a

7  sense of discomfort.  However, we cannot say for sure whether *Graduation* constitutes fair use or

8  whether Prince has transformed Cariou's work enough to render it transformative.

9      We have the same concerns with *Meditation, Canal Zone (2007), Canal Zone (2008)*, and

10  *Charlie Company*.  Each of those artworks differs from, but is still similar in key aesthetic ways,

11  to Cariou's photographs.  In *Meditation*, Prince again added lozenges and a guitar to the same

12  photograph that he incorporated into *Graduation*, this time cutting the subject out of his

13  background, switching the direction he is facing, and taping that image onto a blank canvas.  In

14  *Canal Zone (2007)*, Prince created a gridded collage using 31 different photographs of Cariou's,

15  many of them in whole or significant part, with alterations of some of those photographs limited

16  to lozenges or cartoonish appendages painted or drawn on.  *Canal Zone (2008)* incorporates six

17  photographs of Cariou's in whole or in part, including the same subject as *Meditation* and

18  *Graduation*.  Prince placed the subject, with lozenges and guitar, on a background comprising

19  components of various landscape photographs, taped together.  The cumulative effect is of the

20  subject in a habitat replete with lush greenery, not dissimilar from many of Cariou's *Yes Rasta*

21  photographs.  And *Charlie Company* prominently displays four copies of Cariou's photograph of

22  a Rastafarian riding a donkey, substantially unaltered, as well as two copies of a seated nude

21

1   woman with lozenges covering all six faces.  Like the other works just discussed, *Charlie*

2   *Company* is aesthetically similar to Cariou's original work because it maintains the pastoral

3   background and individual focal point of the original photograph – in this case, the man on the

4   burro.  While the lozenges, repetition of the images, and addition of the nude female unarguably

5   change the tenor of the piece, it is unclear whether these alterations amount to a sufficient

6   transformation of the original work of art such that the new work is transformative.

7        We believe the district court is best situated to determine, in the first instance, whether

8   such relatively minimal alterations render *Graduation*, *Meditation*, *Canal Zone (2007)*, *Canal*

9   *Zone (2008)*, and *Charlie Company* fair uses (including whether the artworks are transformative)

10   or whether any impermissibly infringes on Cariou's copyrights in his original photographs.  We

11   remand for that determination.

12   **III.**

13        In addition to its conclusion that Prince is liable for infringing on Cariou's copyrights, the

14   district court determined that the Gagosian defendants are liable as vicarious and contributory

15   infringers.  *Cariou*, 784 F. Supp. 2d at 354.  With regard to the twenty-five of Prince's artworks,

16   which, as we have held, do not infringe on Cariou's copyrights, neither Lawrence Gagosian nor

17   the Gallery may be liable as a vicarious or contributory infringer.  *See Faulkner v. Nat'l*

18   *Geographic Enters., Inc.*, 409 F.3d 26, 40 (2d Cir. 2005).  If the district court concludes on

19   remand that Prince is liable as a direct infringer with regard to any of the remaining five works,

20   the district court should determine whether the Gagosian defendants should be held liable,

21   directly or secondarily, as a consequence of their actions with regard to those works.  *See*

22   Copyright Act, 17 U.S.C. §§ 106(1), (2), (3), (5).

22

1                                            **CONCLUSION**

2              For the reasons discussed, we hold that all except five (*Graduation*, *Meditation*, *Canal*

3       *Zone (2007)*, *Canal Zone (2008)*, and *Charlie Company*) of Prince's artworks make fair use of

4       Cariou's photographs.  We express no view as to whether the five are also entitled to a fair use

5       defense.  We REMAND with respect to those five so that the district court, applying the proper

6       standard, can determine in the first instance whether any of them infringes on Cariou's copyrights

7       or whether Prince is entitled to a fair use defense with regard to those artworks as well.  The

8       judgment of the district court is **REVERSED** in part and **VACATED** in part.[5]  The case is

9       **REMANDED** for further proceedings consistent with this opinion.

---

[5] Because we reverse the district court with regard to the twenty-five of the artworks, and leave open the question of fair use with regard to the remaining five, we vacate the district court's injunction.  In the event that Prince and Gagosian are ultimately held liable for copyright infringement, and in light of all parties' agreement at oral argument that the destruction of Prince's artwork would be improper and against the public interest, a position with which we agree, the district court should revisit what injunctive relief, if any, is appropriate.  *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010).