**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PATRICK CARIOU,

                                    Plaintiff,

            -against-

RICHARD PRINCE, GAGOSIAN GALLERY,
INC., and LAWRENCE GAGOSIAN,

                                    Defendants.

No.: 08 Civ. 11327 (DAB)

ECF Case

**BRIEF AMICI CURIAE OF THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC. AND THE ROBERT RAUSCHENBERG FOUNDATION IN SUPPORT OF FURTHER EVIDENTIARY PROCEEDINGS FOR PURPOSES OF DETERMINING FAIR USE ON REMAND**

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ............................................................................... 1

PRELIMINARY STATEMENT ........................................................................... 3

ARGUMENT ....................................................................................................... 11

    A.    The Existing Evidentiary Record Must Be Supplemented If the Court Is to Determine Whether a Reasonable Observer Would Find the Five Prince Paintings to Be Transformative .......................................................... 11

        1.    The Court Needs Evidence of Who the "Reasonable Observer" Is and How That Observer Would Perceive the Works at Issue ................. 13

        2.    An Artwork's Broader Context Must Be Considered When Visual Indicia of Transformation or Artists' Statements Are Insufficient ......... 14

    B.    This Court Should Consider Expert Evidence of the Context, Meaning, and Message of the Works at Issue in This Case ................................. 15

CONCLUSION .................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)................................................................11, 14

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006)............................................................10, 14, 15

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239 (1903)............................................................................6, 12

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....................................................................5, 10, 13, 16

*Capitol Square Review & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995)................................................................................12

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013)................................................................ passim

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)................................................................................14

*Golan v. Holder*,
132 S.Ct. 873 (2012)..............................................................................14

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)................................................................................14

*Salazar v. Buono*,
559 U.S. 700 (2010)................................................................................12

*Skoros v. City of New York*,
437 F.3d 1 (2d Cir. 2006)..........................................................................12

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002)................................................................................12

OTHER AUTHORITIES

Abigail Solomon-Godeau, "Photography After Art Photography," ART AFTER
MODERNISM: RETHINKING REPRESENTATION 80 (Brian Wallis ed., 1984)................................8

Arthur C. Danto, "The Artworld," THE JOURNAL OF PHILOSOPHY, Vol. 61, No. 19, at 571-
84 (1964)................................................................................................8

Arthur C. Danto, WHAT ART IS (Yale Univ. Press 2013)..................................................6

Brandon Taylor, COLLAGE: THE MAKING OF MODERN ART (2004) .............................10

Fed. R. Evid. § 702 ......................................................................................................15

Richard Flood, Laura Hoptman and Massimiliano Gioni, COLLAGE: THE
    UNMONUMENTAL PICTURE (2007) ...........................................................................10

U.S. CONST. amend. I........................................................................................ passim

## STATEMENT OF INTEREST

The Andy Warhol Foundation for the Visual Arts, Inc. and the Robert Rauschenberg Foundation ("Amici") are among the largest private supporters of the arts in the United States. As copyright holders themselves, grant-makers to artists and arts organizations, and institutions that serve the public's cultural needs, Amici have a vital interest in assuring a legal framework that properly balances copyright protections with artistic free expression.[1]  Because this case pits two artists against one another in a way that both tests and threatens the stability of that framework, Amici respectfully appear to assist the Court in the task of maintaining that balance.[2]

The Andy Warhol Foundation for the Visual Arts, Inc. ("Warhol Foundation") has an especially strong interest in assuring that copyright law provides sufficient protection for original works of authorship, while also preserving the artistic freedom to use those works to create new art and expression.  Founded upon Mr. Warhol's death, the Warhol Foundation advances the visual arts by promoting the creation, presentation, and documentation of contemporary art. Among its other activities, it has made cash grants to date totaling $250 million to fund individual artists, scholars, researchers, museums, and other cultural organizations.  All of the Warhol Foundation's work is premised upon the belief that art reflects an important cultural dialogue and that freedom of artistic expression is fundamental to a democratic society.  That commitment is evident in the Warhol Foundation's approach to managing and protecting the intellectual property it owns, which includes copyrights in certain of Mr. Warhol's works.  While

---

[1] No party's counsel authored this brief in whole or in part.  Nor did any party, party's counsel, or any other person contribute money to fund the preparation or submission of this brief.

