**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------

PATRICK CARIOU,

              Plaintiff,

     v.

RICHARD PRINCE, GAGOSIAN
GALLERY, INC. and LAWRENCE
GAGOSIAN,

            Defendants.

Case No.  08 CIV 11327 (DAB)

**BRIEF *AMICI CURIAE* OF THE AMERICAN PHOTOGRAPHIC ARTISTS,
AMERICAN SOCIETY OF JOURNALISTS AND AUTHORS, AMERICAN SOCIETY
OF MEDIA PHOTOGRAPHERS, GRAPHIC ARTISTS GUILD, JEREMY SPARIG,
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, PICTURE ARCHIVE
COUNCIL OF AMERICA, AND PROFESSIONAL PHOTOGRAPHERS OF AMERICA
IN SUPPORT OF PLAINTIFF PATRICK CARIOU**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................... ii

STATEMENT OF INTEREST ........................................................................................................ 1

PRELIMINARY STATEMENT .................................................................................................... 7

ARGUMENT .................................................................................................................................. 9

    A.   Defendants' Approach to Determining Whether Prince's So-Called "Minimal
        Alterations" to the Five Paintings Were Transformative Would Permit Unfettered
        *post hoc* Rationalization of All Appropriation and Provides No Reasonable Limit
        on the Fair Use Defense ........................................................................................................ 10

    B.   Granting Prince a Fair Use Defense in the Five Paintings Would Harm the Market
        for Artists to License or Sell Their Works ......................................................................... 16

    C.   Warhol's Proposed Standard Would Eliminate The Derivative Works Right From
        The Copyright Act ............................................................................................................... 19

    CONCLUSION .............................................................................................................................. 23

# TABLE OF AUTHORITIES

Page

**Cases**

*Am. Geophysical Union v. Texaco,*
    60 F.3d 913 (2d Cir. 1994)................................................................. 12, 18

*AP v. Meltwater U.S. Holdings, Inc.,*
    931 F. Supp. 2d 537 (S.D.N.Y. 2013)................................................... 19

*Campbell v. Acuff-Rose Music,*
    510 U.S. 569 (U.S. 1994)...................................................................... 16

*Cariou v. Prince,*
    714 F.3d 694 (2d Cir. 2012)........................................................... passim

*Castle Rock Entm't v. Carol Publ'g Group,*
    150 F.3d 132 (2d Cir. 1998).................................................................. 20

*Harper & Row, Publrs. v. Nation Enters.,*
    471 U.S. 539 (U.S. 1985)...................................................................... 18

*Infinity Broad. Corp. v. Kirkwood,*
    150 F.3d 104 (2d Cir.1998).................................................................... 13

*Los Angeles News Serv. v. Reuters Television Int'l. Ltd.,*
    149 F.3d 987 (9th Cir.1998).................................................................. 14

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,*
    166 F.3d 65 (2d Cir. 1999).................................................................... 22

*Ringgold v. Black Entm't Television, Inc.,*
    126 F. 3d 70 (2d Cir. 1997)................................................................... 12

*Stewart v. Abend,*
    495 U.S. 207 (1990)............................................................................... 20

*UMG Recordings v. MP3.com, Inc.,*
    92 F. Supp. 2d 349 (S.D.N.Y. 2000)..................................................... 14

**Statutes**

17 U.S.C. § 101.............................................................................................. 20

17 U.S.C. § 106(2).................................................................................... 19, 21

17 U.S.C. § 107.............................................................................................. 20

17 U.S.C. § 201(d).......................................................................................... 21

17 U.S.C. § 501(b).......................................................................................... 21

**Other Authorities**

3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4], p. 13-102.61 (1993).......... 16

## STATEMENT OF INTEREST

The American Society of Media Photographers ("ASMP"), Picture Archive Association of America, The Digital Media Licensing Association ("PACA"), Professional Photographers of America ("PPA"), National Press Photographers Association ("NPAA"), individual Jeremy Sparig, Graphic Artists Guild ("GAG"), American Photographic Artists ("APA"), and the American Society of Journalists and Authors ("ASJA") (collectively "*Amici*") represent a community of day-to-day working visual artists and authors with a considerable interest in how the resolution of this matter will impact the rights in their original creations.[1]  *Amici* submit this brief primarily in opposition to the amicus brief filed by the Andy Warhol Foundation and other elite foundations and museums who do not represent the views of working artists.[2]

*Amicus*, the American Photographic Artists ("APA")[3] is a professional association of approximately 2,500 professional photographers and copyright owners.  APA members have a strong interest in the issues presented by this case because their businesses and livelihoods depend upon the broadly defined subject matter that is protected under the "derivative works" right in the Copyright Act.  More specifically, APA members operate businesses which rely heavily upon, and derive substantial revenues from, a large, broadly defined, secondary derivative market for the use of existing photographic work.  APA members seek to preserve the licensing possibilities presented by this secondary and derivative market, and they seek a consistent application of the principles under which this market has traditionally functioned.

---

[1] Plaintiff, Patrick Cariou, as well as Defendants, Richard Prince, the Gagosian Gallery, Inc., and Lawrence Gagosian have all, through their legal counsel, consented to the submission of this brief.