[2] Twenty-nine of this country's leading museums and other arts organizations, many of whom appeared as amici in the Court of Appeals, have endorsed the Warhol and Rauschenberg Foundations' positions in this brief regarding the standards for analysis of whether a work of art is "transformative" and the appropriateness of evidence from the broader art community, as well as expert testimony, in connection with that determination.  That support is set forth in the letter annexed as Exhibit A hereto.

the Warhol Foundation charges licensing fees for reproduction of images of those works in merchandise, it also permits artists freely to build on Mr. Warhol's work in the creation of new art. The Warhol Foundation therefore weighs these interests on a continuing basis to maintain a proper balance between exercising the limited monopoly of copyright and supporting fair use, thus maintaining the fundamental goal of copyright to promote creativity and to sustain our society's First Amendment interest in freedom of artistic expression.

The Robert Rauschenberg Foundation ("Rauschenberg Foundation") likewise shares a strong interest in copyright law's ability to protect original works of authorship, while preserving the right of artists to use original works to create new art and expression. Founded by Robert Rauschenberg nearly 20 years before his death, the Rauschenberg Foundation advances the visual arts through a program of lending, exhibition, and scholarship related to Rauschenberg's work, as well as by grants and programs that support artistic innovation and collaboration. The Rauschenberg Foundation's activities include an artists' residency program designed to promote cultural dialogue, free expression, and pattern-breaking innovation within the artistic community. The Rauschenberg Foundation is also the steward of Rauschenberg's legacy of copyrighted works, including the copyrights in works that have themselves been used by other artists and works that exemplify the artistic practice of using the work of other artists in ways that create uniqueness of meaning and serve a transformative purpose. As both a funder of artistic expression and a charitable foundation with responsibility to protect the copyrights under its control, the Rauschenberg Foundation recognizes that the "fair use" analysis must be well informed and properly contextualized in order to achieve the necessary balance between free expression and the protection of the limited monopoly that copyright confers.

## PRELIMINARY STATEMENT

This Court has been tasked with determining whether five works created by one accomplished artist, Richard Prince ("Prince"), that incorporate certain images created by another accomplished artist, Patrick Cariou ("Cariou"), violate Cariou's rights in those images. To that end, the Court will apply the legal standard set forth by the Court of Appeals:  would a "reasonable observer" perceive any or all of Prince's paintings to be "transformative" of Cariou's photographs?  Because the Court of Appeals found itself unable to make that determination on the existing record, it is clear that the Court must now go beyond its own facial examination of the five paintings at issue to identify the reasonable observer of those works and determine how she would perceive them.  That determination sensibly requires the Court to reopen the record to submissions by both parties not only as to any visually apparent differences between the works, but also as to any newness of "expression, meaning, or message" that may arise by reference to their art-historical or other context.

Amici submit this brief to provide the Court with views of the broader art community on the nature and scope of the evidentiary submissions that would be appropriate to accomplish this task.  In doing so, we seek to assist the Court in making a fair use determination in a manner that will not only resolve the present dispute, but will also provide important and much-needed guidance to artists, educators, museums, and future courts facing similar issues.  When the Warhol Foundation appeared as an *amicus* in the Court of Appeals supporting Prince in seeking reversal, we did so principally to urge clarification of the governing legal standard.  It was also the Warhol Foundation's position on appeal that, whether from a visual perspective or viewed within the historical context of art using pre-existing imagery, none of the paintings impermissibly infringed Cariou's copyrights.  *See* Br. Amicus Curiae the Andy Warhol Foundation for the Visual Arts, Inc. in Support of Defs.-Appellants and Urging Reversal