[2] No party's counsel authored this brief in whole or in part. Nor did any party, party's counsel, or any other person contribute money to fund the preparation or submission of this brief.

[3] *Amicus Curiae* American Photographic Artists ("APA") is a non-governmental, 501(C) (6) not for profit organization incorporated in the State of New York with a membership of approximately 2,500 outstanding professional photographers. APA has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

*Amicus*, the American Society of Journalists and Authors, Inc. ("ASJA")[4], founded in 1948, is a non-governmental, 501(c)(6) not for profit organization with headquarters in New York City and with active regional chapters in Arizona, Chicago, Illinois, New York City (local chapter separate from headquarters), Northern California, Southern California, San Diego, California, the Rocky Mountains region (Denver area), the Southeast (Atlanta area), the Upper Midwest (Minneapolis area), upstate New York (Rochester area), and Washington, DC. ASJA has a membership of approximately 1,400 outstanding freelance writers of magazine articles, trade books, and many other forms of nonfiction writing, each of whom has met ASJA's exacting standards of professional achievement. The requirements for membership in the organization are stringent: an author is required to demonstrate a substantial professional resume before being admitted to membership. Nonfiction book authors qualify with two or more traditionally published nonfiction books, or one book with a second under contract. Article authors must provide a minimum of six substantial bylined articles written on a freelance basis in national publications that pay for content. A reader browsing any U.S. news stand would find many articles by ASJA members. *See generally*, http://www.asja.org/our-members/member-news.

ASJA offers extensive benefits and services focusing on professional development, including regular confidential market information, meetings with editors and others in the field, an exclusive referral service, seminars and workshops, discount services and, above all, the opportunity for members to explore professional issues and concerns with their peers.

---

[4] *Amicus Curiae* American Society of Journalists and Authors ("ASJA") is a non-governmental, 501(c)(6) not for profit organization incorporated in the State of New York with a membership of approximately 1,400 freelance journalists and authors. ASJA has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Additionally, ASJA is the publisher and author of several works. Therefore, ASJA has considerable interest in protecting the rights of its members to not have their works subject to appropriation without substantial transformations, and has a great interest in the application of the Second Circuit standard to Cariou's works.

*Amicus*, the American Society of Media Photographers ("ASMP")[5], has a core mission to protect and promote the interests of professional photographers who make images, still and/or moving, intended primarily for publication in a wide variety of media and markets.  ASMP has approximately 7,000 members and is the oldest and largest organization of its kind in the world. ASMP's representatives frequently testify before Congressional committees and subcommittees regarding copyright and related matters, as well as on panels and in hearings organized by the U.S. Copyright Office.  ASMP also advances the copyright interests of its members through its membership and participation in the Authors Coalition of America, the Copyright Alliance and the International Federation of Reproduction Rights Organizations.

ASMP is an association of individual photographers and illustrators, who rely on the royalty streams from the licensing of their copyrighted works for their livings. They have fought to: procure satisfactory domestic and international copyright protection; secure fair payment of royalties, license fees and non-monetary compensation for authors' work; and annually help hundreds of members negotiate and enforce the copyrights and licensing agreements that earn their members a living, whether the work is commercial, retail or editorial.

*Amicus*, the Graphic Artists Guild ("GAG")[6] serves illustrators, designers, web creators,

---

[5] *Amicus Curiae* American Society of Media Photographers ("ASMP") is a non-governmental, 501(c)(6) not for profit organization incorporated in the State of New York with a membership of approximately 7,000 outstanding professional photographers. ASMP has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

[6] *Amicus Curiae* Graphic Artists Guild ("GAG") is a 501(c)5 independent labor organization incorporated in New York State. GAG has no parent corporation and no publicly held corporation holds 10% or more of its stock.

production artists, cartoonists, surface designers and other graphic creators on a national basis. Copyright protection of creative works is particularly important to the Guild, as that protection enables its members to support themselves and to create new works for the benefit of the public. The Guild is organized as a union to more effectively represent artists' interests in many areas, including the political arena, ensuring fair treatment at the hands of local, state and federal governments. The Guild works closely with the U.S. Copyright Office to ensure that its members have a voice on laws that most affect visual artists and that the important laws protecting their rights remain in force. The Graphic Artists Guild Legal Defense Fund also supports artists involved in precedent-setting legal disputes.

*Amicus*, Jeremy Sparig, is a professional photographer. He has taught photography workshops and participated in shoot assignments for the New York Times, the New York Post, the Metro Newspaper, and Bloomberg News.  He has also curated a group exhibit of 17 New York City based photojournalists in a Lower East Side gallery, and exhibited some of his own work.  Most notably, his work was exhibited at a solo show at the National Center for Atmospheric Research and as part of a multimedia exhibit that visited the Smithsonian.

Jeremy Sparig joins this brief, because despite his aforementioned work, his economic successes in photography have been limited, and many other photographers enjoy a greater skill level and ability than I possess.  In many respects, his is a typical working photographer that has real experience with photojournalistic, commercial, and artistic photography; I'm photographer, one of many visual artists using and relying on photography as a mode of expression and for economic survival.  As such, he has a strong interest in the proper application of the Second Circuit standard for "fair use" of appropriated works.