3

("Warhol Amicus Br."), *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) (No. 11-1197-cv), 2011 WL 5517867 at **6-7, 19-20, 22, 28-29, 32.  The Warhol Foundation remains of that view, which is shared by the Rauschenberg Foundation.[3]  Nevertheless, Amici are also respectful of the Court's task on remand and the need to evaluate the five remaining paintings under a clarified legal standard and with the benefit of additional evidence that will go to the question of transformativeness as perceived by the reasonable observer.

We can see no argument against supplementation of the existing record because the perceived inadequacy of the record was the basis for the Court of Appeals' remand.  So, in that regard, and with due respect, Cariou's suggestion that the Court can now resolve the matter without going much beyond the prior summary judgment record is simply wrong.  *See* Pl.'s Mem. Applying the Second Circuit's Fair Use Standard ("Cariou Remand Mem."), Dkt. No. 85 at 7-10.

Prince, on the other hand, provides the Court with highly informative declarations from two persons with long experience in the field of contemporary art, statements that represent the kind of critically-informed visual analysis and, even more importantly for this case, knowledge of art history and context in contemporary art practice that will be relevant on remand.  *See* Defs.' Mem. in Response to Pl.'s Mem. of Law Applying the Second Circuit's Fair Use Standard ("Prince Response"), Dkt. No. 89 at 9-18; *see also* Defs.' Br. in Opp. to Cert. Pet., *Cariou v. Prince*, (No. 13-261), 2013 WL 5570254 at **17-19, 23.  We support the general position set forth in Prince's Response, arguing in favor of the introduction of additional evidence in the form of materials going beyond a purely visible, or "side-by-side," comparison of Prince and

---

[3]  By saying this, we do not disparage Cariou's work; on the contrary, we affirm it to be creative and fully entitled to copyright protections.  We simply believe those protections do not extend as far as Cariou contends.

Cariou's works to determine whether they are entitled to the protection of the fair use doctrine.[4] But we write separately to emphasize that artists employing pre-existing imagery may be entitled to such protections *even where* the transformative meanings found in their "follow-on" works arise less out of visible differences than on differences of context. *See generally* Decl. of Nancy Spector in Support of Prince Response (Dkt. No. 91) at 3-7; Decl. of Brian Wallis in Support of Prince Response (Dkt. No. 92) at 3-5.[5]

A follow-on work's uniqueness of meaning, and thus its transformative purpose and character, are not always easily determined upon initial inspection and comparison with the work allegedly infringed.  To be sure, there are cases where the transformative nature of a follow-on work is so clear that no deeper inquiry may be required beyond what appears upon initial inspection of the works.  *See*, *e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 582-83 (1994).  But in many cases, and certainly in this case as remanded, the Court must take on the more difficult task of deciding whether a follow-on work carries a meaning or message – whether facially apparent or not – that is sufficiently distinct from the first work to be entitled to the First Amendment safeguard embodied by the fair use doctrine.

This decision is made from the viewpoint of the "reasonable observer."  *See Cariou*, 714 F.3d at 707 (citing *Campbell*, 510 U.S. at 582).  Accordingly, this Court is tasked with identifying who the reasonable observer is, and to do so, the Court must recognize the *audience* (or audiences) that reasonably may perceive meaning in the work.  In conducting its fair use

---

[4] To the extent that any such comparisons are made "side-by-side" only in the form of reproductions of the two artists' works, much would be lost, or at least leveled, in translation.

[5] Prince himself mentions how he "present[s] the original works 'in a different context,'" *Cariou*, 714 F.3d at 699, and notes the importance of context in his Response (Dkt. No. 89) at 9. Therefore, while the Response's proposed application to the facts then details numerous visual differences between Prince's works and Cariou's, this should not be read as a suggestion that new expression, meaning, or message can only or even primarily arise out of visual transformation.

inquiry, we therefore respectfully submit that the Court should consider the views of the broader

art community, whose members are plainly among the range of "reasonable observers" of a work

of art.