*Amicus*, the National Press Photographers Association ("NPPA")[7] is a 501(c)(6) non-profit professional association dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Our members produce and edit thousands of visual works such as still photographs (in both film and digital form) and video recordings. These works are used for editorial and documentary purposes to illustrate stories in print, for broadcast and on the Internet, including widespread dissemination on social media. As with any copyrightable work, but more so because of the very nature of photography, these works are subject to widespread misappropriation by individual users and corporations in ways never intended or licensed by our members. The difficulty in policing such infringements and enforcing copyright threatens not only the livelihood of our members but the very existence of photography as a profession. Since its founding in 1946, the NPPA has vigorously promoted and defended the rights of photographers and journalists, including copyright and freedom of the press in all its forms, especially as it relates to visual journalism.

The entities served by the NPPA's members include authors, publishers, broadcasters and anyone wishing to use photographs and video recordings to inform the public, promote products or drive page views on the Internet The NPPA's members and their respective clients have a strong interest in the issues presented by this case because our day-to-day activities depend on the consistently-applied and longstanding broad scope of subject matter protected under the derivative works right in the Copyright Act, and our members have a particularly strong interest

---

[7] *Amicus Curiae* the National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. The NPPA has no parent corporation and no publicly held corporation owns 10% or more of its stock.

in ensuring that their reasonable expectation that those principles continue to be consistently applied.

*Amicus*, the Picture Archive Council of America ("PACA")[8], the Digital Media Licensing Association, is the leading North American trade association of digital media content licensors, representing over 100 companies actively involved in licensing digital content, primarily on behalf of primarily visual artists, such as photographers, and illustrators. Founded in 1951, its purpose is devoted to developing business standards, promoting ethical business practices and actively advocating for copyright protection on behalf of its members. The association members include some of the largest content licensing entities such as Getty Images, Inc. and Corbis Corporation, as well as specialty companies that offer unique collections of imagery in the arts, science, nature, and world history. Regardless of the size, the industry depends on fair copyright laws that support image licensing over theft and permit the members to license images on behalf of artists, who share in the revenue stream. Once visual images converted from physical slides and negatives to digital files, the industry has invested substantial amounts in developing online databases of previously created images that can be searched using keywords, downloaded and licensed with a few simple keystrokes. Users of images have come to rely on members to find the vibrant visual imagery that illustrate the media that is viewed by the public today. Whether it's a textbooks, websites, news broadcasts, films, magazine articles, blogs, television, theater, or promotions and advertisements, it is likely that some of the content was licensed from a PACA member. It's the ability to license the same visual content for multiple purposes, which forms the basis of what is sometimes known as "stock imagery". These purposes include direct licensing

---

[8] *Amicus Curiae* Picture Archive Council of America ("PACA") (also known as Digital Media Licensing Association) is a non-governmental, 501(c)(6) not for profit organization incorporated in the State of New York with a membership of approximately 100 outstanding digital media licensors. PACA has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

for reproduction use, (including wall décor) as well as derivative use licensing, including the use of images for art reference. Almost any subject that has ever been photographed or illustrated can be found for potential licensing. However, if content can be used without licensing, merely because it is altered for a different purpose, them the underpinnings of the licensing model based on a healthy copyright system will begin to completely erode. As any subject can be found, the excuse to appropriate images based merely on subject matter for artistic use, eliminates the derivative use license and deprives members and the artists they represent with legitimate licensing fees, causing real economic harm.

*Amicus*, the Professional Photographers of America ("PPA")[9] is a professional association of approximately 27,000 professional photographers from dozens of specialty areas including portrait, wedding, commercial, advertising, and fine art.   The professional photographers represented by the PPA have been the primary caretakers of world events and family histories for the last 150 years, and have shared their creative works with the public secure in the knowledge that their rights in those works would be protected.

PPA members have a strong interest in the issues presented by this case because their day-to-day activities depend on the consistently-applied and longstanding broad scope of subject matter protected under the derivative works right in the Copyright Act, and have a particularly strong interest in ensuring that their reasonable expectation that those principles continue to be consistently applied.

## PRELIMINARY STATEMENT

*Amici* are organizations and individuals with a strong interest in the secondary use of

---

[9] *Amicus Curiae* Professional Photographers of America ("PPA") is a 501(c)6 professional association organized in the state of Delaware that maintains its principle offices in Atlanta, Georgia.  PPA has a membership of approximately 27,000 professional photographers. PPA has no parent corporation, and has no stock and hence no shareholders.

their and their members' works, support the position that Defendants have not proven their fair use defense with regard to the five paintings, *Graduation*, *Meditation, Canal Zone (2007)*, *Canal Zone (2008)*, and *Charlie Company* (collectively the "Five Paintings"). The application of the "reasonable person" test for transformativeness, in the form advanced by Defendants and the Warhol Foundation in its *amicus* brief would permit the blanket appropriation of artistic creations without compensation to the authors and owners of the copyrights in those works. While appropriation is a long-known practice in the artistic community, the use of an artist's underlying work in a different medium is no different than selling any intellectual property through a different channel of distribution.  The standard articulated by the Warhol Foundation would create an unwarranted safe harbor around a small coterie of well-connected elite artists who sell their works for extraordinary prices, at the expense of the greater community of working artists.  Instead of resorting to an examination of hypothetical and elitist views, rather, what should determine whether there is a "transformation" in the fair use sense here under the reasonable person test should be based on the application of common observation skills to determine whether the appropriating artist, in the course of committing copyright infringement, has made something which is beyond the economic goal of the Copyright Act to compensate the original authors and protect their right to control who makes copies and derivative works.