It is a long-held tenet among art historians, curators and many other cultural

commentators that adequate assessment of an artwork's meaning is not limited to what can be

seen and felt by the five senses.  Rather, one must attempt to form a cognitive understanding as

to what the artwork *is*, including by reference to art history, art theory, and an identification of

the relevant audience for the work.  *See generally* Arthur C. Danto, WHAT ART IS (Yale Univ.

Press 2013).  For example, it is generally known that the art of many cultures expresses religious,

symbolic, and other meanings in ways that would be unintelligible to the uninitiated or

uninformed.  Similarly, while any work of art may afford multiple points of access and

appreciation to audiences interested in the formal relationships of color and shape that may be

displayed, or the subject matter depicted, it cannot be denied that there are some works of art

which derive their meanings and value from historical precedent or some other cultural context,

which may well include the development of new artistic vocabularies and strategies, and new

subject matter for art – not all of which may be so readily discerned by all viewers.  This is as

true today as it was over a century ago when Justice Holmes remarked that "[i]t would be a

dangerous undertaking for persons trained only to the law to constitute themselves final judges of

the worth of pictorial illustrations outside of the narrowest and most obvious limits."  *Bleistein v.*

*Donaldson Lithographing Co.*, 188 U.S. 239, 251-52 (1903).[6]

---

[6] In this regard, it is worth recalling that the key holding of *Bleistein* established that "mere" graphic advertisements could be entitled to copyright protection; and that the copyrightability of photography *as a medium* had itself been established only a few short years before.  Our point here is not to argue the copyrightability or not of Prince's follow-on works, but rather to emphasize that new artistic genres, indeed even new artistic media, are not always

Simply put, within the context of art history, the "purely" visual has never been the measure of how meaning is created. To impose that limit in the context of contemporary art would be to deny understandings that have been apprehended and appreciated by generations of artists, art historians, curators, collectors, and others. Ever since Marcel Duchamp dissolved visible distinctions between the "real world" and the "art world" by placing a store-bought urinal in an art gallery nearly a century ago, it has thus been well established that an artist can "transform" an object and thereby create a work of art by imposing a new meaning on it or presenting it in a different context.



Marcel Duchamp, *Fountain* (1917), Porcelain, 2' x 1'2" x 1'7" (Collection of the Philadelphia Museum of Art, Philadelphia)

This is true even where the primary and secondary artworks appear visually indistinguishable. That was, at least in part, the result that Andy Warhol achieved by silk-screening another artist's "Brillo" graphic designs onto plywood sculptures the exact size as the original cardboard product boxes; that Robert Rauschenberg achieved by incorporating "found"

and immediately recognizable to all. That is precisely why the law of fair use is integral to the entire copyright regime, lest new forms of creativity be crushed before society has the opportunity to ascribe new meaning and value to them – or not. There is ample evidence available that Prince's work has been understood by many to convey new meanings. Whether there is also evidence to the contrary, fair use simply does not require that meaning be understood or valued unanimously.

photographs as collaged or silkscreened elements in his paintings; that Sherrie Levine achieved when she photographed reproductions of Walker Evans' documentary Depression-era photographs and displayed prints of the resulting images as her own work; and that Richard Prince achieved by re-photographing "Marlboro Man" ads from a magazine and re-presenting them as "fine art." *See* Arthur C. Danto, "The Artworld," THE JOURNAL OF PHILOSOPHY, Vol. 61, No. 19, at 571-84 (1964); Abigail Solomon-Godeau, "Photography After Art Photography," in ART AFTER MODERNISM: RETHINKING REPRESENTATION 80 (Brian Wallis ed., 1984); IMAGE WORLD: ART AND MEDIA CULTURE (Whitney Museum of American Art 1989); THE PICTURES GENERATION, 1974-1984 (Metropolitan Museum of Art 2009).