As such, *amici* emphasize the harm that a too-loose application of the test to determine the transformativeness of an appropriated work would have upon the market for licensing original works of art. There is a functioning licensing market here that is robust and easy to navigate. A competitive and fair licensing market is essential to the livelihood of artists working throughout the United States. A standard that would permit the mere appropriation of photographs by others without compensation to the copyright holders would completely

undermine the extant licensing market. Furthermore, a fair use defense based on the mere appropriation of copyrighted material, without more, not only harms the market for original works, but also damages the artist's market for sales of derivative works for items such as postcards, posters, and other public consumables. *Amici* thus urge this Court to find no fair use.

## ARGUMENT

*Amici* are writing to the Court in support of Cariou's position that the Five Paintings infringe his copyrights and do not qualify for the fair use defense.  In remanding this determination to this Court, the Second Circuit observed that the Five Paintings "do not sufficiently differ from the photographs of Cariou's that they incorporate for us confidently to make a determination about their transformative nature as a matter of law," *Cariou*, 714 F.3d at 710–11, indicating that the Five Paintings may hew too closely to the original photographs to even consider whether and how they might embody a new purpose and thus be transformative.  It is also important to note that the remand was not limited to the question of whether the Five Paintings were transformative, but rather "whether such relatively minimal alterations render [the Five Paintings] fair uses (including whether the artworks are transformative) or whether any impermissibly infringes on Cariou's copyrights in his original photographs."  This Court is thus directed to go through the full fair use analysis as to each of the Five Paintings, of which "transformativeness" is but one element of the first factor.  In response, Defendants have proffered so-called expert evidence which do not reflect remotely the relevant market for Cariou's works and his derivative markets.  The declarations submitted herewith by *amici*, and this brief, are intended to clarify for the Court a more accurate picture of how working artists and copyright owners actually function in the real world marketplace.

A.   **Defendants' Approach to Determining Whether Prince's So-Called "Minimal Alterations" to the Five Paintings Were Transformative Would Permit Unfettered *post hoc* Rationalization of All Appropriation and Provides No Reasonable Limit on the Fair Use Defense**

The Second Circuit remanded consideration of the fair use defense as applied to the Five Paintings, which, at best, only minimally altered Cariou's original photographs. *Cariou*, 714 F.3d at 711. Defendants claim that "it is possible for a jury to conclude that the remanded artworks may be perceived as having a different message than *Yes, Rasta* depending upon the context in which the photographs are presented." (Defs'. Mem. of Law Applying the 2d Cir.'s Fair Use Standard ("Defs' Mem. of Law"), Dkt. 89, at 9). The Warhol Foundation proposes that this Court should consider evidence which "illustrate[s] the broad artistic context in which Prince's works reside and the new meaning and message in those works." (Br. *Amici Curiae* of the Andy Warhol Found. ("Warhol Foundation Br."), Dkt. 98, at 15). Warhol advocates that courts should use the "reasonable person" test to evaluate transformativeness not based on a visual comparison of the works, but upon the opinions of hired affiants purporting to be experts on the hypothetical artistic merit of the infringing works. *Id.* This approach is wrong, because it removes entirely the requirement that the court identify a new transformative purpose embodied by the new work. Indeed, the Warhol Foundation's proposed standard could easily be applied to the mere display of minimally-altered, or even entirely unaltered works of art, as the display of old works in a new setting or venue could theoretically convey a different message to some hypothetical observer. That is not what the fair use doctrine is designed to protect.

The core of this misguided position is that a reasonable person may perceive an unaltered visual work as transformed from the original, merely because it has been placed in a different context, such as a book versus a painting. (*See, e.g.*, Defs' Mem. of Law, Dkt. 89, at 9–11). This argument does not even need to be taken to its extreme to permit any form of "appropriation

art"— art that re-contextualizes the works of others —without the permission of or compensation to the original author.  According to the Defendants and Warhol, courts should never have need to decide whether the second work meaningfully alters the first work, or decide whether the alterations bring about a transformative new purpose, because re-contextualization is all that is needed to  prove an appropriated use is fair.  (Warhol Found. Br., Dkt. 98, at 13–16). This is the hoped-for result, according to the Warhol Foundation, because nobody—not the court, lawyers or even the original artist himself—is in the position to say whether the second work conveys a different message to some hypothetical member of the elite audience they posit.  *Id.* at 16.  This approach must be rejected, as it is entirely at odds with the plain language of Section 107, as well as its interpretation and application by the Second Circuit in this case.