Andy Warhol, *Brillo Box* (1964), acrylic silkscreen on plywood, 20" x 20" x 17" (Collection of the Andy Warhol Museum, Pittsburgh)



Robert Rauschenberg, *Skyway* (1964), oil and silkscreen on canvas, 216" x 192" (Collection of the Dallas Museum of Fine Art, Dallas)



Sherrie Levine, *After Walker Evans* (1980), gelatin silver print, 8" x 10" (Collection of the International Center of Photography, New York)



Richard Prince, Untitled (Cowboys) (1980-84), Ektacolor print, 24" x 40" (Collection of The Museum of Contemporary Art, Los Angeles)

Artists continue to use this artistic technique – now frequently and generally described as appropriation – in a wide range of visual and other media.  Continuing the conceptual trajectory of Duchamp's "readymades" – ordinary objects such as urinals made art by the artist's designation as such – when contemporary artists like Prince use pre-existing imagery, the result is not the same as the source image, even if it looks similar, or even identical.  In fact, this is true of artists' use of the collage technique generally.  *See* Brandon Taylor, COLLAGE: THE MAKING OF MODERN ART (2004); Richard Flood, Laura Hoptman and Massimiliano Gioni, COLLAGE: THE UNMONUMENTAL PICTURE (2007).  Historically, artists have used appropriated imagery to produce a range of new meanings, some of which rely upon being able to identify the source of the pre-existing imagery, but many of which do not.  *See* Warhol Amicus Br., 2011 WL 5517867 at **6-7, 19-21.  That happens to be the case with Prince's use of Cariou's photographic imagery here.

Assessing transformative use in the visual arts context cannot therefore be easily reducible to mere image-matching – and nothing in the law requires such a reductive approach.  *See Campbell*, 510 U.S. at 589 ("context is everything"); *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) ("[T]he determination of fair use is an open-ended and context-sensitive inquiry.");

10

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611-12 (2d Cir. 2006) (concert posters were fair use when re-contextualized and incorporated as part of a book).  Consequently, it is imperative that the Court consider such evidence as might reasonably bear on the distinctiveness, or not, of the five works in question, not only from a visual perspective, but also with respect to their new expression, meaning, or message *regardless of obvious visual differences*.

## ARGUMENT

### A.   The Existing Evidentiary Record Must Be Supplemented If the Court Is to Determine Whether a Reasonable Observer Would Find the Five Prince Paintings to Be Transformative

The Court of Appeals found the current evidentiary record insufficient to permit it to determine whether a reasonable observer would perceive the remaining five Prince paintings to add sufficiently new expression, meaning, or message to Cariou's photographs to be "transformative as a matter of law." *Cariou*, 714 F.3d at 707.  It therefore remanded the case for this Court to assess the transformative nature of those five paintings by "examin[ing] how the artworks may 'reasonably be perceived,'" *id.* (quoting *Campbell*, 510 U.S. at 582), in other words, to construct the hypothetical reasonable observer of such works.  By definition, further fact-finding is now required to do so.  On completion of further evidence submissions, as in the ordinary case, this Court will either be asked to render a decision on summary judgment as a matter of law, or to set the case for trial, where the jury will apply the law to the facts.[7]

Without sufficient evidentiary context from members of the broader art community, who

---

[7] We thus do not read the Court of Appeals' vacatur as Mr. Prince does in suggesting that the validity of his fair use defense can no longer be determined as a matter of law on a motion for summary judgment, but must go to a jury.  *See* Prince Response at 1.  Indeed, the law is clear that the District Court is institutionally competent to decide transformativeness as a matter of law on a properly developed record.  The essence of the reversal was simply to clarify the applicable legal standard and to call for reopened fact-finding and evidentiary submissions, following which it will become each party's decision how and on what procedural basis to seek a final decision.

must be within the universe of "reasonable observers," the Court cannot realistically consider

Prince's works in the context that fair use requires.[8]  Amici respectfully submit that the Court

has yet to consider key additional evidence on this issue from artists, scholars, critics, market

participants, and other such persons, who may assist the Court in determining whether there

exists a reasonable observer who would perceive new meaning or message in Prince's paintings.