Contrary to the urging of Prince and the Warhol Foundation, the Second Circuit did not say in sum or in substance that the fair use test turns on the simple question of whether the defendant combined the copyrighted work with other materials.  First, while the Second Circuit (incorrectly) held that a secondary work is not required to comment on the original work to give rise to transformativeness, even the Second Circuit stated that the second work must nevertheless "serve some purpose," whether or not enumerated in the preamble to Section 107.  The Second Circuit thus acknowledged that its conclusion as to the 25 works it found were fair theft "should not be taken to suggest, however, that any cosmetic changes to the photographs would necessarily constitute fair use. A secondary work may modify the original without being transformative. For instance, a derivative work that merely presents the same material but in a new form, such as a book of synopses of televisions shows, is not transformative." *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2012). Then, in the particular context of this case, the Court indicated that one question on remand is "whether such relatively minimal alterations render [the

Five Paintings] fair uses (including whether the artworks are transformative). . . ." *Cariou*, 714 F.3d at 711 (2d Cir. 2012). But the key here must be "purpose," as the Second Circuit mandates the identification of a "purpose."  That obligation cannot be satisfied by merely identifying differences, nor can it be satisfied by passing off the job of identifying a purpose to hypothetical elite viewers of the secondary works; both exercises must be done by the court.  In the specific context of intentional appropriation art, of course, no amount of explanation or speculation can give rise to a cognizable new "purpose" where the two works are identical or nearly indistinguishable.  Likewise, no amount of alterations, without the identification of a new purpose, can turn a collage from an infringing derivative work to a non-infringing fair use.  That is because where the secondary use is "for the same intrinsic purpose" as the original, the use is not transformative.  *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 923 (2d Cir. 1994) (copying scientific articles in order to perform scientific research was not transformative); *Ringgold v. Black Entm't Television, Inc.*, 126 F. 3d 70, 79 (2d Cir. 1997) (use of quilt as set decoration on television program was not transformative because the work was used "for precisely a central purpose for which it was created — to be decorative").

This approach plays out clearly in the Second Circuit's assessment of the 30 works at issue.  In connection with the 25 that it determined made fair use of Cariou's photographs, the Second Circuit said that they "manifest an entirely different aesthetic," and that those works "have a different character, give Cariou's photographs a new expression, and employ new aesthetics with creative and communicative results distinct from Cariou's." *Cariou*, 714 F.3d at 708.  While the undersigned *amici* disagree with the Second Circuit's "aesthetic" assessment, when considering the five remanded photographs, however, even though the Second Circuit identified some alterations which might evoke a different feeling by a hypothetical viewer, the

Second Circuit felt that the fair use defense was not apparent.  For example, with respect to the work entitled *Graduation*,  the Second Circuit felt that "[w]here the [Cariou] photograph presents someone comfortably at home in nature, [Prince's] *Graduation* combines divergent elements to create a sense of discomfort."—Thus the Court translated its feelings into a question for remand as follows:

> [W]e cannot say for sure whether *Graduation* constitutes fair use or whether Prince has transformed Cariou's work enough to render it transformative....it is unclear whether these alterations amount to a sufficient transformation of the original work of art such that the new work is transformative....the district court is best situated to determine, in the first instance, whether such relatively minimal alterations render [the Five Paintings] fair uses (*including whether the artworks are transformative*).

*Cariou*, 714 F.3d at 711 (emphasis added).

The fact that the Second Circuit could find 25 images transformative but not feel comfortable making a determination as to the other five was not an invitation to invite expensive battles of the experts into every fair use case.  It is difficult enough for working artists to vindicate their rights even where no fair use is claimed. *See* Declaration of Mickey Osterreicher, dated Dec. 16, 2013, ("Osterreicher Decl."), at 10–11, 14. But the battle of the experts that Prince and the Warhol Foundation propose, in addition to imposing a further financial and impossible burden on working artists to vindicate their rights in their own intellectual property, is also wrong for another economic reason not permitted by the Copyright Act.  That is because the standard of analysis that they propose permits *ex post* rationalization for appropriation, which denigrates the rights of some artists for the benefit of other "artists" who happen to have access to superior economic systems of marketing and distribution.

The approaches proposed by Prince and the Warhol Foundation is opposite of the general rule that simply providing a different mechanism to distribute a work is not transformative.  *See*

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir.1998) (concluding that

retransmission of radio broadcast over telephone lines is not transformative).  Displaying barely

altered photographs in a museum is akin to simply reproducing an underlying creation while

merely changing the medium of display. Instead, the standard for determining if a new work is

actually transformative in the "fair use" sense "involves inquiring into whether [the appropriated

work] essentially repeats the old or whether, instead, it 'transforms' it by infusing it with new

meaning, new understanding, or the like."  *UMG Recordings v. MP3.com, Inc.*, 92 F. Supp. 2d

349, 351 (S.D.N.Y. 2000) (holding that reproduction of audio CD into computer MP3 format

does not transform the work). If an allegedly infringing work merely provides a new manner or

channel of transmission or distribution of an original work, such a use is not transformative.  *Los*

*Angeles News Serv. v. Reuters Television Int'l. Ltd.*, 149 F.3d 987, 993 (9th Cir.1998) (holding

that reproducing news footage without editing the footage "was not very transformative"). The

Five Paintings at issue on remand represent essentially unaltered Cariou photographs in a new

setting where a different type of audience might see it.  Prince has not created a new work that

gives rise to a new transformative purpose, but rather has found a way to commercially exploit

the works of another artist by selling to a new (more affluent) audience.  Wider or better

commercialization is not transformative by any acceptable standard.