With the exception of the recently-filed Declarations of Nancy Spector and Brian Wallis in

support of Prince's Response (Dkt. Nos. 91 & 92)[9], however, the Court generally has lacked the

benefit of broader input on the possible range of both visual and non-visual distinctiveness in

Prince's work.[10]

---

[8] There is of course an important distinction between the "reasonable observer" in fair use and other First Amendment cases and the "reasonable man" elsewhere:  because overriding First Amendment values are at stake, the inquiry calls for evidence going beyond everyday perceptions in order to avoid the risk that legitimate expression be chilled by bias or misapprehension. *Cf. Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779-81 (1995) (O'Connor, J., concurring in part and concurring in the judgment) (a reasonable observer "inquiry should be conducted from the perspective of a hypothetical observer *who is presumed to possess a certain level of information that all citizens might not share*.") (emphasis supplied); *accord Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002) (quoting *Good News Club* v. *Milford Central School,* 533 U.S. 98, 119 (2001)) ("'[T]he reasonable observer in the endorsement inquiry must be deemed aware' of the 'history and context' underlying a challenged program"); *Salazar v. Buono*, 559 U.S. 700, 728 (2010) (Alito, J. concurring) ("The endorsement test [under the Establishment Clause] views a challenged display through the eyes of a hypothetical reasonable observer who is deemed to be aware of the history and all other pertinent facts relating to a challenged display."); *Skoros v. City of New York*, 437 F.3d 1, 30 (2d Cir. 2006) (court "considers whether a 'reasonable observer . . . aware of the history and context of the community and forum in which the religious display appears,' would understand it to endorse religion or, in this case, one religion over another") (citations omitted).

[9] Both Ms. Spector and Mr. Wallis are highly-recognized curators and scholars in the field of contemporary art.  In our view, their perceptions are thus relevant to the Court's fair use inquiry; and, if properly admitted into evidence, may provide the trier of fact with a sufficient basis to render a decision here as a matter of law.

[10] Amici do not suggest that the views of the general public are irrelevant.  On the contrary, all art can be approached from a variety of perspectives and every viewer should be free to find meaning where she may.  We simply heed Justice Holmes' warning that "[i]t may be more than doubted, for instance, whether the etchings of Goya or the paintings of Manet would have been sure of protection when seen for the first time."  *Bleistein*, 188 U.S. at 251.  Whether

**1.    The Court Needs Evidence of Who the "Reasonable Observer" Is and How That Observer Would Perceive the Works at Issue**

The Supreme Court made clear in *Campbell* that the "reasonable observer" cannot be the judge alone.  *Campbell*, 510 U.S. at 582-83.  The same would apply with respect to a jury.  As Judge Wallace pointed out in his dissenting opinion, courts are ill-equipped to stand as art critics in determining the meaning and message of contemporary art, where meaning and message may be hidden from plain view:  "Certainly we are not merely to use our personal art views to make the new legal application to the facts of this case. . . . It would be extremely uncomfortable for me to do so in my appellate capacity, let alone my limited art experience. . . ."  *Cariou*, 714 F.3d at 714 (Wallace, J., concurring and dissenting in part).  Judge Wallace recognized that a mere comparison of two works isolated from their contexts is insufficient, and therefore should be informed by additional fact and opinion evidence on the subject:  "I disagree that we must limit our inquiry to our own artistic perceptions of the original and secondary works. . . .  I, for one, do not believe that I am in a position to make these fact- and opinion-intensive decisions . . . nor am I trained to make art opinions ab initio."  *Id*. (citing *Campbell*, 510 U.S. at 582).  The uncertainty and unpredictability that result from fair use decisions made without a fully-developed record as to the possible range of reasonable observers can only lead to subjective outcomes that chill artistic freedom of expression.  The only way to avoid these problems is to inform the Court's decision with evidence from members of the broader art community.