Similarly, the Warhol Foundation's proposal that "the Court must . . . remain open to a

reasonable observer's perception of a new meaning or message that is not facially apparent[,]"

(Warhol Found. Br. at 15), must be rejected.  The Warhol Foundation proposes a standard

whereby seemingly identical pieces will not be treated as unexcused infringements, but will be

distinguished by a series of expert reports and costly testimony. These increased costs magnify

the harm to the original artists; who frequently have no choice but to stand by while the

copyright in their works are violated brazenly, as the costs of litigation outweigh any potential remedy the legal system can provide currently. *See* Osterreicher Decl. at 10–11, 14. The rights of the artist in his original work should not be contingent on the cost of enforcement. *Id.* The application of the "reasonable observer" standard, in the form proposed by the Warhol Foundation would subject a copyright holder to further unknown risk in an attempt to enforce her rights. An artist whose work is appropriated would no longer be able to rely on visual judgment to determine if the risk of enforcing her copyright is worthwhile; at best she can anticipate a risky battle between artistic experts, the advantage likely residing with the party with greater resources.[10] *Id.* at 10.

This standard would permit visual artists with connections in the artistic world to take visually powerful photographs, like those used in the Five Paintings, and simply redisplay them, either as paintings with minor modifications, or with no modifications at all but in a new setting. Sanctioning such an approach would permit appropriators to sell the original creator's aesthetic in a new medium without compensating the creator. Without real transformation, such a use is no different than the types of appropriation considered in the digital reproduction cases discussed above. Here, the picture is being used as a picture, *i.e.*, the identical use and purpose as the original, simply displayed in a different market context. If the reasonable person standard is expanded to permit contextual analysis beyond an actual comparison of the works such as visual

---

[10] Photography is a form of art.  Declaration of Jeremy Sparig, dated Dec. 16, 2013 ("Sparig Decl."), at 9. As an art, it has two expressive components: 1) the empirical fact of the moment; and 2) the contextual decisions made by the photographer.  *Id.* at 10. Together these comprise the artistic creation of a photographer. When a photograph is appropriated, the entire aesthetic creation of the original artist is taken. Minimal alteration of an appropriated photograph, does not transform the original work. Painting and photography are substantial similar aesthetic presentations.  *Id.* at 11. ("Both photos and paintings use shape, form, color (or its absence), lines, light and dark, objects and symbols and subjects, to create a space for the production of meaning. 'The signifying system of photography, like that of classical painting, at once depicts a scene and a gaze of the spectator, an object and a viewing subject… Through the agency of the frame the world is organized into a coherence which it actually lacks, into a parade of tableaux, a succession of decisive moments.'" *Id.* at Ex. 2. A photograph, minimally altered, presented as a painting must be subject to visual comparison as the basis for a "reasonable purpose" test. Otherwise, photographers have no effective remedy at law, if the appropriator can simply rationalize his presentation.

observation, there is no real check on what distinguishes rank theft from a true fair use.  *Amici*

thus urge this Court to pay particular attention to harm this type of application would do to the

market for photographs and photographic licensing; mere appropriation of Cariou's photographs

with minimal alteration is not sufficiently transformative to divest Cariou of his rights and grant

new rights to Prince in the Five Paintings.

### B.    Granting Prince a Fair Use Defense in the Five Paintings Would Harm the Market for Artists to License or Sell Their Works

While the Second Circuit directed that this Court include in its analysis on remand

whether the remaining works are transformative, its broadly worded remand did not confine this

Court's remaining work to "transformation," or even to just a consideration of the first factor of

the fair use test.  Instead, this Court must also consider the other fair use factors, especially the

important fourth factor, "the extent of market harm caused by the particular actions of the alleged

infringer," and "whether unrestricted and widespread conduct of the sort engaged in by the

defendant would result in a substantially adverse impact on the potential market for the original."

3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4], p. 13-102.61 (1993)

(hereinafter Nimmer) (footnote omitted); *see also Campbell v. Acuff-Rose Music*, 510 U.S. 569,

590 (U.S. 1994). The ability to simply appropriate copyrighted works with minimal alteration

and without compensating the artists has the potential to severely cripple the markets for

photography and visual arts, and create a chilling effect on the creation of certain classes of new

works. *See* Osterreicher Decl. at 5; Sparig Decl. at 23, 27–32.  Photographers, and the industry in

general, depend upon licensing in order make the practice of photography viable. *See*

Osterreicher Decl. at 6–8 ("Many NPAA members' livelihoods are entirely based upon licensing

their copyrighted works for users to lawfully acquire."); Sparig Decl. at 32 ("If the only equity a

photographer has is in his or her work, and if that equity—the result of a significant investment

of time, effort, and money—can be appropriated, without consequence, by individuals who have the capacity to pay a fair licensing fee (or go out and create the work themselves), then it seems the court is sending a message that all art deserves to be protected, but photography does not deserve to be treated as art, nor merit the same protection.").