Further, the reasonable observer's views must be in sync with the goals of the applicable law.  As is relevant here, the Supreme Court consistently and unequivocally has held that copyright is intended to be the "engine of free expression," providing limited exclusive rights

fair use is determined by a judge or a jury, both are for this purpose members of the general public, and the reasonableness of their observations should be guided by the informed opinions of the broader art community about how these and similar works historically have been perceived and understood.

only as an incentive for the creation and dissemination of new works.  *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).  And importantly, the exclusive rights copyright provides are not absolute.  While copyright inevitably restricts some expression, *see*, *e.g.*, *Golan v. Holder*, 132 S.Ct. 873, 889 (2012) (taking millions of foreign works out of the public domain to grant them copyright protection), fair use is a statutory balance against the monopoly rights granted to copyright owners, providing a critical "First Amendment safeguard[]" against copyright's encroachment on free expression.  *Eldred v. Ashcroft*, 537 U.S. 186, 220 (2003).  Accordingly, the views of the "reasonable observer" must encompass the goals of copyright law generally, that is, the incentive to create, and of fair use specifically, including to allow the breathing room to speak freely through artistic means.

### 2.   An Artwork's Broader Context Must Be Considered When Visual Indicia of Transformation or Artists' Statements Are Insufficient

When comparing visual works for purposes of an alleged infringement analysis, courts often look to apparent indicia of difference, such as obvious changes of imagery, materials, or scale.  *See Cariou*, 714 F.3d at 706 (noting the "fundamental differen[ce]" between Prince's and Cariou's "composition, presentation, scale, color palette, and media"); *Blanch*, 467 F.3d at 253 (describing differences in, among other things, media, colors, background, and size).  But the analysis cannot always stop there.  *See*, *e.g.*, *Bill Graham Archives*, 448 F.3d at 611 (defendant's work combined the plaintiff's images "with a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images.").

Courts, again including the Court of Appeals in this case, have also sometimes found artists' rationales for their use of existing works persuasive, while holding that such statements are not definitive or even necessary.  *See Cariou*, 714 F.3d at 706 ("Prince's deposition testimony further demonstrates his drastically different approach and aesthetic from Cariou's.");

14

*see also Blanch*, 467 F.3d at 255 n.5 ("Koons's clear conception of his reasons for using 'Silk Sandals,' and his ability to articulate those reasons, ease our analysis in this case.  We do not mean to suggest, however, that either is a *sine qua non* for a finding of fair use[.]").

Amici of course agree with both Cariou and Prince that the above kind of evidence is helpful in evaluating whether sufficient new expression, meaning, or message have been added by a follow-on artist so as to transform a prior work.  *Compare* Cariou Remand Mem. at 7-10 *with* Prince Response at 10-18.  And some cases may be so clear-cut that they require no more. Nevertheless, the Court must also remain open to a reasonable observer's perception of a new meaning or message that is not facially apparent.

### B.   This Court Should Consider Expert Evidence of the Context, Meaning, and Message of the Works at Issue in This Case

Further, Amici respectfully submit that the Court should consider reliable expert evidence from within the broader art community simply because it represents "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. § 702.  The Court of Appeals' ruling also supports consideration of expert evidence as to the transformative nature of the new works:  "Each of [the remaining] artworks differs from, but is still similar in key aesthetic ways, to Cariou's photographs. . . .  It is unclear whether these alterations amount to a sufficient transformation of the original work of art such that the new work is transformative."  *See Cariou*, 714 F.3d at 711.