While *amici* may disagree with the Second Circuit's apparent requirement of total "usurpation," it framed the issue as follows:  "[o]ur court has concluded that an accused infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original." *Cariou*, 714 F.3d at 709. If the Court is going to supplement the record at all, then it should take note that aside from whether Cariou himself developed the same market as Prince, in reality there is a robust marketplace has developed where artists are compensated for secondary uses outside their usual channels of sale.  There are thus several methods by which Prince could have attempted to license Cariou's photos, rather than appropriating them. First, Prince could simply have contacted Cariou for rights in the photographs.  There are many easily-accessed markets to license the use of particular photographs. Osterreicher Decl. at 7–8; Declaration of Megan Murphy, dated Dec. 16, 2013 ("Murphy Decl."), at 5–8 ; Declaration of Lisa Shaftel, dated Dec. 16, 2013 ("Shaftel Decl."), at 6, Ex.1. For instance, there are several digital media licensing companies, such as Getty Images, which grant photographers the opportunity to offer public licensing of their stock images. Osterreicher Decl. at 7–8; Murphy Decl. at 5–8 ("Getty Images makes images available for licensing for art decor and for derivative works that would include art reference and art such as the works created by Prince. If you need images of Jamaica, or Rastafarians, these images can be lawfully licensed simply, easily and for standard license fees."); *see also* Shaftel Decl. at Ex. 1. Leaving aside the minimal contributions Prince made to

-17-

Cariou's five photographs, because there is an operational licensing market that Prince could have accessed, fair use is even more difficult to justify. *See Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 566 n. 9 (U.S. 1985) ("[Here] there is a fully functioning market that encourages the creation and dissemination of memoirs of public figures. In the economists' view, permitting 'fair use' to displace normal copyright channels disrupts the copyright market without a commensurate public benefit."); *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 931 (2d Cir. N.Y. 1994) ("[I]t is sensible that a particular unauthorized use should be considered 'more fair' when there is no ready market or means to pay for the use, while such an unauthorized use should be considered 'less fair' when there is a ready market or means to pay for the use."). A decision that would permit the mere appropriation of photographs with minimal change, under the heading of fair use, threatens to harm the established licensing market for photography and graphic arts.

Courts generally, in fair use analyses, focus on the loss to potential licensing revenues from "traditional, reasonable, or likely to be developed markets." *American Geophysical Union*, 60 F.3d at 930.  As noted above, the market for photographic licensing is well-established, and it continues to grow each year. Yet Prince chose to bypass this market. He should not be rewarded for doing so.

Prince is simply selling Cariou's works with minimal alteration to the "number of wealthy and famous" individuals Prince knows.  *Cariou*, 714 F.3d at 709. But that does not transform the works themselves, and it clearly does usurp the market for derivative uses by the original author.  For example, journal and blog authors are often compensated by a fixed fee plus bonus compensation for the number of page view of the article, or "re-tweets" of the original work.  The original author might not be able to reach that secondary market on her own, but is

nonetheless compensated for it. Where an appropriator takes the heart of the work so that there is no need to link to or access the original, the author is harmed in the firm of lost page views, and thus lost income. Permitting the appropriation of minimally-altered photographs to be distributed in a more robust market has the analogous effect to distributing news articles in a different medium. *See* Declaration of Minda Zetlin ("Zetlin Decl."), dated Dec. 16, 2013, at 6–7, Ex. 2, Dumenco Article, Exs. 1, 3 (redacted versions of authors' contracts and Yahoo! Contributor Network payment policy).

That is why, for example, where an entity copied the "ledes" and organized Associated Press articles for distribution to its separate customer base, even though the works were "re-contextualized," the use of the articles by defendant Meltwater was not transformative. *AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 552 (S.D.N.Y. 2013). The court did not afford Meltwater "fair use" protection because it simply provided a new avenue of distribution for original reporting which, while sliced, diced, and categorized by Meltwater, was not "transformed" in the fair use sense because when the copyrighted works were compared, while re-contextualized, the heart of the work was stolen. *Id.* Simply because Prince has access to more lucrative avenues of distribution and was able to exploit the value of Cariou's aesthetic vision to his own economic benefit does not entitled Prince to a fair use defense. Rather, it counsels that Prince should have availed himself of the standard licensing market in order to put Cariou's photographs to his high value use, while compensating the original creator or finding an alternate source for images of a similar nature if Cariou declined to issue a license.

### C. Warhol's Proposed Standard Would Eliminate The Derivative Works Right From The Copyright Act

Finally, permitting the vague and hired-expert-dependent standard for transformativeness advocated by the Warhol Foundation brief would eliminate the exclusive right to create,

authorize and distribute derivative works ceded to original authors by the Copyright Act.  *See* 17 U.S.C. § 106(2). Section 101 of the Copyright Act defines a derivative work as: "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture eversion, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, *transformed*, or adapted." 17 U.S.C. § 101 (emphasis added). In *Stewart v. Abend*, 495 U.S. 207, 237 (1990), the Supreme Court held that where a motion picture derived from a short story was qualified as a derivative work, there was no fair use because the derivative use did not fall into any of the categories enumerated in the preamble of *§ 107*. The Supreme Court further held that unauthorized commercial uses are a presumptively unfair intrusion into the "monopoly privilege that belongs to the owner of the copyright."  *Id. See also Castle Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 143 (2d Cir. 1998) (noting that "[a] derivative work, over which a copyright owner has exclusive control, is defined as a work based upon one or more preexisting works," rejecting a fair use defense). The definition continues: "A work consisting of editorial revisions, annotations, *elaborations, or other modifications*, which, as whole, represent an original work of authorship, is a 'derivative work.'"  17 U.S.C. § 101 (emphasis added).