The Warhol Foundation's *amicus curiae* brief filed with the Court of Appeals provides a sampling of some types of evidence that would tend to illustrate the broader artistic context in which Prince's works reside and the new meaning and message in those works.  *See* Warhol Amicus Br., 2011 WL 5517867 at **6-22 (describing the historical context from which Prince's work comes, citing to scholarly texts written by those knowledgeable in the field).  These types of

evidence can provide helpful guidance as to whether the reasonable observer would view a second work as sufficiently transformative within historical context and relevant understandings of genre. If non-visual evidence of new meaning, including contextual evidence, were to be ignored by the courts, "some works of genius would be sure to miss appreciation . . . [, t]heir very novelty would make them repulsive until the public had learned the new language in which their author spoke." *Campbell*, 510 U.S. at 582-83 (quoting Justice Holmes).

This evidence, not surprisingly, will also provide guidance as to whether a secondary work would tend to act as a market substitute for the preexisting work. Indeed, the fact that "Prince's work appeals to an entirely different sort of collector than Cariou's" and that "nothing in the record suggests that anyone will not now purchase Cariou's work, or derivative non-transformative works . . . as a result of the market space that Prince's work has taken up" further evidences the transformative nature of Prince's work. *Cariou*, 714 F.3d at 709. Only by considering the possible new meaning or message of a work from many different perspectives can the Court make a fully informed decision as to whether Prince's use of Cariou's photographs was transformative here. Accordingly, while no one has a monopoly on the meaning of an artwork, members of the broader art community as reasonable observers are particularly well positioned to assist the judge or the jury in understanding the diversity of views about the meaning or message of art like Prince's.

Considering these additional types of evidence would also support the development of sound fair use jurisprudence that both acknowledges and accounts for differences in practice and approach to creativity across fields. As practitioners in the arts continue to push the creative boundaries of their fields, the Court's reliance on a wide range of reliable and informed expertise will be necessary to ensure that fair use remains a "First Amendment safeguard" and that copyright does not stifle the creativity it is supposed to encourage.

16

**CONCLUSION**

Art derives value and meaning from social discourse and informed analysis.  That is why we have art historians, curators, museum educators, guides, and critics who explain – and often challenge – consensus views of artworks' significance.  But in resolving questions concerning fair use, the Court is not tasked with determining the value of the artworks in question, nor is the Court itself the reasonable observer of those works.  Rather, the Court's task is to determine who that reasonable observer is and whether *she* may reasonably perceive a different meaning or message in them.  Where new or different, and thus potentially transformative, meaning is not readily apparent from a visual inspection of the works, it is essential that the Court have the benefit of a fully-developed evidentiary record to consider in reaching its decision, including expert testimony and other evidence from the broader art community.

Respectfully submitted,

Dated: October 22, 2013

By: /s/ Julie A. Ahrens
      Julie A. Ahrens
      Tim Greene
      Stanford Law School
      Center for Internet and Society
      559 Nathan Abbott Way
      Stanford, CA 94305
      (650) 723-2511
      jahrens@stanford.edu

By: /s/ Virginia Rutledge
      Virginia Rutledge
      135 North Carolina Ave. SE
      Washington, D.C. 20003
      (646) 642-2949
      virginiarutledge@yahoo.com

By: /s/ Zachary J. Alinder
      Zachary J. Alinder (*pro hac vice* pending)
      Kevin M. Papay (*pro hac vice* pending)
      BINGHAM McCUTCHEN LLP
      Three Embarcadero Center
      San Francisco, CA 94111
      (415) 393-2578
      zachary.alinder@bingham.com

*Attorneys for Amici Curiae The Andy Warhol Foundation for the Visual Arts, Inc. and The Robert Rauschenberg Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2013, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court, Southern District of New York by using

the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the CM/ECF system.


Dated: October 22, 2013                    By: /s/ Julie A. Ahrens                              
                                               Julie A. Ahrens