This is where the Warhol Foundation's argument fails of its own weight.  It argues that Prince's works have new meaning and thus are sufficiently creative so as to be considered a new work of art by the elitist audience for his "art."  But to do so is to admit that Prince has created derivative works that Cariou alone has the right to create and authorize.  "Transformation" for purposes of the derivative work right and "transformation" for purposes of "fair use" cannot mean the same thing without more, otherwise the Judge-made "transformation" analysis would usurp Congress' use of the words "abridgment, condensation, or any other form in which a work

may be recast, *transformed*, or adapted," in the Copyright Act would be meaningless and eviscerated.  *Amici* do not believe the intent of the Second Circuit was to do so, but the Warhol Foundation's position, if accepted, would inexorably lead to that result.  With all due respect to the Second Circuit, it is not permitted to override an Act of Congress in such a manner.

The derivative work right, and the issues raised by this case, are important not only for visual artists and authors, but for all copyright owners. In addition to the other reasons set forth above, one of the principal benefits that the exclusive derivative works right confers on copyright owners is that such works are separately licensable by the copyright owner. The Copyright Act confers upon the owner of a copyright a bundle of discrete exclusive rights, each of which may be transferred or retained separately by the copyright owner. This "divisibility" doctrine is codified throughout the copyright law. *See, e.g.*, 17 U.S.C. §§ 106, 201(d), 501(b) . As noted, the derivative works right is one of the rights enumerated in Section 106, and Section 201(d) (2) provides that "[a]ny of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately." 17 U.S.C. § 201(d)(2). Accordingly, if minimal change to an original photograph is sufficient to permit Prince to simply display Cariou's photographs, then he would impinge upon Cariou's derivative works rights as well. In fact, due to the display of the Five Paintings in a gallery and Prince's market connections, he would subsequently be able to merchandize Cariou's images more efficiently. *See* Shaftel Decl. at Ex. 1.[11]  A change of context, standing essentially alone, thus does not qualify as a fair use.  Consider, for example, a translation into a different language: the context is changed, it is slightly altered because no translation is entirely literal, it has

---

[11] There is a robust market for image licensing for the sale of postcards, stationary, posters, and other displayable goods. This market is more easily exploited by artists working in mediums better connected to such industries. *See* Shaftel Decl. at Ex. 1. If barely altered photographs are subject to a "fair use" defense the original artist loses control of both the choice to participate in and the right to receive compensation for derivative works and products sold in the secondary market.

different meaning to a different audience, but it is not a fair use; rather, it is an infringing

derivative work.  *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72 (2d

Cir. 1999) (finding copyright infringement and that translation was "not in the least

transformative.").  Moreover, if the Warhol position is adopted, ironically, Prince will be free to

license what is, essentially, Cariou's work to other artists or merchandisers, without any

compensation to the original creator.

## CONCLUSION

Prince took Cariou's photographs and displayed them as his own in his Five Paintings. He did not avail himself of any avenues by which he could easily have obtained permission to use Cariou's creations or other readily licensable images. He minimally altered the photographs; it was a bare display of Cariou's original work. As a result, Prince also usurped Cariou's right to control the marketing and exposure of Cariou's original aesthetic vision. Defendants and the Warhol Foundation propose an application of the "reasonable person" standard that would not even require modification of the original photographs' aesthetic in any way. Such a standard would permit appropriating artists to circumvent the available licensing systems, knowing that a standard that permits simple after-the-fact rationalization for appropriation as a "fair use" defense forecloses many less-endowed visual artists from fighting them in the courts.

In short, such a standard deprives copyright owners of both their original copyrighted vision, as well as the additional valuable property rights conferred by the statutory scheme. Photographers, and all creators of original work, should not be deprived of their work's value on the basis of appropriation.

For the foregoing reasons, Cariou's motion for summary judgment should be granted and Prince should be found to infringe Cariou's copyright in the photographs used in the Five Paintings under consideration.

Dated: New York, New York
December 16, 2013

                                 Respectfully submitted,

                                   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

                                   By: /s/ David Leichtman
                                   David Leichtman (DL 7233)
                                   Hillel I. Parness (HP 1638)
                                   Shane St. Hill (SS 1361)

                                   601 Lexington Avenue
                                   34th Floor
                                   New York, New York 10022
                                   (212) 980-7400
                                   (212) 980-7499

                                   *Attorneys for Amici Curiae*
                                   *American Photographic Artists,*
                                   *American Society of Journalists and Authors,*
                                   *American Society of Media Photographers,*
                                   *Graphic Artists Guild,*
                                   *National Press Photographers Association,*
                                   *Picture Archive Council of America,*
                                   *Professional Photographers of America*